**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**BECKLEY DIVISION**

WHITE SULPHUR SPRINGS HOLDINGS, LLC,

      Plaintiff,

v.

JAMES C. JUSTICE, II, *et al.*,

      Defendants.

Civil Case No. 5:26-cv-00257

Hon. Frank W. Volk

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' AMENDED MOTION TO STAY**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...............................................................................................1

BACKGROUND ....................................................................................................................5

    A.    Parties And Relevant Players...............................................................................5

    B.    The Carter Bank Loans .......................................................................................6

    C.    The Scheme To Transfer The Loans ...................................................................7

    D.    Defendants' Post-Sale Negotiations With TRT....................................................8

    E.    WSSH's Attempt To Force The Greenbrier Into Receivership and Defendants' Discovery Of The Unlawful Scheme ...................................................9

    F.    TRT's And WSSH's Ongoing Harm To The Greenbrier .....................................11

ARGUMENT ........................................................................................................................12

I.    THE COURT'S INHERENT AUTHORITY ALLOWS A STAY OF THIS ACTION PENDING RESOLUTION OF DEFENDANTS' CLAIMS IN STATE COURT ............12

II.    EQUITABLE FACTORS WEIGH STRONGLY IN FAVOR OF STAYING THIS CASE PENDING THE OUTCOME OF THE STATE-COURT PROCEEDINGS ........................................................................................................13

    A.    Staying These Proceedings Would Conserve Resources Of The Court And The Parties And Avoid The Potential For Conflicting Decisions.........................13

    B.    Absent A Stay, Defendants Face A Severe Risk to Their Businesses And Ongoing Financial Harm.....................................................................................16

    C.    WSSH Will Suffer No Prejudice From A Stay.....................................................17

CONCLUSION......................................................................................................................20

**Page(s)**

**Cases:**

*Amdur* v. *Lizars*,
372 F.2d 103 (4th Cir. 1967) ...............................................................................12

*Ctr. for Biological Diversity* v. *EPA*,
56 F.4th 55 (D.C. Cir. 2022) .................................................................................13

*Flores* v. *Jaddou*,
2023 WL 7282897 (D. Md. Nov. 3, 2023) ............................................................19

*Fortiline Inc.* v. *STAline Waterworks Inc.*,
2025 WL 1133159 (D.S.C. Apr. 17, 2025) ......................................................12, 15

*Godfrey* v. *United States*,
2025 WL 3129298 (S.D.W. Va. Nov. 7, 2025) ......................................................12

*Goldberg* v. *Kaczmarek*,
2025 WL 3227346 (D. Md. Nov. 19, 2025) ...........................................................16

*Greenbrier Hotel Corp.* v. *TRT Holdings, Inc.*,
Case No. CC-13-2026-C-51 (Cir. Ct. Greenbrier Cnty.) ....................................9, 10

*Landis* v. *N. Am. Co.*,
299 U.S. 248 (1936) ....................................................................................4, 12, 19

*Manuel* v. *Gembala*,
2010 WL 3860407 (E.D.N.C. Sep. 30, 2010) .......................................................14

*United States ex rel. Miller* v. *Reckitt Benckiser Grp. PLC*,
698 F. Supp. 3d 889 (W.D. Va. 2023) .....................................................................6

*Mullis* v. *Mountain State Univ., Inc.*,
2014 WL 5465749 (S.D.W. Va. Oct. 28, 2014) ............................12, 13, 14, 15, 19

*Mulvey Constr., Inc.* v. *Bituminous Cas. Corp.*,
2011 WL 1303438 (S.D.W. Va. Mar. 31, 2011) ....................................................13

*Prepared Food Photos, Inc.* v. *N & K Foods, Inc.*,
2023 WL 2652270 (D. Md. Mar. 27, 2023) ...........................................................18

*Pusey & Jones Co.* v. *Hanssen*,
261 U.S. 491 (1923) ..............................................................................................14

*Salomon & Ludwin, LLC* v. *Winters*, 150 F.4th 268 (4th Cir. 2025)..............................................17

*Tastee Treats, Inc.* v. *U.S. Fid. & Guar. Co.*,
2009 WL 37188 (S.D.W. Va. Jan. 7, 2009)..........................................................4, 12, 14, 15

*United States* v. *Oliver*,
878 F.3d 120 (4th Cir. 2017) ............................................................................12

*Veteran Eng'g Grp., Inc.* v. *CSI Eng'g, P.C.*,
2011 WL 5826673 (D. Md. Nov. 17, 2011) ............................................................19

*Wash. Metro. Area Transit Comm'n* v. *Holiday Tours, Inc.*,
559 F.2d 841 (D.C. Cir. 1977) ..........................................................................17

*White* v. *Ally Fin. Inc.*,
969 F. Supp. 2d 451 (S.D.W. Va. 2013) ................................................................12

**Other Authorities:**

12 Wright & Miller's Federal Practice & Procedure (3d. ed. 2026)............................................16

Fed. R. Evid. 201(b)(2) ........................................................................................6

Omni Hotels & Resorts, *All Hotels & Resorts*, https://www.omnihotels.com/destinations............6

Omni Hotels & Resorts, *Omni Homestead*, https://www.omnihotels.com/
hotels/homestead-virginia/property-details..............................................................6

Public Accounts, *Franchise Tax Account Status*,
https://comptroller.texas.gov/taxes/franchise/account-status/search/32104872745 ..................5

SMU Dedman Sch. Of L., Robert B. Rowling '79: Featured Speaker at the Trailblazer
Speaker Series (Dec. 12, 2024), https://www.smu.edu/law/news-events/2024/robert-
rowling-trailblazer..........................................................................................6

## PRELIMINARY STATEMENT

This action is part of an orchestrated scheme by Plaintiff White Sulphur Springs Holdings, LLC ("WSSH") and its billionaire owners to seize control of The Greenbrier resort through unlawful means. WSSH purports to have purchased certain loans issued to United States Senator James C. Justice II; his wife, Cathy L. Justice; and their son, James C. Justice, III (collectively, the "Justices") and secured by The Greenbrier. Less than two weeks after allegedly purchasing those loans, WSSH filed this action claiming the loans are in default, The Greenbrier is in "disrepair," and the Justices must be stripped of the property so that it can be placed under the control of a receiver. But WSSH does not validly own these loans. WSSH unlawfully acquired them through fraud, breach of contract, and in violation of West Virginia antitrust law. And the parties are currently litigating in West Virginia state court whether the sale of the loans should be rescinded.

But WSSH is forging ahead with this action. WSSH has filed an "emergency" motion seeking appointment of a receivership that would strip the Justices of possession of The Greenbrier before the state court has occasion to decide whether WSSH validly acquired the purportedly defaulted loans in the first place. As the Justices will demonstrate in their forthcoming opposition, WSSH's motion to appoint a receiver is baseless and should be rejected. But this Court need not get that far. Whether WSSH has any right to enforce the loan agreements—and thus pursue this action at all—is being litigated in Greenbrier County Circuit Court. And if the state court concludes that the purported sale of the loans to WSSH must be rescinded, or that WSSH cannot otherwise enforce those loans, this action ends. There is no need for this Court to jump into the fray and expend judicial resources until that critical threshold question is resolved.

This plan to seize The Greenbrier dates back as early as 2024. WSSH is a wholly owned subsidiary of TRT Holdings, Inc. ("TRT"), a Texas company best known for owning Omni Hotels

and Resorts. One of Omni's flagship properties is the Omni Homestead Resort & Spa, a luxury resort located in Hot Springs, Virginia, and The Greenbrier's principal competitor. For years, TRT and its billionaire owner, Robert Rowling, have wanted to get their hands on The Greenbrier. And in 2024, they saw their opportunity. TRT posed as a purported consultant to a private equity firm that was considering doing business with the Justices to gain access to the family's and The Greenbrier's confidential information. A confidentiality agreement prohibited TRT from using that confidential information for any purpose other than the contemplated transaction. The agreement also prohibited TRT from acquiring or proposing to acquire any debt of The Greenbrier, as did a separate second-lien note that TRT had purchased around the same time.

TRT knowingly violated those contracts and forged ahead with its plan anyway. As early as January 2026, TRT began negotiating with Carter Bank & Trust ("Carter Bank") to purchase certain loans that Carter Bank had extended to the Justices and that were secured by The Greenbrier and associated properties (the "Loans"). All the while, Carter Bank repeatedly (and falsely) told the Justices that it did not have any serious buyers for the Loans and had no intention to sell them. But on or about March 25, 2026, with no notice to the Justices, Carter Bank announced that it had sold the Loans for $289.5 million to WSSH, a shell company that TRT had set up two weeks prior.

Unaware that the sale of the Loans resulted from a fraudulent, anticompetitive scheme, in the days after the sale, the Justices and TRT discussed potential arrangements for managing the family's obligations under the Loans while the Justices sought new financing to allow them to pay off the debt. During these conversations, TRT's representatives acknowledged to Senator Justice that the Loans could be repaid for $341 million. But TRT had no intention of letting their opportunity to lay claim on The Greenbrier slip away. When the Justices told TRT that it had secured a lender willing to pay off the Loans for approximately $341 million—a $51.5 million

profit for TRT for holding the Loans for just thirteen days—TRT reneged on its prior offer and declared the Justices in default. On the very same day, WSSH filed this action demanding that The Greenbrier and other property be stripped from the Justices and placed into a receivership, and that the Justices be restricted from full use of their personal and real property.

WSSH and TRT have no right to pursue any of these remedies, including this lawsuit. WSSH's and TRT's purchase of the Loans is invalid. It was enabled by fraud (Carter Bank's lies that it had no intention to sell the Loans), breach of contract (TRT's breaches of the confidentiality agreement and second-lien note), and a conspiracy to neutralize a competitor in violation of West Virginia's antitrust laws. Immediately upon uncovering this malfeasance, the Justices filed an action in the Circuit Court for Greenbrier County challenging the sale of the Loans as unlawful and asserting, among other things, fraud and estoppel-based claims against Carter Bank; confidentiality and trade secrets claims against TRT and its affiliates (including WSSH); antitrust-related claims against Carter Bank and TRT and its affiliates (including WSSH); and claims for declaratory and injunctive relief. The Justices have asked the Circuit Court to rescind the sale of the Loans to WSSH and award additional damages. The Justices are also seeking a preliminary injunction from the Circuit Court to prevent WSSH and TRT from taking any further action to enforce the Loans until the Justices' claims are adjudicated.

In a hastily crafted attempt to undercut a decision from the Circuit Court rescinding the sale of the Loans, WSSH came to this Court seeking staggeringly broad injunctive relief on an "emergency" basis, including the extraordinary remedy of appointing a receiver to take control of, operate, and even sell The Greenbrier and related properties. To support that request, WSSH contends that The Greenbrier is in imminent danger of degradation that will diminish its value and imperil its ability as collateral to fully secure the Loans. That is ludicrous. As Defendants will

fully explain in their forthcoming oppositions to WSSH's motions seeking a receivership and preliminary injunction, The Greenbrier is currently operating at a profit. And, together with the other collateral, it is worth more than double the value of the Loans. There is no emergency here. Nor is there any basis for the sweeping preliminary injunctive relief that WSSH seeks.

But there is also no reason to continue with this case at all while the state court is considering whether WSSH validly owns these Loans under West Virginia law or is otherwise legally barred from enforcing the Loans due to its misconduct. Indeed, inherent in this Court's power "to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants" is the power to "stay proceedings." *Landis* v. *N. Am. Co.*, 299 U.S. 248, 254 (1936). And that inherent power has long been used "to hold an action in abeyance pending the resolution of a related state court action." *Tastee Treats, Inc.* v. *U.S. Fid. & Guar. Co.*, 2009 WL 37188, at *1 (S.D.W. Va. Jan. 7, 2009).

Here, the factors that courts typically consider in determining whether to stay a case all point towards a stay. *First*, the proceedings in Greenbrier County Circuit Court involve a key threshold issue of state law—the validity of the sale of the Loans to WSSH. If the state court agrees with Defendants regarding the illegality of the sale and rescinds it, WSSH cannot pursue *any* of the claims or seek any of the remedies that it asserts here. Judicial economy and the need to avoid conflicting decisions thus counsel in favor of a stay. *Second*, Defendants will be prejudiced if these proceedings move forward because WSSH's demands for extraordinary equitable remedies—the seizure of their property—are actively harming Defendants and the value of their property. *Third*, WSSH will not be prejudiced by a stay because a pause in these proceedings will not prevent WSSH from ultimately recovering the money it claims to be owed.

WSSH's motivation is plain—to short-circuit the state proceedings regarding whether it validly owns the Loans by using a purported "emergency" as a basis to ask this Court to deploy extraordinary equitable remedies, seize The Greenbrier from the Justices, and prevent the Justices from fully using their funds and other property. This Court should not entertain WSSH's claims or its requests for preliminary injunctive relief until the state court resolves the threshold question of whether WSSH's purchase of the Loans violated West Virginia law.

## BACKGROUND[1]

### A. Parties And Relevant Players

The individual Defendants in this action are the Justices. (ECF No. 37 ("Am. Compl.") ¶¶ 2-4.) The Justices have owned and operated The Greenbrier—a luxury golf and convention-scale resort nestled in the Allegheny Mountains outside of White Sulphur Springs, West Virginia—for nearly two decades. Several business entities associated with The Greenbrier, including the hotel, the associated golf and tennis club, and the on-site medical facility, are also named as Defendants. (*See* Am. Compl. ¶¶ 5–10.)

Plaintiff WSSH is a Texas limited liability company formed on March 12, 2026.[2] On or about March 25, 2026, WSSH purported to purchase the Loans from Carter Bank. (Am. Compl. ¶¶ 1, 22.) WSSH's sole member is OHO Corporation. (Am. Compl. ¶ 1.) OHO Corporation is in turn wholly owned by TRT, the parent holding company that also owns Omni Hotels & Resorts. (*See* Disclosure of Corp. Affiliations (ECF No. 2).) TRT is owned and operated by Texas

---

[1] The facts giving rise to this motion are set forth herein, in Plaintiff's Amended Complaint and accompanying exhibits, and the attached Declarations of James Justice II ("Justice II Decl.") (attached as Exhibit 2) and James C. Justice III ("Justice III Decl.") (attached as Exhibit 3.).

[2] *See* Texas Comptroller of Public Accounts, *Franchise Tax Account Status*, https://comptroller.texas.gov/taxes/franchise/account-status/search/32104872745.

billionaire Robert Rowling.[3]  Omni operates more than 50 hotel and resort properties worldwide,[4] including a luxury golf and convention-scale resort called the Omni Homestead Resort & Spa, which is less than an hour's drive from The Greenbrier in Hot Springs, Virginia.[5]

### B.      The Carter Bank Loans

Carter Bank first extended the Loans to the Justices in early 2010.  (*See* Am. Compl. ¶¶ 13–14; Ex. B (ECF No. 38-2) through Ex. L (ECF No. 38-12).)  Over the past two years, Carter Bank and the Justices entered into various agreements regarding the Justices' repayment of the Loans, including forbearance agreements and confessions of judgment.  (*See* Am. Compl. ¶¶ 15–17.)  The most recent such agreement is the February 28, 2026 Forbearance Agreement (the "Forbearance Agreement"), which, absent a default, remained in effect through April 15, 2026, and prevented Carter Bank from seeking any remedies, including foreclosing on The Greenbrier and related collateral.  (Am. Compl. Ex. A (ECF No. 38-1) at 11.)

In early 2025, Carter Bank told the Justices that they could pay off the Loans for approximately $300 million.  (Justice III Decl. ¶ 15.)  With the assistance of a prominent investment bank, the Justices lined up several potential lenders to obtain refinancing and repay

---

[3]      *See* SMU Dedman Sch. Of L., Robert B. Rowling '79: Featured Speaker at the Trailblazer Speaker Series (Dec. 12, 2024), https://www.smu.edu/law/news-events/2024/robert-rowling-trailblazer (describing Robert Rowling as "owner and chairman of TRT Holdings").

The Court can take judicial notice of company websites and other facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *see also United States ex rel. Miller* v. *Reckitt Benckiser Grp. PLC*, 698 F. Supp. 3d 889, 906 n.11 (W.D. Va. 2023) (taking judicial notice of a company's website).

[4]      *See* Omni Hotels & Resorts, *All Hotels & Resorts*, https://www.omnihotels.com /destinations.

[5]      *See*      Omni      Hotels      &      Resorts,      *Omni      Homestead*, https://www.omnihotels.com/hotels/homestead-virginia/property-details.

Carter Bank in full.  (*Id.* ¶ 16.)  But Carter Bank suddenly reneged on its offer and upped its repayment demand to $360 million.  (*Id.* ¶ 17.)  When one potential lender was still willing to proceed, Carter Bank killed the deal by setting arbitrary and unachievable deadlines that led the remaining lender to withdraw.  (*Id.* ¶¶ 18–19.)  Throughout this process, Carter Bank knew of the ongoing refinancing efforts and assured the Justices that it had no intention of selling the Loans.  (*Id.* ¶¶ 21–22.)  In fact, as recently as February 19, 2026, Carter Bank told the Justices that no serious buyers had approached it about the Loans and that it had no plans to sell the Loans.  (*Id.* ¶ 22.)  That was false.  As the Justices now know, Carter Bank was conspiring with TRT to sell the Loans to TRT so that TRT could use them to try to take possession of The Greenbrier.

C.      **The Scheme To Transfer The Loans**

In September 2024, representatives of TRT (including TRT executives Blake Rowling and Michael Smith) visited The Greenbrier as purported consultants for a private equity firm exploring potential transactions with the Justices.  (*Id.* ¶ 26.)  During that visit, TRT received confidential information under false pretenses—including proprietary pricing, marketing, reservation, and financial information, as well as access to non-public areas of the resort—for the purpose of its consulting role.  (*See id.* ¶ 28.)  Defendants provided that information because, as the private equity firm's consultant, TRT was bound by a confidentiality agreement prohibiting TRT from using confidential information it received for any purpose other than the contemplated financing transaction.  (*See* Ex. 4 § 1(a) (Confidentiality Agreement).)  The agreement also prohibited TRT from "acquir[ing] or propos[ing] to acquire any beneficial ownership . . . or constructive economic ownership[] through . . . any indebtedness of [The Greenbrier]."  (*Id.* § 6.)

That same month, TRT bought second-lien debt that further restricted TRT's ability to acquire The Greenbrier's debt.  As Blake Rowling later revealed to the Dallas Morning News, in

or around September 2024,[6] TRT secretly acquired $12–15 million in second-lien debt of The Greenbrier. (*See* Ex. 5 (Dallas Morning News Article).) The second-lien note independently barred TRT—directly or indirectly—from communicating or negotiating with Defendants' lenders about Defendants' indebtedness or from purchasing, negotiating to purchase, or attempting to purchase the Justice family's debt. (*See* Ex. 6 § 13k(i)–(ii) (Second-Lien Note).)

In January 2026, in violation of the confidentiality agreement and the second-lien note, TRT met with Carter Bank to negotiate TRT's purchase of the Loans. (Justice III Decl. ¶ 44.) Meanwhile, Carter Bank continued falsely to tell the Justices that it had no realistic buyers for the Loans. (*See id.* ¶ 22.) On March 25, 2026, without notice to the Justices, Carter Bank purported to sell the Loans to TRT's shell company WSSH. (*See id.* ¶ 31; Ex. 7 (Carter 8-K).) WSSH paid $289.5 million—more than $70 million less than Carter Bank previously demanded from another lender. (*Id.*; *see also* Justice III Decl. ¶ 17.)

### D. Defendants' Post-Sale Negotiations With TRT

After the sale became public, Senator Justice, then-unaware of TRT's scheme, spoke with Robert Rowling. (*See* Justice II Decl. ¶ 8.) During the call, Robert Rowling expressed a desire to work cooperatively with the Justice family at The Greenbrier. (*Id.* ¶ 9.) At an April 6, 2026 meeting, Robert Rowling acknowledged that the Loans could be repaid for $341 million. (*Id.* ¶ 10.) As an alternative, Robert Rowling offered a deal whereby TRT would forgive $200 million of the Loans in exchange for a 50% interest in The Greenbrier and various other consideration. (*Id.* ¶ 11.) Confronted with the threat that TRT posed to the value of The Greenbrier and the welfare of its employees, Senator Justice considered and ultimately accepted the offer, leaving

---

[6] Blake Rowling mistakenly stated that TRT acquired the second lien note in or around September 2024. *See* Ex. 5. The note is in fact dated October 15, 2024. *See* Ex. 6.

TRT to put the terms in writing. (*Id.*) But TRT reneged the next day. (*See* Ex. 8 (Ruby / TRT email).) Defendants then notified TRT that they intended to pay off the Loans at $341 million, the amount that TRT was demanding (and $51.5 million more than it had paid for the Loans just thirteen days earlier), and quickly arranged a new lender. (*See* Justice III Decl. ¶¶ 35–36; Ex. 7.) On April 8, 2026, Defendants sought confirmation of the exact repayment amount from TRT. (*See* Ex. 8.) Instead, on April 9, 2026, WSSH sent a "Notice of Default and Termination of Forbearance" suddenly claiming that Defendants had defaulted on the Loans and that TRT could exercise all rights available under the loan documents. (*See* Ex. 9 at 1–3 (Default Notice).)

**E.** **WSSH's Attempt To Force The Greenbrier Into Receivership And Defendants' Discovery Of The Unlawful Scheme**

On the same day that it sent the default letter, WSSH filed its initial, one-count complaint in this action that sought the "immediate" appointment of a receiver to assume control of The Greenbrier and numerous associated properties that Defendants own. (*See* ECF No. 1 at 16–18.)

As this was unfolding, Defendants were uncovering the unlawful scheme that TRT employed to purchase the Loans. Specifically, Defendants discovered that WSSH, TRT, Carter Bank, and others had—in violation of two separate contracts and various West Virginia laws— conspired for TRT to purchase the Loans so that TRT could attempt to force a takeover of The Greenbrier. When they learned this, Defendants immediately filed a lawsuit in Greenbrier County Circuit Court on April 12, 2026, that detailed the unlawful scheme, asserted claims for fraud, breach of contract, and tortious interference with business relationships, and sought (among other things) rescission of the sale of the Loans to WSSH under West Virginia law. (*See* Compl., *Greenbrier Hotel Corp.* v. *TRT Holdings, Inc.*, Case No. CC-13-2026-C-51, Dkt. No. 1 (Cir. Ct. Greenbrier Cnty.).) Defendants have since amended that complaint, including to add antitrust

claims, as the full scope of TRT's scheme has come to light, and are seeking preliminary injunctive relief. (*See id.*, Ex. 1.) Briefing on that motion is ongoing.

On April 13, 2026, the day after Defendants filed their lawsuit in Greenbrier County outlining WSSH's and TRT's fraudulent scheme and seeking rescission of the sale of the Loans, WSSH filed a motion seeking the "emergency" appointment of a receiver in this case. (*See* ECF Nos. 6, 6-1.) WSSH's motion claimed "the immediate right to collect the entire amount of indebtedness owed to it" and to exercise "all rights available to it" under governing loan documents. (ECF No. 6-1 at 2, 6.) The motion asked this Court to appoint a receiver with sweeping authority to seize Defendants' real and personal property. (*See* ECF No. 6 at 4–5.)

Recognizing that WSSH's motion was intended to undercut the state court's consideration of whether WSSH validly purchased the Loans, Defendants quickly moved to stay this action. (*See* ECF No. 9.) On April 17, 2026, this Court set a briefing schedule for the parties' pending motions and scheduled an evidentiary hearing for May 11, 2026. (*See* ECF No. 18.) But nearly a week after the Court entered its scheduling order (and 10 days after WSSH filed its "emergency" request), WSSH's counsel informed Defendants' counsel of its intent to file an amended complaint and an amended motion. (*See* Ex. 10 at 1 (Hayes email to Ruby).) The parties then requested a joint extension of the schedule, which the Court granted. (*See* ECF Nos. 34, 35.)

On May 1, 2026, WSSH filed its amended complaint, which seeks the same broad injunctive relief and immediate appointment of a receiver to "take full control" of The Greenbrier and related properties, operate them, and potentially sell them. (*See* Am. Compl. at 27–30.) The amended complaint also adds a breach of contract claim on the basis that Defendants violated various provisions of the Forbearance Agreement (that WSSH unlawfully acquired from Carter Bank), as well as a claim for attorneys' fees and costs. (*Id.* at ¶¶ 54–64, 87–89.) WSSH also filed

an amended motion seeking appointment of a receiver (ECF No. 39) and a new motion seeking a preliminary injunction (ECF No. 41).

### F. TRT's And WSSH's Ongoing Harm To The Greenbrier

In April 2023, several appraisals from global valuation firms valued The Greenbrier and its related assets at approximately $1.107 billion. (Justice III Decl. ¶ 13.) Specifically, the appraisals valued the Greenbrier Resort at $597 million (*Id.*), the Greenbrier Sporting Club at $110.4 million (*Id.*), the Oakhurst real estate development at $52.5 million (*Id.*), a group of timber and farming properties at $59 million (*Id.*), and a mining complex at $289 million (*Id.*). But TRT's and WSSH's hostile campaign—including its attempts to force The Greenbrier into receivership—threatens to diminish that value. Following TRT's well-publicized default accusation, bookings have fallen. (*Id.* ¶ 48.) The Justice Family has also struggled to attract corporate clients or secure large-scale events, a critical component of The Greenbrier's revenue. (*Id.*) Indeed, clients have already expressed hesitation about future bookings in light of the uncertainty that Defendants' conduct has generated. (*Id.*) And, if Defendants proceed, The Greenbrier is at risk of losing several large upcoming contracts. (*Id.*) Defendants' actions have also jeopardized relationships with The Greenbrier's vendors and business partners. (*Id.* ¶ 49.) Defendants' conduct has therefore resulted in severe damage to The Greenbrier, including loss of business value, loss of revenue, reputational damage, damage to relationships with business partners, and loss of business opportunities in an amount of at least $500 million. (*Id.* ¶ 50; Ex. 1 ¶ 68.) Put simply, TRT and WSSH—not the Justices—are inflicting ongoing damage to The Greenbrier's value.

**ARGUMENT**

**I. THE COURT'S INHERENT AUTHORITY ALLOWS A STAY OF THIS ACTION PENDING RESOLUTION OF DEFENDANTS' CLAIMS IN STATE COURT.**

The Court has broad discretion to stay proceedings before it. "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis*, 299 U.S. at 254. That power has long been recognized to permit a court "to stay an action pending the outcome of parallel proceedings in another court." *United States* v. *Oliver*, 878 F.3d 120, 124 (4th Cir. 2017) (citing *Landis*, 299 U.S. at 254); *see Amdur* v. *Lizars*, 372 F.2d 103, 106 (4th Cir. 1967); *Tastee Treats*, 2009 WL 37188, at *1 ("A recognized use of this power is to hold an action in abeyance pending the resolution of a related state court action."). Indeed, a stay is warranted to avoid duplicative and potentially inconsistent rulings, which would unnecessarily expend judicial and party resources. *See, e.g.*, *Mullis* v. *Mountain State Univ., Inc.*, 2014 WL 5465749, at *1–2 (S.D.W. Va. Oct. 28, 2014) (granting stay when plaintiff was bound by state-court settlement decision that could render federal litigation "futile"); *see also Fortiline Inc.* v. *STAline Waterworks Inc.*, 2025 WL 1133159, at *2 (D.S.C. Apr. 17, 2025) (granting stay when "substantially similar" case in state court posed risk of "potentially inconsistent rulings and conflicting decisions").

When deciding whether to exercise this inherent power, the Court considers "(1) the interests of judicial economy; (2) hardship and equity to the moving party if the action is not stayed; and (3) potential prejudice to the non-moving party." *Godfrey* v. *United States*, 2025 WL 3129298, at *1 (S.D.W. Va. Nov. 7, 2025) (Volk, J.) (quoting *White* v. *Ally Fin. Inc.*, 969 F. Supp. 2d 451, 462 (S.D.W. Va. 2013)).

**II. EQUITABLE FACTORS WEIGH STRONGLY IN FAVOR OF STAYING THIS CASE PENDING THE OUTCOME OF THE STATE-COURT PROCEEDINGS.**

All three of the equitable factors support a stay here. If WSSH does not validly own the Loans or is otherwise legally barred from exercising creditor remedies to enforce the Loans, it has no right to *any* of the relief that it seeks in this action—contractual, equitable, or otherwise. Because WSSH's ability to pursue any of the remedies it seeks in this action depends entirely on the outcome of the state-court proceedings, a stay pending the resolution of that matter would both conserve judicial resources and avoid conflicting decisions between the state and federal courts. Additionally, because WSSH is seeking extraordinary equitable relief on an accelerated emergency basis, Defendants are likely to suffer significant prejudice absent a stay. Both of these factors, when balanced against the fact that WSSH is unlikely to suffer any prejudice from a pause in these proceedings, weigh heavily in favor of a stay.

**A. Staying These Proceedings Would Conserve Resources Of The Court And The Parties And Avoid The Potential For Conflicting Decisions.**

"[J]udicial economy" favors "prevent[ing] potentially unnecessary litigation." *Mullis*, 2014 WL 5465749, at *2. And "[i]t is a cardinal virtue of Article III courts to avoid unnecessary decisions." *Ctr. for Biological Diversity* v. *EPA*, 56 F.4th 55, 71 (D.C. Cir. 2022). Federal courts thus routinely stay proceedings when an ongoing, non-federal proceeding "is directly related to" and would "assist in resolving" the matter before the court. *Mulvey Constr., Inc.* v. *Bituminous Cas. Corp.*, 2011 WL 1303438, at *7 (S.D.W. Va. Mar. 31, 2011). Staying a federal action is particularly appropriate when there is a pending state case that could render the federal action unnecessary. *See Mullis*, 2014 WL 5465749, at *1–2.

That is precisely the case here. WSSH is seeking to enforce rights it claims it obtained through its purported purchase of the Loans and asking this Court for a bevy of equitable and other

remedies based on those claimed rights. (Am. Compl. at 27–30.) But as Defendants are alleging in the state proceedings, WSSH possesses none of those rights because it did not lawfully purchase the Loans. Because WSSH does not have a "legally recognized right" in Defendants' property, it has no right to pursue any of its claims or the remedies it seeks. *See, e.g.*, *Manuel* v. *Gembala*, 2010 WL 3860407, at \*7 (E.D.N.C. Sep. 30, 2010); *cf. Pusey & Jones Co.* v. *Hanssen*, 261 U.S. 491, 497 (1923) (noting importance of "substantive right, legal or equitable, in or to the property of [the] debtor"). Accordingly, Defendants are asking the Circuit Court to bar WSSH from taking any action to enforce the Loans, because the sale resulted from fraud, breach of contract, and a conspiracy to neutralize a competitor in violation of West Virginia's antitrust laws. (Ex. 1 (State Ct. Am. Compl.) ¶¶ 1–2, 191.)

Because WSSH violated state law in obtaining the Loans, judicial economy plainly favors allowing the state court to decide Defendants' threshold claims first. If the Circuit Court agrees and enters a ruling invalidating the sale of the Loans and blocking WSSH from enforcing the Loans, WSSH would have to dismiss its claims here, making it unnecessary for this Court to consider the substantive issues in this case. On the other hand, proceeding with this case at this juncture risks the Court deciding thorny legal issues that later become moot and the parties expending significant resources to conduct discovery that proves unnecessary. In these circumstances, "[a] temporary stay will prevent potentially unnecessary litigation and, as a result, is in the interest of judicial economy." *Mullis*, 2014 WL 5465749, at \*2; *see Tastee Treats*, 2009 WL 37188, at \*2 (granting stay because a "favorable outcome" for plaintiff in the state-court proceedings "would narrow the issues in the present action considerably, saving the Court and the parties time and expense").

Proceeding with this action now also runs the risk of conflicting rulings:  this Court may award WSSH the emergency remedies it requests (*e.g.*, immediately placing The Greenbrier into receivership), but the Circuit Court may determine that WSSH did not validly purchase the Loans and thus possesses no right to the remedies that this Court awarded.  Such "potentially inconsistent rulings and conflicting decisions" alone justify a stay.  *See Fortiline*, 2025 WL 1133159, at *2.  But there is an even greater risk here:  beyond conflicting rulings, Defendants could lose their property at WSSH's hands before the state court decides whether WSSH even owns the underlying Loans.  Indeed, that appears to be WSSH's design.  This "possibility of a windfall"—successfully stripping the Justices of ownership of The Greenbrier so that TRT can start to orchestrate a sale— "if the present action concludes before the state action" likewise counsels in favor of a stay.  *Tastee Treats*, 2009 WL 37188, at *2.

At bottom, there is "undisputedly some factual overlap and common legal issues between this action and the other pending [state-court] litigation."  *Fortiline*, 2025 WL 1133159, at *2. Proceeding with "similar state and federal actions represent[s] an inefficient use of judicial resources," as well as a risk of inconsistent rulings and a windfall to WSSH.  *Tastee Treats*, 2009 WL 37188, at *2; *see also Fortiline*, 2025 WL 1133159, at *2.  A stay alleviates these risks and preserves the Court's resources, while also allowing the litigants to dedicate their resources to a single, potentially dispositive proceeding on the threshold issue "rather than expending resources on potentially futile litigation."  *Mullis*, 2014 WL 5465749, at *2.  Judicial economy and the need to avoid conflicting decisions thus strongly weigh in favor of pausing these proceedings until the state court determines whether WSSH validly owns and can enforce the Loans.

**B. Absent A Stay, Defendants Face A Severe Risk To Their Businesses And Ongoing Financial Harm.**

As Defendants will explain further in their forthcoming oppositions to WSSH's motions seeking a receivership and a preliminary injunction, a "receivership is extreme and to be avoided in all but the most acute cases of harm or loss to a demonstrated interest." *Goldberg* v. *Kaczmarek*, 2025 WL 3227346, at *2 (D. Md. Nov. 19, 2025); *see also* 12 Wright & Miller's Federal Practice & Procedure § 2983 (3d ed. 2026) ("The appointment of a receiver is considered to be an extraordinary remedy that should be employed with the utmost caution and granted only in cases of clear necessity to protect plaintiff's interests in the property."). WSSH does not come close to demonstrating it is entitled to that extraordinary relief here, which would inflict substantial and irreparable harm on Defendants if granted.

The prejudice to Defendants is amplified by the emergency nature of WSSH's requested relief, which imposes an imminent risk of harm absent a stay. WSSH is asking the Court for the appointment of a receiver with broad powers to dismantle Defendants' businesses and assets "as soon as possible." (Am. Mem. of Law in Supp. of Am. Emergency Mot. for Appointment of Receiver (ECF No. 40) at 19.) The very fact of this request—and the uncertainty caused by the threat of such severe remedies—is actively damaging Defendants' businesses, most notably the value of The Greenbrier. For example, bookings have fallen since TRT's well-publicized default accusation. (Justice III Decl. ¶ 48.) Defendants have also struggled to attract corporate clients and secure large-scale events because certain clients have expressed hesitation about contracting in light of the uncertainty caused by this litigation. (*See id.*) As long as the risk of the receivership hangs over The Greenbrier, Defendants risk losses, and short-term losses in the hospitality industry can compound and turn into long-term patterns threatening the business' viability. (*Id.*)

In short, this is no ordinary case where a defendant seeks a stay to avoid incurring unnecessary litigation expenses. WSSH seeks—on an emergency basis—some of the most aggressive equitable remedies permitted by law. Defendants face risk of the permanent loss of their businesses and personal property, the ongoing loss of value of those businesses and property, a restriction on the use of their funds and an inability to conduct routine business activities, and the ongoing expense of having to spend money defending themselves against a lawsuit that WSSH has no right to bring. Even the threat of such draconian remedies works significant hardship on Defendants. *Cf. Salomon & Ludwin, LLC* v. *Winters*, 150 F.4th 268, 278 n.7 (4th Cir. 2025) (noting that "lost goodwill, lost customer trust and damage to reputation" are examples of irreparable harm). In the circumstances of this case, before even considering such drastic remedies, the Court should pause these proceedings to allow the state court to determine whether WSSH has the right to seek them in the first place. *Cf. Wash. Metro. Area Transit Comm'n* v. *Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977) (upholding stay pending appeal when, "in the absence of a stay," business would face "destruction in its current form" because of restraint on its operations).

### C. WSSH Will Suffer No Prejudice From A Stay.

Finally, WSSH would not be prejudiced by a stay for several reasons. *First*, WSSH's own actions reveal that it will not be harmed by a stay. Despite its repeated attempts to create an "emergency" by decreeing that one exists, WSSH has not presented *any* facts showing that there is an actual "emergency" warranting immediate receivership or the broad injunctive relief that WSSH seeks. WSSH has not presented any credible evidence showing that Defendants are actively devaluing The Greenbrier and its related properties, hiding money and other assets, or doing anything at all that would imperil WSSH's ability to recover what it is purportedly owed on

the Loans. Indeed, WSSH delayed the schedule in this case by nearly a month so that it could update its complaint and motions. The only "emergency" WSSH faces is that the state court might resolve Defendants' thresholds claims and invalidate WSSH's right to enforce the Loans before WSSH can work its scheme to strip the Justices of their possession of The Greenbrier in this Court.

*Second*, WSSH—a company that is ultimately owned by a billionaire—faces no financial prejudice from a stay, as there is no risk that it would not be repaid if the state court concludes that WSSH owns the Loans. WSSH claims that the total payoff amount under the Loans is approximately $370 million. (*See* ECF No. 9-6, at 1.) Even assuming that is true, the value of The Greenbrier and other collateral dwarfs that amount. Based on appraisals from April 2023, The Greenbrier and other collateral are worth $1.107 billion—almost three times the debt it secures. (*See* Justice III Decl. ¶¶ 11, 13) And as noted above, there is no evidence that Defendants' actions are devaluing The Greenbrier and other collateral. In fact, by pursuing a receivership and publicly declaring a sham default, it is WSSH who is threatening the value of the collateral.

The absence of prejudice to WSSH is best illustrated by WSSH's rejection of Defendants' offer to repay the Loans at a premium just thirteen days after WSSH acquired them. (*See* Justice III Decl. ¶¶ 35–38.) Specifically, after acknowledging that Defendants could repay the Loans for $341 million, WSSH rejected Defendants' offer to do so. (*See id.* ¶¶ 32, 37–38.) If WSSH was truly concerned about the value of the Loans' collateral, it would have taken this payoff—at a profit of $51.5 million in just thirteen days—rather than litigating. It did not because owning the Loans (if WSSH validly does) poses no financial risk to WSSH.

*Third*, the brevity of the stay Defendants seek—pending resolution of the state court action—further undermines any claim of prejudice. *See Prepared Food Photos, Inc.* v. *N & K Foods, Inc.*, 2023 WL 2652270, at *1 (D. Md. Mar. 27, 2023) (finding prejudice to non-moving

party "tempered by the fact that the Court will not grant an indefinite stay"); *Flores* v. *Jaddou*, 2023 WL 7282897, at \*3 (D. Md. Nov. 3, 2023) (distinguishing temporary stay "directly tied to other proceedings" from indefinite stay (internal quotation omitted)). A stay pending resolution of WSSH's rights in the Loans in state court is appropriately tailored to support judicial economy and efficient resolution of the issues.

*Finally*, WSSH would face no prejudice from a stay because it is party to the related state-court proceeding. The non-moving party is less likely to be prejudiced by a stay of one case if it can participate in the related proceeding. *See, e.g.*, *Mullis*, 2014 WL 5465749, at \*2; *cf. Landis*, 299 U.S. at 255 ("Only in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both."). Here, WSSH is a named party in the state-court action and so will have a full opportunity to present its legal arguments.

\*        \*        \*

At bottom, a stay pending the outcome of the proceedings in Greenbrier County Circuit Court is warranted because that action "will most certainly resolve critical issues raised in the instant action." *Veteran Eng'g Grp., Inc.* v. *CSI Eng'g, P.C.*, 2011 WL 5826673, at \*4 (D. Md. Nov. 17, 2011). Moreover, a stay would avoid unnecessary litigation expenses and the potential for conflicting decisions, remove the existential threat Defendants face from WSSH's request for immediate appointment of a receiver and injunctive relief, and do no harm to WSSH's ultimate ability to recover if it is the valid owner of the Loans. Judicial economy combined with the severe prejudice Defendants face and lack of prejudice to WSSH all weigh heavily in favor of a stay pending the outcome of the state proceedings.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' amended motion to stay.

Dated:  May 8, 2026

Respectfully submitted,

/s/ *Steven R. Ruby*
Steven R. Ruby (WVSB #10752)
Raymond S. Franks II (WVSB #6523)
David R. Pogue (WVSB #10806)
CAREY DOUGLAS KESSLER & RUBY
PLLC
901 Chase Tower, 707 Virginia Street, East
P.O. Box 913
Charleston, WV 25323
Telephone:  (304) 345-1234
Facsimile:  (304) 342-1105
sruby@cdkrlaw.com
rfranks@cdkrlaw.com
drpogue@cdkrlaw.com

/s/ *H. Rodgin Cohen*
H. Rodgin Cohen (WVSB #767)
Robert L. Jones IV (*pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Telephone:  (212) 558-4000
cohenhr@sullcrom.com
jonesrob@sullcrom.com

Amanda Flug Davidoff (*pro hac vice*)
Oliver W. Engebretson-Schooley (*pro hac vice*)
1700 New York Avenue, N.W.
Suite 700
Washington, DC 20006
Telephone:  (202) 956-7500
davidoffa@sullcrom.com
engebretsono@sullcrom.com

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 8, 2026, the foregoing document was served upon the

following counsel by means of the Court's CM/ECF filing system.

Ellen S. Cappellanti, Esq.
Albert F. Sebok, Esq.
Elizabeth B. Elmore, Esq.
JACKSON KELLY PLLC
500 Lee Street East, Suite 1600
P.O. Box 553
Charleston, WV 25301-3202
ecappellanti@jacksonkelly.com
asebok@jacksonkelly.com
ebelmore@jacksonkelly.com

Seth Patrick Hayes, Esq.
Zachary Hanley Warder, Esq.
JACKSON KELLY PLLC
3000 Swiss Pine Way, Suite 200
P.O. Box 619
Morgantown, WV 26501
shayes@jacksonkelly.com
zachary.warder@jacksonkelly.com

R. Clay Hoblit, Esq.
HOBLIT DARLING RALLS HERNANDEZ
& HUDLOW
802 North Carancahua Street
Suite 2100
Corpus Christi, TX 78401
choblit@hdr-law.com


/s/ *H. Rodgin Cohen*
H. Rodgin Cohen (WVSB #767)