E-FILED | 4/29/2026 12:48 PM
CC-13-2026-C-51
Greenbrier County Circuit Clerk
Jamie Baker

## IN THE CIRCUIT COURT OF
## GREENBRIER COUNTY, WEST VIRGINIA

GREENBRIER HOTEL CORPORATION;
JAMES C. JUSTICE COMPANIES, INC.;
TWIN FIR ESTATES, LLC; WILCOX
INDUSTRIES, INC.; JUSTICE LOW SEAM
MINING, INC.; PLAYERS CLUB, LLC;
JUSTICE FAMILY GROUP, LLC;
GREENBRIER MEDICAL INSTITUTE, LLC;
GREENBRIER GOLF & TENNIS CLUB
CORPORATION; THE GREENBRIER
SPORTING CLUB DEVELOPMENT CO.,
INC.; THE GREENBRIER SPORTING CLUB,
INC.; TAMS MANAGEMENT, INC.;
BELLWOOD CORPORATION; OAKHURST
CLUB, LLC; JAMES C. JUSTICE II; JAMES
C. JUSTICE III; and JILLEAN L. JUSTICE,

     *Plaintiffs*,

v.

CARTER BANK & TRUST; CARTER
BANKSHARES, INC.; TRT HOLDINGS, INC.;
WHITE SULPHUR SPRINGS HOLDINGS,
LLC; ROBERT ROWLING; BLAKE
ROWLING; and MICHAEL SMITH,

     *Defendants.*

Case No.:  CC-13-2026-C-51

Judge Robert E. Richardson

### AMENDED COMPLAINT

1. Defendant TRT Holdings, Inc., the owner of one of the largest hotel and resort chains in the country, including the principal competitor of The Greenbrier Hotel and Resort ("The Greenbrier"), and Defendants White Sulphur Springs Holdings, LLC, Robert Rowling, Blake Rowling, and Michael Smith (the "TRT Defendants") are executing a multi-year scheme designed to snatch The Greenbrier from the local and longstanding ownership of the Justice family by unlawful and deceptive means and in violation of laws designed to prevent such anticompetitive

conduct. The TRT Defendants, moreover, have violated agreements that prohibit them from acquiring Plaintiffs' loans, not only recently but secretly and improperly more than 18 months ago in furtherance of their scheme. Defendant Carter Bank has conspired with the TRT Defendants to assist in their efforts, also through unlawful means. If successful, Defendants' efforts will put hundreds of employees of The Greenbrier at risk of losing their jobs. The calamitous effects of Defendants' actions on those individuals, the residents of Greenbrier County, and the people of West Virginia cannot be overstated. Plaintiffs file this Complaint to oppose Defendants' unlawful actions and resist their attempt to pilfer one of West Virginia's crown jewels and jeopardize the livelihood of hundreds of West Virginians.

2.     Plaintiffs seek the rescission of Defendant Carter's unlawful sale of Plaintiffs' loans (the "Loans") to the TRT Defendants, the right to pay off the Loans at the bargained-for price, and such additional damages as are necessary and proper.

**PARTIES**

3.     Plaintiff Greenbrier Hotel Corporation ("Greenbrier") is a West Virginia corporation with its headquarters and principal place of business in White Sulphur Springs, West Virginia. Plaintiff Greenbrier's primary asset is The Greenbrier.

4.     Plaintiff James C. Justice II ("Jim Justice") is an individual and the owner of 49% of Justice Family Group, LLC ("JFG"), which is the 100% owner of Plaintiff Greenbrier. Plaintiff Jim Justice is a resident of West Virginia.

5.     Plaintiff James C. Justice III ("Jay Justice") is an individual and the owner of 30% of JFG. Plaintiff Jay Justice is a resident of Virginia.

6.     Plaintiff Jillean L. Justice ("Jill Justice") is an individual and the owner of 21% of JFG. Plaintiff Jill Justice is a resident of West Virginia.

7. Plaintiff James C. Justice Companies, Inc. ("JCJ"), is a Delaware corporation with its headquarters in Virginia.

8. Plaintiff Twin Fir Estates, LLC, is a Virginia limited liability company with its headquarters and principal place of business in Virginia.

9. Plaintiff Wilcox Industries, Inc., is a West Virginia corporation with its headquarters and principal place of business in West Virginia.

10. Plaintiff Justice Low Seam Mining, Inc., is a West Virginia corporation with its headquarters in Virginia and principal place of business in West Virginia.

11. Plaintiff Players Club, LLC is a Delaware limited liability company with its headquarters and principal place of business in White Sulphur Springs, West Virginia.

12. Plaintiff Justice Family Group, LLC, is a Delaware limited liability company with its headquarters and principal place of business in White Sulphur Springs, West Virginia.

13. Plaintiff Greenbrier Medical Institute, LLC, is a West Virginia limited liability company with its headquarters and principal place of business in White Sulphur Springs, West Virginia.

14. Plaintiff Greenbrier Golf & Tennis Club Corporation is a West Virginia corporation with its headquarters and principal place of business in White Sulphur Springs, West Virginia.

15. Plaintiff The Greenbrier Sporting Club Development Co., Inc., is a Delaware corporation with its headquarters and principal place of business in White Sulphur Springs, West Virginia.

16. Plaintiff The Greenbrier Sporting Club, Inc., is a West Virginia corporation with its headquarters and principal place of business in White Sulphur Springs, West Virginia.

17. Plaintiff Tams Management, Inc., is a West Virginia corporation with its headquarters in Virginia and principal place of business in West Virginia.

18. Plaintiff Bellwood Corporation is a West Virginia corporation with its headquarters and principal place of business in West Virginia.

19. Plaintiff Oakhurst Club, LLC, is a West Virginia limited liability company with its headquarters and principal place of business in White Sulphur Springs, West Virginia.

20. Defendant Carter Bank & Trust ("Carter Bank") is a Virginia banking institution with its principal place of business in Virginia.

21. Defendant Carter Bankshares, Inc., the parent of Carter Bank, is a Virginia corporation with its principal place of business in Virginia. Defendant Carter Bankshares, Inc., and Defendant Carter Bank & Trust are together referred to herein as "Carter."

22. Defendant TRT Holdings, Inc. ("TRT"), is a Texas corporation. Upon information and belief, Defendant TRT has its headquarters and principal place of business in Texas.

23. Defendant White Sulphur Springs Holdings, LLC ("WSSH"), is a Texas limited liability company. Upon information and belief, Defendant WSSH has its headquarters and principal place of business in Texas. Upon information and belief, Defendant WSSH is a wholly owned subsidiary of Defendant TRT.

24. Defendant Robert Rowling is, upon information and belief, a Texas resident, an owner of Defendant TRT, and the chairman of Defendant TRT.

25. Defendant Blake Rowling is, upon information and belief, a Texas resident and the president of Defendant TRT.

26. Defendant Michael Smith is, upon information and belief, a Texas resident and an executive vice-president of Defendant TRT.

## JURISDICTION AND VENUE

27.     This Court has jurisdiction pursuant to Article VIII, Section 6 of the West Virginia Constitution and West Virginia Code §§ 51-2-2 and 55-13-1.

28.     Venue is proper in this Court because, among other reasons, Plaintiff Greenbrier and numerous other Plaintiffs have their headquarters and principal places of business in Greenbrier County; a significant amount of the real property that secures the Loans is situated in Greenbrier County; and Plaintiffs Jim and Jill Justice reside in Greenbrier County.

## FACTUAL BACKGROUND

### *The TRT Defendants*

29.     Defendant TRT is a Texas-based private investment firm that, upon information and belief, is owned by Defendant Robert Rowling and run by Defendants Robert Rowling, Blake Rowling, and Smith. Defendant TRT owns and operates Omni Hotels and Resorts ("Omni"), a chain of luxury hotels and resorts located throughout the United States and Canada.

30.     One of Omni's flagship properties is The Omni Homestead Resort and Spa in Hot Springs, Virginia ("The Omni Homestead"). The Omni Homestead—a National Historic Landmark that is listed on the National Register of Historic Places—is nestled in the Allegheny Mountains of Virginia just across the border from West Virginia. In addition to its full complement of resort amenities, The Omni Homestead is also well-known for its event space. The Omni Homestead has 76,000 square feet of meeting space and derives significant business from hosting weddings, corporate retreats, and other large-scale events. The Omni Homestead is also known for its golf courses, including the Cascades and the Old Course. Located just under 39 miles from The Greenbrier, The Omni Homestead is The Greenbrier's chief competitor in the market for luxury golf and convention-scale resorts located in the Allegheny Mountains.

31.     Defendant TRT, its owner Defendant Robert Rowling, and its executives Defendant Blake Rowling and Defendant Smith, have long coveted The Greenbrier and wanted to combine it with The Omni Homestead and make it a centerpiece of their hotel and resort collection. Located in the Allegheny Mountains just outside White Sulphur Springs, West Virginia, The Greenbrier is one of West Virginia's crown jewels—a historic, century-old resort that is renowned for its amenities and over 200,000 square feet of event space. The Greenbrier is a National Historic Landmark that is listed on the National Register of Historic Places. For generations, The Greenbrier has played host to weddings, corporate retreats, gatherings of politicians and world leaders, and large-scale events of all stripes. The Greenbrier is also well-known for its championship golf courses, including the Old White, the Greenbrier, the Meadows, and the Ashford Short Course. The Greenbrier employs approximately 2000 people and is by far the largest private sector employer in Greenbrier County, West Virginia.  In fact, it is in the top 35 employers across all of West Virginia. Plaintiff Jim Justice—a lifelong West Virginian, former Governor of West Virginia, and current U.S. Senator from West Virginia—and his family have owned The Greenbrier for nearly two decades. In 2009, Plaintiff Jim Justice bought The Greenbrier and saved it from bankruptcy, preventing the loss of thousands of jobs. Since then, The Greenbrier has enjoyed great success and has remained a point of pride for West Virginians.

### *Defendant Carter*

32.     Plaintiffs have had a lending relationship with Defendant Carter for more than two decades, during which time Plaintiffs have paid Defendant Carter hundreds of millions of dollars in principal and interest. Upon information and belief, Plaintiffs have been, by far, Defendant Carter's single largest credit relationship and source of revenue.

33. From approximately 2001 through 2017, Plaintiff Jim Justice had a close and successful business relationship with Worth Carter, founder of Defendant Carter. Worth Carter said that the Justice family "made the bank" and was the key to the bank's success. When Worth Carter passed away in 2017, his family asked Plaintiff Jim Justice to give the eulogy at his funeral.

34. Despite that once-close personal and financial partnership, Defendant Carter has, since Worth Carter's death in 2017, been relentlessly hostile to Plaintiffs. In 2017, Defendant Carter's principal outside counsel, who continues to serve in that role and as Defendant Carter's primary advisor with respect to the Loans, told Plaintiff Jay Justice that he was going to take everything the Justice Family owned. Despite Plaintiffs' consistent efforts in recent years to repay Plaintiffs' obligation to Defendant Carter in full, Defendant Carter has rebuffed those efforts and has acted consistently with its attorney's threat ever since.

35. Plaintiffs have had numerous Loans with Defendant Carter. Over the past several years, Plaintiffs presented Defendant Carter with several proposals, commitment letters, and in certain cases readily available funds to pay off the Loans. But Defendant Carter blocked each of those efforts through various acts of bad faith and unfair dealing.

36. In early 2025, Defendant Carter told Plaintiffs that Plaintiffs could pay off the Loans on The Greenbrier for approximately $300 million. In response, in or around May 2025, Plaintiffs engaged a prominent investment bank (the "First Investment Bank") to identify a replacement lender to pay off the Loans on The Greenbrier and become Plaintiffs' primary lender. Plaintiffs notified Defendant Carter that the First Investment Bank was working toward a payoff of the Loans on The Greenbrier. Plaintiffs coordinated regular communications and updates with Defendant Carter and the First Investment Bank to keep Defendant Carter apprised of the status of these refinancing efforts.

37.     During the third quarter of 2025, Plaintiffs notified Defendant Carter that the First Investment Bank had identified several lenders who would pay off the Loans on The Greenbrier. Defendant Carter responded by reneging on its previous agreement that the Loans on The Greenbrier could be paid off for approximately $300 million and instead raised their payoff demand to approximately $360 million. As a result, all but one of the prospective replacement lenders withdrew from the lending process.

38.     Nonetheless, one prospective replacement lender remained willing to proceed with the transaction at the approximately $360 million payoff demand. Defendant Carter acknowledged that this prospective lender, given its large market capitalization and significant experience in loans of this kind, had the wherewithal to successfully execute on a refinancing transaction. Defendant Carter—in keeping with its agreement to help Defendant TRT snatch The Greenbrier by preventing Plaintiffs from repaying the Loans—responded by setting an arbitrary deadline for the completion of the transaction that made the transaction effectively impossible and caused that prospective replacement lender to withdraw, given its belief that, while it could execute on the refinancing transaction, the timing being demanded by Carter was not viable.

39.     In or around late November 2025, Plaintiffs notified Defendant Carter that, in addition to their efforts to secure another lender to pay off the Loans, they had contacted a second prominent investment bank (the "Second Investment Bank") to pursue a possible sale of a minority interest in The Greenbrier (with the Justice family retaining control). Such a sale would provide another option to pay off the Loans in full. Defendant Carter told Plaintiffs that as long as the sale process being administered by the Second Investment Bank was progressing, Defendant Carter would continue to extend the maturity date of the Loans and continue to cooperate with Plaintiffs. Defendant Carter acknowledged that this sale process would likely take at least nine to twelve

months to complete. At all relevant times, the sale process was progressing, Defendant Carter was receiving regular updates on the status of process timelines, and Defendant Carter acknowledged that the process was progressing adequately from its perspective.

40. During the first quarter of 2026, Defendant Carter also consistently represented to Plaintiffs that Defendant Carter was not attempting to sell the Loans. As late as on or about February 19, 2026, Defendant Carter told Plaintiffs that the only entities that had expressed interest in buying the Loans were "bottom feeders," who were seeking to acquire the Loans at an unreasonable discount. Further, Defendant Carter purposely led Plaintiffs to believe that it would not sell the Loans as long as the sale process being administered by the Second Investment Bank was progressing.

41. On or around March 18, 2026, Plaintiffs presented Defendant Carter with yet another payoff proposal, this one funded by a prominent private equity firm (the "Private Equity Firm") with which Plaintiffs had entered into terms to secure the payoff of the Loans on The Greenbrier. On or around March 23, 2026, Defendant Carter informed Plaintiffs that it would present the proposal to Defendant Carter's Board of Directors and respond to Plaintiffs regarding the proposal on either March 25 or 26, 2026. But apparently realizing that this plan would kill Defendant Carter's arrangement to help Defendant TRT neutralize a competitor, Defendant Carter never responded to Plaintiffs regarding this final payoff proposal.

### *Defendants' Plot to Seize The Greenbrier*

42. Upon information and belief, Defendants' scheme began to take shape in 2024. On March 6, 2024, to explore a potential financing relationship with The Greenbrier, the Private Equity Firm entered into a non-disclosure agreement with Plaintiffs that prohibited the Private Equity Firm from using confidential information received for any purpose other than evaluating the potential financing transaction (the "Confidentiality Agreement"). The Confidentiality

Agreement also contained a standstill provision that, at all relevant times, prohibited the Private Equity Firm from directly or indirectly acquiring, *proposing*, or agreeing to acquire in any manner ownership of any indebtedness of Plaintiff Greenbrier or its subsidiaries and affiliates—including the Loans. Importantly, both of those provisions expressly applied to representatives and advisors of the Private Equity Firm, which included Defendant TRT. Indeed, Defendant TRT later admitted to Plaintiff Jim Justice that it was bound by the Confidentiality Agreement.

43. In or around September 2024, representatives of Defendant TRT, including Defendant Blake Rowling and Defendant Smith, visited The Greenbrier under the pretense of serving as advisors to the Private Equity Firm in connection with its exploration of a financing relationship with The Greenbrier. During Defendant TRT's September 2024 visit to The Greenbrier as the Private Equity Firm's purported advisor, representatives of Defendant TRT, including Defendant Blake Rowling and Defendant Smith, obtained access pursuant to the Confidentiality Agreement to confidential information belonging to The Greenbrier. At the time, the representatives of Defendant TRT falsely claimed that they were obtaining confidential information for the purpose of advising the Private Equity Firm. In truth and fact, however, and as Defendant Robert Rowling later admitted, Defendant TRT had been secretly attempting to acquire The Greenbrier for years. Defendant TRT's true purpose in obtaining Plaintiffs' confidential information was to advance its efforts to acquire Plaintiff Greenbrier. Defendant TRT's false representations during that visit were intended to mislead Plaintiff Greenbrier and the Justice family. During the visit in or around September 2024, Defendant TRT acquired confidential information that included proprietary pricing information, proprietary marketing and reservation information, confidential financial records, and access to areas of The Greenbrier resort complex

that are off-limits to the public—all information of extreme importance to a hostile competitor planning a takeover.

44. Upon information and belief, the very same month that representatives from Defendant TRT visited The Greenbrier as the Private Equity Firm's purported advisor, the TRT Defendants furthered their scheme to try to seize The Greenbrier. Specifically, in September 2024, in direct violation of the standstill provision, the TRT Defendants secretly acquired second-lien debt of The Greenbrier to further their attempt to orchestrate a takeover. Plaintiffs became aware of this acquisition only in April 2026, when Defendant Blake Rowling admitted it to the Dallas Morning News.[1]

45. In secretly acquiring second-lien debt of Plaintiff Greenbrier, the TRT Defendants became subject to the terms of a note (the "Second-Lien Note") that prohibited them from, directly or through a representative, communicating with, negotiating with, or attempting to contact any of Plaintiffs' credit providers or lenders with respect to Plaintiffs' indebtedness, or purchasing, negotiating for purchase, or attempting to purchase any loans or debt of Plaintiffs.

46. At some point following the September 2024 debt acquisition, Defendants saw their opportunity to carry out their scheme in one fell swoop. Upon information and belief, at some point after Defendant TRT's September 2024 visit, and while the Confidentiality Agreement, including the standstill provision, and the Second-Lien Note were still in effect, Defendant TRT secretly approached Defendant Carter to negotiate a potential sale of the Loans and use them as a means to take possession of The Greenbrier. Upon information and belief, the Chief Executive

---

[1] *See* Nick Wooten, Dallas hotel billionaire, U.S. senator locked in legal feud over historic Greenbrier resort, The Dallas Morning News (Apr. 23, 2026) https://www.dallasnews.com/business/real-estate/article/dallas-billionaire-u-s-senator-feud-greenbrier-22218594.php.

Officer of Defendant Carter told at least one acquaintance as early as late 2025 that Omni would buy The Greenbrier's loans. As set forth in further detail below, Defendants' secret efforts included a meeting in late January 2026 among Defendant TRT, Defendant Blake Rowling, a co-conspirator, a representative of Defendant Carter, and others. At or about that time, Defendants TRT and Blake Rowling revealed their intention to take possession of The Greenbrier and to use employees from the nearby Omni Homestead to immediately begin operating both resorts—eliminating the jobs of a substantial number of current employees at The Greenbrier.

47.     And at all relevant times, Defendant Carter knew that, as part of its scheme to take over The Omni Homestead's main competitor, the TRT Defendants had used false pretenses to acquire Plaintiff Greenbrier's confidential information pursuant to the Confidentiality Agreement. Upon information and belief, Defendant Carter provided Defendant TRT with additional information in furtherance of Defendant TRT's intended acquisition of the Loans even though both Defendants TRT and Carter knew that Defendant TRT was violating the Confidentiality Agreement by using confidential information in an effort to acquire the Loans and violating the Confidentiality Agreement and the Second-Lien Note by even negotiating for the purchase of the Loans in the first place.

48.     On or about March 25, 2026, Defendant Carter and the TRT Defendants consummated their months-long conspiracy for Defendant Carter to sell the Loans for approximately $289.5 million to Defendant WSSH, which is a shell company created on March 12, 2026. Defendant WSSH is owned by Defendant TRT for the sole purpose of acquiring the Loans and attempting to leverage its rights as the lender under the Loans to acquire The Greenbrier, despite the fact that the balance of the Loans comes nowhere near the value of The Greenbrier as an asset. That loan sale, which had been in the works for months if not longer, directly violated the

Confidentiality Agreement's provision that prohibited Defendant TRT from acquiring or proposing to acquire any debt of Plaintiff Greenbrier. The loan sale also directly violated the provision of the Second-Lien Note that prohibited Defendant TRT from, directly or through a representative, communicating with, negotiating with, or attempting to contact any of Plaintiffs' credit providers or lenders with respect to Plaintiffs' indebtedness, or purchasing, negotiating for purchase, or attempting to purchase any loans or debt of Plaintiffs. Plaintiffs were given no notice of the sale before it took place and no opportunity to purchase the Loans at the same price or even the higher price that Carter had told the Justice family that it owed.

49.     Upon information and belief, Defendant TRT purchased the Loans at least in part because of the confidential information it received, under false pretenses, from Plaintiff Greenbrier in 2024. Upon information and belief, Defendant TRT's purchase of the Loans was also informed in part by the information that Defendant Carter provided the TRT Defendants despite Defendant Carter's knowledge that the TRT Defendants were improperly using information they received under the Confidentiality Agreement and negotiating a deal for the Loans in violation of the Confidentiality Agreement and the Second-Lien Note. Upon information and belief, Defendant TRT is not in the business of making or servicing loans and initially proposed to purchase, and ultimately purchased, the Loans with the intent of orchestrating a default and seizing possession of The Greenbrier, the principal competitor of the TRT-owned The Omni Homestead. This is obvious from the fact that Defendant TRT's acquisition price of $289.5 million for the Loans was nearly 40% above the value of the Loans on Carter's books.

50.     Plaintiffs first learned of the sale through a letter sent by Carter Bank on March 26, 2026. On or about March 27, 2026, after Defendant Carter filed a Form 8-K publicly disclosing the sale, Plaintiff Jim Justice, unaware of Defendants' scheme, had a telephone conversation with

Defendant Robert Rowling, at Defendant Robert Rowling's request, in which Defendant Robert Rowling claimed that the TRT Defendants wanted to work cooperatively with the Justice family and identify ways to work together at The Greenbrier.

51. On or about April 6, 2026, Defendants Robert and Blake Rowling and Defendant Smith traveled to The Greenbrier to meet with Plaintiff Jim Justice. During the meeting, Defendant Blake Rowling claimed that Defendant TRT wanted to find a way to work cooperatively with The Greenbrier and the Justice family. Also during the meeting, the TRT Defendants agreed that The Greenbrier had the right to pay off the Loans by April 15, 2026, for the amount specified in the most recent agreement relating to the Loans, that is, approximately $341 million (the maximum amount that Plaintiffs could be charged under the operative agreement between them and Defendant Carter, without any discount for full payoff). It was during this meeting that the TRT Defendants also acknowledged the Confidentiality Agreement and indicated that they were bound by the provisions in that Agreement. The TRT Defendants argued at the meeting that they had not violated the Confidentiality Agreement because they took no action to acquire the loans until after March 6, 2026, when the Agreement purportedly expired. That statement was false, among other reasons, because (as Plaintiffs would later learn) the TRT Defendants had been negotiating with Carter Bank to acquire the Loans at least as early as January 2026, if not earlier. The TRT Defendants also did not disclose that they had already acquired debt covered by the Second-Lien Note in September 2024 in violation of the Confidentiality Agreement.

52. Later in the meeting, Defendant Robert Rowling offered an arrangement in which the TRT Defendants would forgive $200 million of Plaintiffs' loans in exchange for a 50% ownership interest in The Greenbrier. Confronted with the threat that Defendant TRT posed to the value of The Greenbrier and the welfare of its employees, and a classic "your money or your life"

demand, Plaintiff Jim Justice responded that he was willing to consider that proposal. The TRT Defendants suggested that the parties take a lunch break, after which the TRT Defendants would propose more specific terms.

53. After the lunch break, the TRT Defendants made an offer as follows:

a. Defendant TRT and/or its affiliates would forgive $200 million of The Greenbrier's loans;

b. Defendant TRT and/or its affiliates would become a 50% owner of The Greenbrier;

c. Defendant TRT and/or its affiliates would be the general partner of a joint venture between the Justice family and Defendant TRT, and would manage the operations of The Greenbrier;

d. The Justice family would retain a significant role at The Greenbrier;

e. The Justice family would receive, free of debt, the coal assets in which Defendant TRT purportedly acquired secured interests from Defendant Carter.

54. Faced with virtually no options in light of the TRT Defendants' unlawful purported acquisition of the Loans, Plaintiff Jim Justice agreed to this offer. Defendant TRT agreed to provide a written term sheet embodying its offer no later than the morning of April 8, 2026.

55. On April 7, 2026, however, with no further discussion or notice, Defendant TRT abruptly reversed course, sending an email in which it reneged on its offer of the previous day. Defendant TRT's decision to go back on this offer was economically irrational given that the terms of the deal would have allowed Defendant TRT to acquire 50% of The Greenbrier for a sum well below the market value of that share.

56. In response, Plaintiffs notified Defendant TRT that they intended to pay off the Loans at the amount provided for in the most recent agreement regarding the Loans, that is, the

amount that the TRT Defendants agreed was applicable until April 15, 2026—approximately $341 million. Plaintiffs promptly obtained terms from another lender to provide the funds to pay off the Loans in the agreed-upon amount. In fact, Plaintiffs requested wiring instructions to pay off the TRT Defendants in full, and the TRT Defendants provided the wiring instructions for payoff. Plaintiffs then requested confirmation of the exact payoff amount from the TRT Defendants.

57. Rather than send the requested payoff amount, on April 9, 2026, the TRT Defendants sent The Greenbrier a purported Notice of Default and Termination of Forbearance (the "Default Notice"). The Default Notice cited several baseless grounds for the purported default, none of which constituted a genuine event of default. The purpose of the Default Notice was to prevent Plaintiffs from paying off the Loans at the approximately $341 million payoff that the TRT Defendants agreed was correct just three days earlier, on April 6, 2026, and which Plaintiffs, on April 7, 2026, told the TRT Defendants they intended to pay.

58. The Default Notice stated that the TRT Defendants could immediately exercise creditor process and any and all rights available to them under the Loans.

59. The TRT Defendants' decision to reject Plaintiffs' attempt to pay off the Loans for approximately $341 million was yet another economically irrational decision. Indeed, Plaintiffs' April 7, 2026 repayment offer of $341 million was $51.5 million more than the amount for which the TRT Defendants purchased the Loans just thirteen days earlier. The TRT Defendants' decision to brush this offer aside—a deal that any rational business would have accepted—reveals that their true motive for acquiring the Loans was to try to get their hands on The Greenbrier via a sham default process.

60. Since the TRT Defendants wrongly declared a default, their plan to take over The Greenbrier has only accelerated, which has seriously harmed the business and has and will

continue to inflict substantial damage to the property's reputation and goodwill. On the very same day that the TRT Defendants sent Plaintiffs the Default Notice, they filed a baseless lawsuit in federal court seeking extraordinary equitable relief—the appointment of a federal receiver to take immediate possession of The Greenbrier. And just four days later, Defendants froze certain of Plaintiffs' payroll and operational accounts. Not only have these actions severely disrupted Plaintiffs' ability to operate the business and pay its employees, but they have cast a cloud on the resort that has already resulted in falling reservation rates and that threatens to do lasting damage to this important West Virginia institution and its approximately 2000 employees.

61.     In the days since the TRT Defendants sent the purported Default Notice, Plaintiffs have continued to uncover the depth of the TRT Defendants' scheme. Specifically, between April 13 and 15, 2026, Plaintiff Jay Justice spoke to a source with knowledge of the involvement of a co-conspirator of the TRT Defendants. The co-conspirator is an investment firm in Dallas, Texas— also home to Defendant TRT, Defendant WSSH, and Omni—that helped orchestrate the purported sale of the Loans from Defendant Carter to Defendant WSSH. The co-conspirator admitted that Defendant TRT, Defendant Blake Rowling, the co-conspirator, a representative of Defendant Carter, and others met in late January 2026 to negotiate Defendant TRT's purchase of the Loans. The source also told Plaintiff Jay Justice that Defendants intend to take possession of The Greenbrier and to use employees from the nearby Omni Homestead to immediately begin operating both resorts. This meeting, which was a clear violation of the standstill provisions in the Confidentiality Agreement and the Second-Lien Note, reveals Defendants' true motives.

62.     In other words, the TRT Defendants' proposal to acquire the Loans and their subsequent acquisition of the Loans under false pretenses and in violation of the Confidentiality Agreement and the Second-Lien Note were intended to allow the TRT Defendants to eliminate its

17

key competitor, claim The Greenbrier as its own, and run the two historic properties as a single venture.

63.     At all relevant times, Plaintiffs have been in material compliance with their obligations under the Loans.

*The Relevant Market*

64.     The TRT Defendants engineered their scheme to seize The Greenbrier to take control of The Omni Homestead's dominant competitor. The Greenbrier and The Omni Homestead are the primary two options within the product and geographic markets in which they operate— the market for luxury golf and convention-scale resorts (the "Relevant Product Market") that are in the Allegheny Mountains of Virginia and West Virginia (the "Relevant Geographic Market"; together with the Relevant Product Market, the "Relevant Market").

65.     The Relevant Product Market is the market for luxury golf and convention-scale resorts—that is, luxury resorts with championship golf courses and significant convention space that allow for hosting major corporate events, political conferences, weddings, and other large-scale events. That The Greenbrier and The Omni Homestead both operate in the Relevant Product Market—in other words, that the two resorts are reasonably interchangeable—is obvious from a quick review of publicly available information about the two historic properties. For example:

- ***Price.*** The Greenbrier and The Omni Homestead charge similar rates for rooms. According to the travel website TripAdvisor, the average rate for a standard room at The Greenbrier falls within a range of $434.00 to $759.00 per night[2] and the average rate for a

---

[2]     *See* The Greenbrier, TripAdvisor, https://www.tripadvisor.com/Hotel_Review-g59644-d100352-Reviews-The_Greenbrier-White_Sulphur_Springs_West_Virginia.html (last visited Apr. 28, 2026).

standard room at The Omni Homestead falls within a range of $420.00 to $946.00 per night.[3]

- *Use.* As detailed above, due to their physical size, both The Greenbrier and The Omni Homestead cater to customers looking for large convention spaces. Additionally, because of their championship golf courses, both properties have been named to the list of "Top 100 Golf Resorts in the World" by Golf.com.[4] And both have hosted numerous high-profile golf tournaments. For example, The Greenbrier hosted the 1979 Ryder Cup, the 1994 Solheim Cup, and the 2010 to 2019 Greenbrier Classic (an event on the PGA Tour).[5] And The Omni Homestead has hosted seven United States Golf Association National Championships.[6]

- *Quality.* Both resorts earn similar ratings from travelers, with The Greenbrier earning an average of 4.2 stars[7] and The Omni Homestead earning an average of 4.1 stars.[8]

---

[3]   *See* The Omni Homestead Resort & Spa, TripAdvisor, https://www.tripadvisor.com/Hotel_Review-g57835-d116018-Reviews-The_Omni_Homestead_Resort_Spa-Hot_Springs_Virginia.html (last visited Apr. 28, 2026).

[4]   *See* The Greenbrier: Top 100 Golf Resorts in the World, Golf.com, https://golf.com/resorts/greenbrier-top-100-golf-resorts-2023/?srsltid=AfmBOooz885NJ4WwDR3O8J_99SpYPYE9xRj_hZ5I5-VF6pzGBNj0WQhY (last visited Apr. 28, 2026); Omni Homestead Resort: Top 100 Golf Resorts in the World, Golf.com, https://golf.com/resorts/omni-homestead-top-100-golf-resorts-2023/?srsltid=AfmBOorOIXUe5EWr-RSix0dommF2AlUydkXebNYHFjPux_CUq-LN4f11 (last visited Apr. 28, 2026).

[5]   *See* The Greenbrier: Top 100 Golf Resorts in the World, *supra* note 4.

[6]   *See* Omni Homestead Resort: Top 100 Golf Resorts in the World, *supra* note 4.

[7]   *See* The Greenbrier, TripAdvisor, *supra* note 2.

[8]   *See* The Omni Homestead Resort & Spa, TripAdvisor, *supra* note 3.

- *Access.* Both The Greenbrier and The Omni Homestead are served by the same two airports. The closest airport to both The Greenbrier and The Omni Homestead is the small Greenbrier Valley Airport in Lewisburg, West Virginia. And for a larger airport, both The Greenbrier and The Omni Homestead are served by the Roanoke-Blacksburg Regional Airport in Roanoke, Virginia.

66. The Relevant Geographic Market is the Allegheny Mountains of Virginia and West Virginia. As discussed above, The Greenbrier and The Omni Homestead are located 39 miles apart in the Allegheny Mountains. Both of these resorts market themselves as historic, luxury properties that are located in the Allegheny Mountains and that feature championship golf courses and large-scale meeting and convention spaces. For area customers looking for all of these things—mountains, golf, luxury, and space—there are no other options except The Greenbrier and The Omni Homestead.

67. Consumers who visit The Greenbrier and The Omni Homestead are seeking the unique combination of a mountain setting of the Alleghenies, luxury amenities, access to championship-caliber golf, and convention-scale event space. It is the combination of these factors that defines the Relevant Market. For example, consumers do not consider other luxury hotels in the Alleghenies as substitutes for The Greenbrier and The Omni Homestead because they do not offer onsite golf and convention-scale event spaces. Nor do consumers consider other luxury golf resorts to be substitutes because they do not come with the picturesque setting of the Alleghenies or the convention-scale event space. Nor do consumers consider other luxury resorts with convention-scale event spaces as substitutes because they are not located in the Alleghenies and do not offer onsite golf courses.

*Damages*

68.     Defendants' conduct alleged herein has severely injured Plaintiffs in numerous respects, including, but not limited to, loss of business value, loss of revenue, reputational damage, damage to relationships with business partners, and loss of business opportunities. The extent of those damages cannot be precisely calculated at this time, but Plaintiffs estimate their compensatory damages to be at least $500 million, not including treble damages, punitive damages, or any other damages or amounts owed. Plaintiffs' damages continue to increase as Defendants' misconduct persists.

**COUNT ONE**
**BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING**
**(Defendant Carter)**

69.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

70.     Defendant Carter was subject to an implied duty of good faith and fair dealing with respect to the agreements between Plaintiffs and Defendant Carter.

71.     Defendant Carter's false and misleading representations to Plaintiffs, as alleged above, violated the implied duty of good faith and fair dealing.

72.     Defendant Carter's negotiations of the sale of the Loans to a party that Carter knew was ineligible to purchase the Loans or even to negotiate for the purchase of the Loans violated the implied duty of good faith and fair dealing.

73.     Defendant Carter's purported sale of the Loans in contradiction of its representations to Plaintiffs further violated the implied duty of good faith and fair dealing.

74.     As a result of Defendant Carter's violations of the implied duty of good faith and fair dealing, Defendant Carter's purported sale of the Loans should be held invalid and void, and should be rescinded.

21

75. Plaintiffs are further entitled to recover the damages that they have suffered as a result of Defendant Carter's violations of the implied duty of good faith and fair dealing.

**COUNT TWO**
**PROMISSORY ESTOPPEL**
**(Defendant Carter)**

76. Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

77. Defendant Carter's representations to Plaintiffs, as alleged above, were promises that Defendant Carter should have reasonably expected to induce action or forbearance on the part of Plaintiffs. Plaintiffs reasonably relied upon those representations. Were it not for those representations, Plaintiffs would have paid off the Loans at the approximately $289.5 million amount that Defendant Carter allowed the TRT Defendants to pay, or would otherwise have acted to protect their interests against Defendant Carter's sale of the Loans in contravention of its promise.

78. Under the doctrine of promissory estoppel, because Plaintiffs reasonably relied upon Defendant Carter's promise not to sell the Loans so long as certain conditions were met, Defendant Carter's sale of the Loans is invalid and void, and should be rescinded, and Plaintiffs are entitled to pay off the loans for the same amount at which Carter reported that they were sold to the TRT Defendants.

**COUNT THREE**
**EQUITABLE ESTOPPEL**
**(Defendant Carter)**

79. Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

80. Defendant Carter's representations to Plaintiffs, as alleged above, falsely represented and concealed facts that were material to Plaintiffs.

81.     Defendant Carter had actual or constructive knowledge of the true facts, and they intended that Plaintiffs would act upon their representations.

82.     Plaintiffs did, in fact, rely and act upon Defendant Carter's representations, to Plaintiffs' prejudice. Were it not for those representations, Plaintiffs would have paid off the Loans at the approximately $289.5 million amount that Defendant Carter allowed the TRT Defendants to pay, or would otherwise have acted to protect their interests against Defendant Carter' sale of the Loans in contravention of its promise.

83.     Under the doctrine of equitable estoppel, therefore, Defendant Carter's sale of the Loans is invalid and void, and should be rescinded, and Plaintiffs are entitled to pay off the Loans for the same amount at which they purportedly were sold to the TRT Defendants.

**COUNT FOUR**
**FRAUD**
**(Defendant Carter)**

84.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

85.     Defendant Carter's representations to Plaintiffs, as alleged above, falsely represented and concealed facts that were material to Plaintiffs.

86.     Defendant Carter had actual or constructive knowledge of the true facts, and they intended that Plaintiffs would act upon their representations.

87.     Plaintiffs did, in fact, rely and act upon Defendant Carter's representations, and have suffered injury and damages as a result. Were it not for those representations, Plaintiffs would have paid off the Loans at the approximately $289.5 million amount that Defendant Carter allowed the TRT Defendants to pay, or would otherwise have acted to protect their interests against Defendant Carter's sale of the Loans.

88.     Plaintiffs are entitled to recover the damages that they have suffered and will suffer as the result of Defendant Carter's fraud.

## COUNT FIVE
## CIVIL CONSPIRACY TO COMMIT FRAUD
### (All Defendants)

89.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

90.     As recently as February 19, 2026, Defendant Carter assured Plaintiffs that it was not attempting to sell the Loans. That was patently false, as Defendant Carter was at that time actively negotiating with the TRT Defendants and other known and unknown co-conspirators to sell the Loans.

91.     Upon information and belief, Defendant Carter conveyed this false information to Plaintiffs, with the TRT Defendants' and other known and unknown co-conspirators' knowledge and acquiescence, to protect the ongoing unlawful scheme with the TRT Defendants aimed at allowing the TRT Defendants to buy the Loans in violation of the Confidentiality Agreement and the Second-Lien Note and seize The Greenbrier.

92.     Defendant Carter conveyed this false information to Plaintiffs despite the fact that Defendant Carter and the TRT Defendants had actual or constructive knowledge of the true facts.

93.     Defendant Carter and the TRT Defendants worked together to convey this false information to Plaintiffs with knowledge that Plaintiffs would rely and act upon the representations.

94.     Plaintiffs did, in fact, rely on the representations and have suffered injury as a result. Without Defendant Carter's misrepresentations, Plaintiffs would have paid off the Loans at the approximately $289.5 million amount that Defendant Carter allowed the TRT Defendants to pay, or would otherwise have acted to protect their interests against Defendant Carter's sale of the Loans.

95. Defendants' actions that resulted in conveyance of false information to Plaintiffs enabled Defendants to execute their unlawful plan to sell the Loans in violation of the Confidentiality Agreement and the Second-Lien Note.

96. Plaintiffs are entitled to recover the damages that they have suffered and will suffer as the result of Defendants' conspiracy to commit fraud.

## COUNT SIX
## TORTIOUS INTERFERENCE WITH BUSINESS INTERESTS
### (Defendant Carter)

97. Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

98. The TRT Defendants were subject to the Confidentiality Agreement, and Plaintiff Greenbrier had a business expectancy that the TRT Defendants would comply with the terms of the Confidentiality Agreement.

99. At all relevant times, Defendant Carter was aware that the TRT Defendants had obtained confidential information belonging to Plaintiffs under the Confidentiality Agreement and that the TRT Defendants were prohibited from using that information for any purpose other than a financing transaction by the Private Equity Firm.

100. Upon information and belief, Defendant Carter knew that the TRT Defendants were using the confidential information that they obtained pursuant to the Confidentiality Agreement to purportedly acquire the Loans and to attempt to seize control of The Greenbrier from the Justice family.

101. Upon information and belief, Defendant Carter also knew that the TRT Defendants at all relevant times were prohibited by the standstill provision in the Confidentiality Agreement from directly or indirectly acquiring, *proposing*, or agreeing to acquire in any manner ownership of any indebtedness of Plaintiff Greenbrier or its subsidiaries and affiliates, including the Loans.

102. Upon information and belief, Defendant Carter further knew that the TRT Defendants at all relevant times were prohibited by the Second-Lien Note from, directly or through a representative, communicating with, negotiating with, or attempting to contact any of Plaintiffs' credit providers or lenders with respect to Plaintiffs' indebtedness, or purchasing, negotiating for purchase, or attempting to purchase any loans or debt of Plaintiffs.

103. Defendant Carter nevertheless engaged in negotiations with the TRT Defendants no later than late 2025, while the standstill provision in the Confidentiality Agreement remained in force, and also while the Second-Lien Note remained in force.

104. Defendant Carter's sale of the Loans to Defendants TRT and WSSH in violation of the Confidentiality Agreement and the Second-Lien Note was an intentional interference with Plaintiff Greenbrier's business interest and expectancy that the TRT Defendants would comply with the Confidentiality Agreement and the Second-Lien Note.

105. Defendant Carter's interference with Plaintiff Greenbrier's business interest and expectancy has harmed Plaintiffs in that the Loans have now purportedly been sold to the TRT Defendants, who have falsely asserted that Plaintiffs are in default on the Loans, have threatened to exercise creditor remedies against Plaintiffs, and have placed liens on certain of Plaintiffs' business accounts.

106. Plaintiffs are entitled to recover the damages that they have suffered as the result of Defendant Carter's tortious interference.

**COUNT SEVEN**
**CIVIL CONSPIRACY TO COMMIT TORTIOUS INTERFERENCE WITH BUSINESS INTERESTS**
**(All Defendants)**

107. Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

108. The TRT Defendants were subject to the Confidentiality Agreement, and Plaintiff Greenbrier had a business expectancy that the TRT Defendants would comply with the terms of the Confidentiality Agreement.

109. The TRT Defendants were also subject to the Second-Lien Note, and Plaintiffs had a business expectancy that all parties subject to the Second-Lien Note would comply with the terms of the Second-Lien Note.

110. At all relevant times, Defendant Carter was aware that the TRT Defendants had obtained confidential information belonging to Plaintiffs under the Confidentiality Agreement and that the TRT Defendants were prohibited from using that information for any purpose other than a financing transaction by the Private Equity Firm. Upon information and belief, Defendant Carter also knew that the TRT Defendants at all relevant times were prohibited by the standstill provision in the Confidentiality Agreement from directly or indirectly acquiring, *proposing*, or agreeing to acquire in any manner ownership of any indebtedness of Plaintiff Greenbrier or its subsidiaries and affiliates, including the Loans.

111. At all relevant times, Defendant Carter was aware that the TRT Defendants were prohibited by the Second-Lien Note from, directly or through a representative, communicating with, negotiating with, or attempting to contact any of Plaintiffs' credit providers or lenders with respect to Plaintiffs' indebtedness, or purchasing, negotiating for purchase, or attempting to purchase any loans or debt of Plaintiffs.

112. With knowledge that the Confidentiality Agreement and Second-Lien Note prohibited their actions, Defendant Carter and the TRT Defendants disregarded the Confidentiality Agreement and Second-Lien Note to engage in a scheme, along with a group of other known and

unknown co-conspirators, to allow Defendant Carter to sell the Loans to the TRT Defendants to enable the TRT Defendants to attempt to seize The Greenbrier.

113. Defendants' scheme and agreement enabled an intentional interference with Plaintiff Greenbrier's business interests and expectancy that the TRT Defendants would comply with the Confidentiality Agreement and that all parties to the Second-Lien Note would comply with the Second-Lien Note.

114. The resulting interference with Plaintiff Greenbrier's business interests and expectancy has harmed Plaintiffs in that the Loans have now purportedly been sold to the TRT Defendants, who have falsely asserted that Plaintiffs are in default on the Loans, have threatened to exercise creditor remedies against Plaintiffs, and have placed liens on certain of Plaintiffs' business accounts.

115. Plaintiffs are entitled to recover the damages that they have suffered and will suffer as the result of Defendants' conspiracy to commit tortious interference.

**COUNT EIGHT**
**BREACH OF CONTRACT**
**(TRT Defendants – Confidentiality Agreement)**

116. Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

117. Defendant TRT, pursuant to the Confidentiality Agreement, obtained confidential information belonging to Plaintiff Greenbrier. The Confidentiality Agreement is a binding contract. And Defendant TRT was bound by the provisions of the Confidentiality Agreement.

118. The Confidentiality Agreement prohibited the use of confidential information obtained pursuant to the Confidentiality Agreement for any purpose other than the financing transaction that was being considered by the Private Equity Firm.

119. The Confidentiality Agreement also contained a standstill provision that, at all relevant times, prohibited the Private Equity Firm and any of its representatives (including Defendant TRT) from directly or indirectly acquiring, *proposing*, or agreeing to acquire in any manner ownership of any indebtedness of Plaintiff Greenbrier or its subsidiaries and affiliates, including the Loans.

120. Upon information and belief, in September 2024, while the standstill provision of the Confidentiality Agreement remained in force, the TRT Defendants directly violated that standstill provision by—as Defendant Blake Rowling has publicly admitted—secretly acquiring second-lien debt of The Greenbrier.

121. Upon information and belief, at some point after the TRT Defendants' September 2024 visit to The Greenbrier but while the Confidentiality Agreement's standstill provision remained in force, the TRT Defendants impermissibly began secretly negotiating with Defendant Carter to acquire the Loans for the purpose of attempting to take control of The Greenbrier.

122. Upon information and belief, Defendant TRT also impermissibly used the confidential information it obtained under the Confidentiality Agreement for another purpose: its purchase of the Loans and its efforts to take control of The Greenbrier.

123. At all relevant times, Plaintiffs were in compliance with the terms of the Confidentiality Agreement.

124. As the result of Defendant TRT's breaches of the Confidentiality Agreement, Plaintiffs are entitled to a declaration that the TRT Defendants have no enforceable rights with respect to the Loans, to the rescission of the sale of the Loans, and to recover their damages resulting from Defendant TRT's breach.

**COUNT NINE**
**BREACH OF CONTRACT**
**(TRT Defendants - Second-Lien Note)**

125. Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

126. The Second-Lien Note is a binding contract. The TRT Defendants secretly acquired certain loans of Plaintiffs and thereby became subject to the Second-Lien Note.

127. At all relevant times, the TRT Defendants were prohibited by the Second-Lien Note from, directly or through a representative, communicating with, negotiating with, or attempting to contact any of Plaintiffs' credit providers or lenders, or purchasing, negotiating for purchase, or attempt to purchase any loans or debt of Plaintiffs.

128. The TRT Defendants breached the terms of the Second-Lien Note by communicating with, negotiating with, and attempting to contact Defendant Carter regarding Plaintiffs' indebtedness, and by negotiating for the purchase of and purportedly purchasing the Loans.

129. At all relevant times, Plaintiffs were in compliance with the Second-Lien Note.

130. As the result of Defendant TRT's breaches of the Second-Lien Note, Plaintiffs are entitled to a declaration that the TRT Defendants have no enforceable rights with respect to the Loans, to the rescission of the sale of the Loans, and to recover their damages resulting from Defendant TRT's breach.

**COUNT TEN**
**WEST VIRGINIA UNIFORM TRADE SECRETS PROTECTION ACT**
**(TRT Defendants)**

131. Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

132. The TRT Defendants, under the false pretenses of serving as advisors to the Private Equity Firm, used improper means in breach of the Confidentiality Agreement to misappropriate

by acquisition and subsequent disclosure, all without Plaintiff Greenbrier's consent, trade secrets belonging to The Greenbrier.

133. The TRT Defendants further misappropriated the trade secrets by acquiring them directly under circumstances giving rise to a duty to maintain their secrecy or limit their use, and/or by deriving them from or through one or more persons owing Plaintiff Greenbrier a duty to maintain their secrecy or limit their use.

134. The misappropriated trade secrets comprised highly confidential information, including without limitation formulae, patterns, compilations, programs, devices, methods, techniques, or processes.

135. The misappropriated trade secrets derived actual or potential economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from their disclosure or use.

136. The misappropriated trade secrets were the subject of reasonable efforts under the circumstances, such as the Confidentiality Agreement to maintain their secrecy.

137. Through their misconduct set forth above, the TRT Defendants willfully and maliciously violated the West Virginia Uniform Trade Secrets Protection Act, W. Va. Code § 47-22-1, *et seq.*, entitling Plaintiffs to damages, injunctive relief, and attorney fees.

**COUNT ELEVEN**
**EQUITABLE ESTOPPEL**
**(TRT Defendants)**

138. Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

139. The representations to Plaintiffs in or around September 2024 by Defendants TRT, Blake Rowling, and Smith, as alleged above, falsely represented and concealed facts that were material to Plaintiffs.

31

140. Defendants TRT, Blake Rowling, and Smith had actual and constructive knowledge of the true facts, and they intended that Plaintiffs would act upon their representations.

141. Plaintiffs did, in fact, rely and act upon the TRT Defendants' representations, to Plaintiffs' prejudice. Were it not for those representations, Plaintiffs would not have revealed confidential information to the TRT Defendants, and the TRT Defendants would not have been able to use that confidential information to purportedly acquire the Loans and attempt to take ownership of The Greenbrier.

142. The TRT Defendants secretly acquired an interest in certain of Plaintiffs' loans in or around September 2024 and intentionally concealed that interest from Plaintiffs. The TRT Defendants concealed their interest in those loans in an attempt to evade the standstill provision in the Second-Lien Note, which would have prevented them from acquiring the Loans from Defendant Carter. The TRT Defendants cannot equitably be permitted to benefit from their dishonest and deceptive conduct.

143. Under the doctrine of equitable estoppel, therefore, the TRT Defendants' purported purchase of the Loans is invalid and void, TRT should be precluded from asserting any rights under the Loans, and the sale of the Loans should be rescinded.

**COUNT TWELVE**
**WEST VIRGINIA CONSPIRACY TO RESTRAIN TRADE**
**(All Defendants)**

144. Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

145. Defendants worked together to exact severe economic harm on Plaintiffs in an attempt to allow the TRT Defendants to seize The Greenbrier, the chief rival of one of the TRT Defendants' flagship properties, The Omni Homestead.

146. Defendants took concerted action to further their anticompetitive scheme in the form of a series of otherwise economically irrational decisions in connection with the sale of the Loans and the rejection of offers for repayment of the Loans at a premium.

147. Defendants also unlawfully worked together to obtain confidential information under false pretenses in knowing violation of a binding Confidentiality Agreement. And Defendants then proceeded to negotiate a deal for the sale of the Loans that they also knew violated the Confidentiality Agreement and the Second-Lien Note.

148. Defendants intended their actions to harm the TRT Defendants' chief rival in the Relevant Market.

149. Defendants' actions have resulted in direct harm to Plaintiffs, including the diminution in value of Plaintiffs' assets (including The Greenbrier), interference with Plaintiffs' ability to operate its businesses and pay its employees, and loss of revenue and customers.

150. Moreover, if Defendants' conspiracy achieves its aims, Defendants will destroy all competition in the Relevant Market. This will necessarily lead to reduced options and higher prices for consumers. Under ownership by the TRT Defendants and without competition, The Greenbrier and The Omni Homestead would be able to charge supracompetitive prices. This is precisely the type of harm to competition that West Virginia's antitrust laws are intended to prevent.

151. Additionally, upon information and belief, Defendants' unlawful and anticompetitive actions have caused uncertainty in the Relevant Market that is driving customers away from The Greenbrier, increasing The Omni Homestead's market and pricing power, and causing hundreds of West Virginians to face an imminent threat to their jobs and livelihood.

152. This harm to competition results directly from Defendants' fraudulent, anticompetitive scheme and conspiracy that enabled the TRT Defendants to acquire the Loans

under false pretenses, declare a sham default, and start the process of attempting to snatch The Greenbrier.

153. Plaintiffs are the proper parties to pursue this claim, as Defendants' actions threaten to destroy all competition in the Relevant Market and will also thereby end Plaintiffs' ability to compete in those markets and destroy Plaintiffs' businesses. This type of harm to competition that results in direct harm to a competitor is precisely the type of restraint of trade that is proscribed by the West Virginia antitrust laws.

154. Defendants' actions constitute an unlawful restraint of trade under the West Virginia Antitrust Act, W. Va. Code § 47-18-3(a) and W. Va. Code § 47-18-3(b). Plaintiffs are entitled to treble damages, disgorgement, restitution, injunctive relief, and any other damages provided by law.

## COUNT THIRTEEN
## WEST VIRGINIA ATTEMPTED MONOPOLIZATION
### (TRT Defendants)

155. Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

156. In the Relevant Market, there are two players—The Greenbrier and The Omni Homestead. Plaintiffs own and operate The Greenbrier. The TRT Defendants own and operate The Omni Homestead.

157. The TRT Defendants were not able to obtain The Greenbrier through non-anticompetitive means. They thus circumvented the competitive process through a series of underhanded and unlawful acts that culminated with acquisition of the Loans, which are secured by The Greenbrier.

158. To accomplish their acquisition of the Loans, the TRT Defendants knowingly violated the Confidentiality Agreement by obtaining confidential information under false pretenses.

34

The TRT Defendants then used that confidential information to negotiate a deal to purchase the Loans, also knowingly in violation of the Confidentiality Agreement and the Second-Lien Note.

159. After rejecting an offer for repayment of the Loans in full, the TRT Defendants are now attempting to use the unlawfully acquired Loans to take possession of The Greenbrier.

160. The TRT Defendants have done all of this so that they can take control of their chief competitor in the region. If they succeed, the TRT Defendants will have a monopoly over the Relevant Market.

161. More specifically, if Defendants' attempted monopolization achieves its aims, Defendants will destroy all competition in the Relevant Market—in other words, they will establish a monopoly. This will necessarily lead to reduced options and higher prices for consumers. Under ownership by the TRT Defendants and without competition, The Greenbrier and The Omni Homestead would be able to charge supracompetitive prices. This is precisely the type of harm to competition that West Virginia's antitrust laws are intended to prevent.

162. Additionally, upon information and belief, Defendants' unlawful and anticompetitive actions have caused uncertainty in the Relevant Market that is driving customers away from The Greenbrier, increasing The Omni Homestead's market and pricing power, and causing hundreds of West Virginians to face an imminent threat to their jobs and livelihoods.

163. This harm to competition results directly from Defendants' fraudulent, anticompetitive scheme that enabled the TRT Defendants to acquire the Loans under false pretenses, declare a sham default, and start the process of attempting to snatch The Greenbrier.

164. Plaintiffs are the proper parties to pursue this claim, as Defendants' actions threaten to destroy all competition in the Relevant Market and will also thereby end Plaintiffs' ability to compete in those markets and destroy Plaintiffs' businesses. This type of harm to competition that

35

results in direct harm to a competitor is precisely the type of attempted monopolization that is proscribed by the West Virginia antitrust laws.

165. The TRT Defendants' actions constitute unlawful attempted monopolization under the West Virginia Antitrust Act, W. Va. Code § 47-18-4. Plaintiffs are entitled to treble damages, disgorgement, restitution, injunctive relief, and any other damages provided by law.

**COUNT FOURTEEN**
**WEST VIRGINIA REFUSAL TO DEAL**
**(TRT Defendants)**

166. Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

167. The TRT Defendants were engaged in a voluntary course of dealing with Plaintiffs.

168. The TRT Defendants and Plaintiffs are competitors in the Relevant Product Market and in the Relevant Geographic Market. Plaintiffs own and operate The Greenbrier. The TRT Defendants own and operate The Omni Homestead.

169. The TRT Defendants refused to permit repayment of the Loans on economically rational terms that they would have accepted in a competitive market.

170. The TRT Defendants also unilaterally terminated the governing loan agreements instead of allowing Plaintiffs to repay their debts under those agreements at a premium, which Plaintiffs were prepared to do.

171. Defendants' refusal to deal with Plaintiffs was for the purpose of effectuating their scheme aimed at taking possession of The Greenbrier and implementing their anticompetitive aims.

172. More specifically, by refusing to deal with Plaintiffs on terms that they would have accepted in a competitive market, Defendants are attempting to prevent Plaintiffs from repaying the Loans so that Defendants can take possession of the Greenbrier and destroy all competition in the Relevant Market. This will necessarily lead to reduced options and higher prices for consumers.

Under ownership by the TRT Defendants and without competition, The Greenbrier and The Omni Homestead would be able to charge supracompetitive prices. This is precisely the type of harm to competition that West Virginia's antitrust laws are intended to prevent.

173. Additionally, upon information and belief, Defendants' unlawful and anticompetitive actions have caused uncertainty in the Relevant Market that is driving customers away from The Greenbrier and increasing The Omni Homestead's market and pricing power.

174. This harm to competition results directly from Defendants' otherwise economically irrational refusal to accept repayment of the Loans at a premium—a decision Defendants made to enable their attempt to take over The Greenbrier.

175. Plaintiffs are the proper parties to pursue this claim, as Defendants' refusal to deal with Plaintiffs threatens to destroy all competition in the Relevant Market and will also thereby end Plaintiffs' ability to compete in those markets and destroy Plaintiffs' businesses. This type of harm to a competitor that destroys competition is precisely the type of refusal to deal that is proscribed by the West Virginia antitrust laws.

176. Defendants' actions constitute an unlawful restraint of trade under the West Virginia Antitrust Act, W. Va. Code § 47-18-3(b)(3), and unlawful attempted monopolization, W. Va. Code § 47-18-4. Plaintiffs are entitled to treble damages, disgorgement, restitution, injunctive relief, and any other damages provided by law.

**COUNT FIFTEEN**
**DECLARATORY JUDGMENT**
**(All Defendants – Sale of Loans Void)**

177. Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

178. Defendant Carter represented to Plaintiffs that it would not sell the Loans and would continue to extend the Loans' maturity while the sale process being conducted by the Second

Investment Bank was progressing. Defendant Carter also represented to Plaintiffs that it would not accept less than approximately $300 million (at one time) or approximately $360 million (at another time) to pay off the Loans. Those representations were knowingly and willfully false and fraudulent at the time they were made. Plaintiffs reasonably relied, to their detriment, upon Defendant Carter's knowingly and willfully false and fraudulent representations.

179. The Loans were embodied in various agreements between Plaintiffs and Defendant Carter. Defendant Carter's representations described in the foregoing paragraph, together with Defendant Carter's subsequent sale of the Loans in contradiction of those representations, violate Defendant Carter's duty of good faith and fair dealing under those agreements.

180. Because of Defendant Carter's representations described herein, Defendant Carter was equitably estopped from selling the Loans in contradiction of those representations.

181. Defendant Carter knew, moreover, that the TRT Defendants were subject to the Confidentiality Agreement and the Second-Lien Note, that the TRT Defendants' attempted acquisition of the Loans was an impermissible use of confidential information under the Confidentiality Agreement, and that the TRT Defendants' proposal to acquire the Loans was a violation of the Confidentiality Agreement and the Second-Lien Note. Defendant Carter's purported sale of the Loans to Defendant WSSH in conscious disregard of those contractual obligations by the TRT Defendants constitutes a tortious interference with Plaintiffs' business expectancy.

182. The TRT Defendants' purported acquisition of the Loans constitutes an impermissible use of information that the TRT Defendants acquired pursuant to the Confidentiality Agreement and another violation of the standstill provision of the Confidentiality Agreement.

183.     The TRT Defendants' purported acquisition of the Loans breached the Second-Lien Note.

184.     The TRT Defendants' purported acquisition of the loans is further prohibited by the West Virginia Uniform Trade Secrets Protection Act and the doctrine of equitable estoppel.

185.     The violations described herein render it unlawful for Defendant Carter to sell the Loans to Defendant WSSH or to propose to sell them to Defendant WSSH, and for the TRT Defendants, including Defendant WSSH, to purchase the Loans from Defendant Carter, cause the Loans to be purchased from Defendant Carter, or to propose to purchase the Loans from Defendant Carter. Accordingly, Plaintiffs are entitled to a declaration, pursuant to West Virginia Code § 55-13-1, *et seq.*, that the purported sale of the Loans to Defendant WSSH is unlawful and void, that the TRT Defendants have no enforceable rights with respect to the Loans, that the sale of the Loans must be rescinded, and that Plaintiffs are entitled to pay off the Loans for the same amount at which Defendant Carter purportedly sold them to the TRT Defendants.

**COUNT SIXTEEN**
**PRELIMINARY AND PERMANENT INJUNCTION**
**(TRT Defendants)**

186.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

187.     The TRT Defendants' continued misappropriation of Plaintiff Greenbrier's trade secrets and confidential information, and their threats to exercise creditor remedies on the basis of Loans that they do not lawfully own, have harmed, are harming, and will continue to harm Plaintiffs irreparably, unless the TRT Defendants are preliminarily enjoined from further such conduct.

188.     If the TRT Defendants are preliminarily enjoined from such conduct, they will suffer no cognizable harm or other inequity.

189. Plaintiffs are likely to succeed on the merits of their claims herein, entitling them to preliminary and permanent injunctions against further such conduct by the TRT Defendants.

190. The public interest strongly favors the issuance of a preliminary injunction against the TRT Defendants' further prohibited conduct as alleged herein.

**PRAYER FOR RELIEF**

191. WHEREFORE, Plaintiffs pray that this honorable Court afford them the following relief:

a. The rescission of the purported sale of the Loans;

b. Declaratory judgments in their favor as sought herein, including a declaration that the TRT Defendants have no enforceable rights with respect to the Loans and, in the alternative, that Plaintiffs are entitled to pay off the Loans for not more than the price at which they were purportedly sold;

c. Preliminary and permanent injunctions enjoining Defendants from exercising creditor remedies against Plaintiffs, including, but not limited to, foreclosure and non-foreclosure sale of assets, and liens;

d. An award of direct and consequential damages totaling not less than $500,000,000, plus treble damages as permitted by law;

e. An award of punitive damages as permitted by law;

f. An award of costs, interest, expenses, and attorneys' fees;

g. Prejudgment and post-judgment interest on Plaintiffs' damages as permitted by law; and

h. Such other and further relief as the Court may deem just and proper.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED: April 30, 2026

Respectfully submitted,

**GREENBRIER HOTEL CORPORATION; JAMES C. JUSTICE COMPANIES, INC.; TWIN FIR ESTATES, LLC; WILCOX INDUSTRIES, INC.; JUSTICE LOW SEAM MINING, INC.; PLAYERS CLUB, LLC; JUSTICE FAMILY GROUP, LLC; GREENBRIER MEDICAL INSTITUTE, LLC; GREENBRIER GOLF & TENNIS CLUB CORPORATION; THE GREENBRIER SPORTING CLUB DEVELOPMENT CO., INC.; THE GREENBRIER SPORTING CLUB, INC.; TAMS MANAGEMENT, INC.; BELLWOOD CORPORATION; OAKHURST CLUB, LLC; JAMES C. JUSTICE II; JAMES C. JUSTICE III;** and **JILLEAN L. JUSTICE**,

By Counsel:

*/s/ Steven R. Ruby*
Steven R. Ruby (WVSB #10752)
Raymond S. Franks II (WVSB #6523)
David R. Pogue (WVSB #10806)
CAREY DOUGLAS KESSLER & RUBY PLLC
901 Chase Tower, 707 Virginia Street, East
P.O. Box 913
Charleston, WV 25323
Telephone: (304) 345-1234
Facsimile: (304) 342-1105
sruby@cdkrlaw.com
rfranks@cdkrlaw.com
drpogue@cdkrlaw.com

SULLIVAN & CROMWELL LLP

H. Rodgin Cohen (WVSB #767)
Robert L. Jones IV (*pro hac vice* forthcoming)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
cohenhr@sullcrom.com
jonesrob@sullcrom.com

Amanda Flug Davidoff (*pro hac vice* forthcoming)
Oliver W. Engebretson-Schooley (*pro hac vice* forthcoming)
1700 New York Avenue, N.W.
Suite 700
Washington, D.C. 20006
Telephone: (202) 956-7500
davidoffa@sullcrom.com
engebretsono@sullcrom.com