**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**BECKLEY DIVISION**

WHITE SULPHUR SPRINGS HOLDINGS, LLC,

    Plaintiff,

v.

JAMES C. JUSTICE, II, *et al.*,

    Defendants.

Civil Case No. 5:26-cv-00257

Hon. Frank W. Volk

**DEFENDANTS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S AMENDED EMERGENCY MOTION FOR APPOINTMENT OF A RECEIVER AND EMERGENCY MOTION FOR <u>PRELIMINARY INJUNCTION</u>**

<u>**TABLE OF CONTENTS**</u>

<u>**Page**</u>

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND .......................................................................................................................4

      A.     Parties and Relevant Players...........................................................................4

      B.     The Carter Bank Loans ..................................................................................5

      C.     The Scheme to Transfer the Loans .................................................................6

      D.     Defendants' Post-Sale Negotiations With TRT...............................................7

      E.     WSSH's Attempt to Force the Greenbrier into Receivership and Defendants' Discovery of the Unlawful Scheme ....................................................................8

      F.     The Greenbrier and Other Collateral ...................................................................10

ARGUMENT .............................................................................................................................11

I.     WSSH FAILS TO SATISFY ITS HIGH BURDEN TO SHOW THAT IT IS ENTITLED TO EMERGENCY APPOINTMENT OF A RECEIVER...............................................11

      A.     Governing Federal Law Sets a High Bar for Appointment of a Receiver .............11

      B.     WSSH Does Not Have a Contractual Right to a Receiver ...................................12

      C.     The Equitable Factors Weigh Strongly Against Appointment of a Receiver........13

          1.     The collateral is more than adequate to satisfy the outstanding debt ..............14

          2.     WSSH presents no evidence showing that Defendants' financial position endangers the value of The Greenbrier .........................................................15

          3.     Defendants have not engaged in fraudulent conduct ......................................18

          4.     WSSH has adequate legal remedies...............................................................19

          5.     The Greenbrier and its related assets are in no imminent danger of loss ........20

          6.     The harm to Defendants from appointment of a receiver far outweighs the harm to WSSH if a receiver is not appointed ...................................................21

          7.     WSSH is not likely to succeed on the merits...................................................22

          8.     A receivership would not benefit WSSH or the public....................................24

II. WSSH FAILS TO SHOW THAT IT IS ENTITLED TO THE EXTRAORDINARY REMEDY OF A PRELIMINARY INJUNCTION............................................................24

    A. WSSH Has Failed to Show That It Is Likely to Succeed on the Merits ................26

    B. WSSH's Alleged Harm Is Speculative and Far From Irreparable.........................28

    C. The Balance of the Harm Overwhelmingly Favors Defendants............................30

    D. A Preliminary Injunction Does Not Serve the Public Interest...............................31

    E. The Requested Relief Is Effectively a Mandatory Injunction Altering the Status Quo.........................................................................................................................33

III. EQUITY COUNSELS AGAINST APPOINTMENT OF A RECEIVER AND IMPOSITION OF A PRELIMINARY INJUNCTION ......................................................34

CONCLUSION.................................................................................................................................35

**Page(s)**

**Cases:**

*2311 Racing LLC* v. *Nat'l Ass'n for Stock Car Auto Racing, LLC*,
139 F.4th 404 (4th Cir. 2025) ......................................................................33, 34

*ACA Fin. Guar. Corp.* v. *City of Buena Vista*,
298 F. Supp. 3d 834 (W.D. Va. 2018) ................................................................11

*Al-Abood* v. *El-Shamari*,
71 F. Supp. 2d 511 (E.D. Va. 1999) ...................................................................29

*Blankenship* v. *Consolidation Coal Co.*,
850 F.3d 630 (4th Cir. 2017) .............................................................................23

*BMW of N. Am., LLC* v. *CJM Auto. II, LLC*,
2018 WL 3242304 (N.D. Ohio Apr. 26, 2018) ..................................................22

*Carroll Co.* v. *Sherwin-Williams Co.*,
848 F. Supp. 2d 557 (D. Md. 2012) ...................................................................23

*Cheng* v. *Liu*,
2026 WL 102443 (D.S.C. Jan. 14, 2026) ....................................................15, 19

*Cooke* v. *Lancelotta*,
2022 WL 622229 (D. Md. Mar. 3, 2022) ...........................................................34

*Deutsche Bank Tr. Co. Ams.* v. *Mountain W. Hosp., LLC*,
2017 WL 11179626 (N.D.W. Va. Aug. 3, 2017) .........................................13, 19

*Di Biase* v. *SPX Corp.*,
872 F.3d 224 (4th Cir. 2017) ....................................................................... *passim*

*FBR Cap. Mkts. & Co.* v. *Short*,
2009 WL 3254458 (E.D. Va. Oct. 9, 2009) ........................................................32

*FDIC* v. *R&M Invs., LLC*,
2012 WL 12904014 (D.S.C. Aug. 8, 2012) ........................................................13

*First Guar. Bank* v. *Greenbrier Hotel Corp.*,
No. 5:25-cv-00687 (S.D.W. Va. Feb. 5, 2026) ...................................................17

*First United Bank & Tr.* v. *Square at Falling Run, LLC*,
2011 WL 1563108 (N.D.W. Va. Mar. 31, 2011) ..........................................14, 27

*FirstMerit Bank, N.A.* v. *Myrter*,
2015 WL 3916673 (W.D. Pa. June 25, 2015)................................................................21

*Goldberg* v. *Kaczmarek*,
2025 WL 3227346 (D. Md. Nov. 19, 2025) .................................................. *passim*

*Greenbrier Hotel Corp.* v. *TRT Holdings, Inc.*,
Case No. CC-13-2026-C-51 (Cir. Ct. Greenbrier Cnty.)................................. *passim*

*Greene* v. *Scott*,
637 F. App'x 749 (4th Cir. 2016) .................................................................16

*Henderson* v. *Bluefield Hosp. Co.*,
902 F.3d 432 (4th Cir. 2018) .......................................................................25

*Home Mortg. Co.* v. *Ramsey*,
49 F.2d 738 (4th Cir. 1931) ....................................................................11, 22

*Hughes Network Sys., Inc.* v. *InterDigital Commc'ns Corp.*,
17 F.3d 691 (4th Cir. 1994) .........................................................................30

*Imagine Medispa, LLC* v. *Transformations, Inc.*,
999 F. Supp. 2d 862 (S.D.W. Va. 2014)........................................................25

*Jensen* v. *Md. Cannabis Admin.*,
719 F. Supp. 3d 466 (D. Md. 2024) ..............................................................32

*Manuel* v. *Gembala*,
2010 WL 3860407 (E.D.N.C. Sep. 30, 2010)..........................................12, 20, 21

*MB Fin. Bank, N.A.* v. *World Fresh Mkt., LLC*,
2013 WL 870103 (D.V.I. Mar. 6, 2013) .........................................................14

*Meyer Jewelry Co.* v. *Meyer Holdings, Inc.*,
906 F. Supp. 428 (E.D. Mich. 1995)..............................................................22

*United States ex rel. Miller* v. *Reckitt Benckiser Grp. PLC*,
698 F. Supp. 3d 889 (W.D. Va. 2023) .............................................................5

*Nat'l P'ship Inv. Corp.* v. *Nat'l Hous. Dev. Corp.*,
153 F.3d 1289 (11th Cir. 1998) ....................................................................11

*New Lond. Tobacco Mkt., Inc.* v. *Ky. Fuel Corp.*,
No. 6:12-cv-00091-GFVT-HAI (E.D. Ky. Mar. 5, 2026) ....................................17

*Pierce* v. *N.C. State Bd. of Elections*,
97 F.4th 194 (4th Cir. 2024) ........................................................................34

*Precision Instrument Mfg. Co.* v. *Auto. Maint. Mach. Co.*,
   324 U.S. 806 (1945) ..................................................................................................34

*Priv. Fin. Alts., LLC* v. *Walloon Lake Holdings, LLC*,
   2025 WL 3290636 (W.D. Mich. Nov. 26, 2025) ..................................................15

*Pusey & Jones Co.* v. *Hanssen*,
   261 U.S. 491 (1923) ..................................................................................................12

*Quality Props. Asset Mgmt. Co.* v. *Sehn Harrison, LLC*,
   2011 WL 3329889 (E.D. Mich. Aug. 3, 2011) ......................................................23

*Smith* v. *Cessna Aircraft Co.*,
   124 F.R.D. 103 (D. Md. 1989) .................................................................................35

*SS Richmond LLC* v. *Harrison*,
   2023 WL 1499574 (E.D. Va. Jan. 20, 2023) .........................................................22

*In re Turner*,
   182 B.R. 317 (Bankr. N.D. Ala. 1995) ..................................................................18

*U.S. Bank Nat'l Ass'n* v. *Mountain Blue Hotel Grp., LLC*,
   2017 WL 4700660 (N.D.W. Va. Oct. 19, 2017) ...................................................21

*U.S. Bank Nat'l Ass'n* v. *Sayona Hosp., LLC*,
   2014 WL 2918549 (N.D.W. Va. June 25, 2014) ........................................13, 19, 27

*W&T Offshore, Inc.* v. *Endurance Assurance Corp.*,
   2025 WL 2492478 (S.D. Tex. June 25, 2025) .................................................29, 30

*Wells Fargo Bank, N.A.* v. *Premier Hotels Grp., LLC*,
   2015 WL 404549 (M.D. Pa. Jan. 29, 2015) .....................................................15, 18

*W. Sur. Co.* v. *Justice*,
   No. 7:23-cv-00524-MFU (W.D. Va. Jan. 28, 2025) .............................................17

*Williams Ohio Valley Midstream, LLC* v. *Kittle*,
   2024 WL 3325532 (4th Cir. July 8, 2024) ............................................................28

*Wilmington Tr., Nat'l Ass'n* v. *Homes4Families, LLC*,
   2019 WL 5787985 (D. Md. Nov. 6, 2019) ......................................................14, 21

*Winter* v. *Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .......................................................................................... *passim*

**Statutes:**

W. Va. Code § 53-6-1 ......................................................................................................11

W. Va. Code § 53-6-2 ..........................................................................................................11

W. Va. Code § 55-21-2 ........................................................................................................11

W. Va. Code § 55-21-6 ........................................................................................................11

**Other Authorities:**

Fed. R. Civ. P. 66 ................................................................................................................11

Fed. R. Evid. 201(b)(2) .........................................................................................................5

Omni Hotels & Resorts, *All Hotels & Resorts*,
    https://www.omnihotels.com/destinations ...................................................................5

Omni Hotels & Resorts, *Omni Homestead*,
    https://www.omnihotels.com/hotels/homestead-virginia/property-details .................5

Texas Comptroller of Public Accounts, *Franchise Tax Account Status*,
    https://comptroller.texas.gov/taxes/franchise/account-status/search/32104872745 ..................4

SMU Dedman Sch. Of L., Robert B. Rowling '79: Featured Speaker at the Trailblazer
    Speaker Series (Dec. 12, 2024), https://www.smu.edu/law/news-events/2024/robert-
    rowling-trailblazer.........................................................................................................5

Wright & Miller's Federal Practice & Procedure (3d ed. 2026).........................11, 12, 14

# PRELIMINARY STATEMENT[1]

This action is part of an orchestrated scheme by Plaintiff White Sulphur Springs Holdings, LLC ("WSSH") and its billionaire owners to seize control of The Greenbrier resort through unlawful means. WSSH purports to have purchased certain loans issued to United States Senator James C. Justice II; his wife, Cathy L. Justice; and their son, James C. Justice, III (collectively, the "Justices") and secured by The Greenbrier. Less than two weeks after allegedly purchasing those loans, WSSH filed this action claiming that the loans are in default, The Greenbrier is in "disrepair," the Justices must be stripped of the property so that it can be placed under the control of a receiver, and the Justices must be restricted from full use of their personal and real property. But WSSH does not validly own these loans. WSSH unlawfully acquired them through fraud, breach of contract, and in violation of West Virginia antitrust law. The parties are currently litigating whether the sale of the loans should be rescinded in the Circuit Court of Greenbrier County, which is the basis for the Justices' pending stay motion in this Court.

If the Court proceeds with this case before the state court decides whether WSSH even owns the underlying loans (and it should not), the Court should deny WSSH's two "emergency" motions. One seeks appointment of a receiver that would seize The Greenbrier from the Justices and the other requests a preliminary injunction depriving the Justices of full use of their funds and

---

[1]  Pursuant to the Court's May 21, 2026 order (ECF No. 57), Defendants submit this combined memorandum of law in opposition to WSSH's Amended Emergency Motion for Appointment of a Receiver (ECF No. 39) and Emergency Motion for Preliminary Injunction (ECF No. 41). In advance of filing this opposition, Defendants moved to continue the briefing deadlines and scheduled hearings in this action because Defendants have obtained a term sheet for new financing that will allow them to repay the total amount of debt that Plaintiff White Sulphur Springs Holdings, LLC claims it is owed and moot this action. (ECF No. 58.) Consistent with the Court's May 22, 2026 Order, Defendants are submitting this opposition while that motion remains pending. (ECF No. 59 at 2.)

property.  WSSH has come nowhere close to demonstrating that it is facing the type of imminent, irreparable harm that is required to obtain either kind of relief.

For context, the plan to seize The Greenbrier from the Justices dates back as early as 2024. WSSH is a wholly owned subsidiary of TRT Holdings, Inc. ("TRT"), a Texas company best known for owning Omni Hotels and Resorts.  For years, TRT and its billionaire owner, Robert Rowling, have wanted to get their hands on The Greenbrier.  And in 2024, they saw their opportunity.  TRT posed as a purported consultant to a private equity firm that was considering doing business with the Justices to gain access to the family's and The Greenbrier's confidential information.  A confidentiality agreement prohibited TRT from using that confidential information for any purpose other than the contemplated transaction.  The agreement also prohibited TRT from acquiring or proposing to acquire any debt of The Greenbrier, as did a separate second-lien note that TRT purchased around the same time.  TRT knowingly violated those contracts when, as early as January 2026, TRT began negotiating with Carter Bank & Trust ("Carter Bank") to purchase certain loans that Carter Bank had extended to the Justices and that were secured by The Greenbrier and associated properties (the "Loans").  On or about March 25, 2026, with no notice to the Justices, Carter Bank announced that it had sold the Loans for $289.5 million to WSSH, a shell company that TRT had set up two weeks prior.

WSSH's and TRT's purchase of the Loans was unlawful and is invalid.  Indeed, the Justices have asked the Greenbrier County Circuit Court to rescind the sale, award additional damages, and preliminarily enjoin WSSH and TRT from taking any further action to enforce the Loans until the Justices' claims are adjudicated.  But in a hastily crafted attempt to undercut the Circuit Court, WSSH came to this Court seeking staggeringly broad injunctive relief on an "emergency" basis, including the extraordinary remedy of appointing a receiver to take control of,

operate, and even sell The Greenbrier and related properties, as well as a preliminary injunction restricting the Justices' use of their funds and property. To support those requests, WSSH contends that The Greenbrier is in imminent danger of degradation that will diminish its value and imperil its ability as collateral to fully secure the Loans. That is ludicrous. The Greenbrier is currently operating at a profit, and, together with the other collateral, is worth almost three times the value of the Loans. Indeed, the only danger to the value of The Greenbrier comes from WSSH's half-baked attempts to force it into a receivership—not from the Justices.

Setting aside the fact that WSSH does not validly own the Loans and has no right to any remedies under the governing loan agreements, WSSH has not established that it is entitled to either of the extreme remedies that it seeks here.

*First*, WSSH has no right to immediate appointment of a receiver. No contractual provision authorizes that extreme remedy, and the relevant equitable factors weigh heavily against it. Specifically, WSSH has not shown that the value of The Greenbrier and related properties is inadequate to secure the Loans, that the Justices' financial position is imperiled or that it even affects the value of The Greenbrier and related properties, that Defendants engaged in fraudulent conduct, that monetary relief would be inadequate, or that it would suffer imminent harm absent appointment of a receiver. All this coupled with the harm a receivership would impose on The Greenbrier and Defendants decisively demonstrates that a receivership is inappropriate here.

*Second*, WSSH has not met its burden to show that it is entitled to a preliminary injunction. WSSH has not shown a likelihood of success on the merits, irreparable harm, or a balance of hardships in its favor. WSSH is not likely to succeed on its claims because it has no rights under the Loans and mischaracterizes Defendants' statements to support its claim for breach. WSSH also alleges only a speculative monetary injury, which is not irreparable harm. And Defendants

face significant hardship from preliminary injunctive relief, as demonstrated by the ongoing harm caused by only the threat of WSSH's lawsuit. Finally, the public interest weighs against this extraordinary preliminary relief, which would undercut Defendants' ability to operate The Greenbrier and thus jeopardize thousands of employees and the property's many patrons and guests. The Court should thus deny WSSH's amended emergency motion for appointment of a receiver and emergency motion for preliminary injunction.

## BACKGROUND[2]

### A. Parties and Relevant Players

The individual Defendants in this action are the Justices. (ECF No. 37 ("Am. Compl.")) ¶¶ 2-4.) The Justices have owned and operated The Greenbrier—a luxury golf and convention-scale resort nestled in the Allegheny Mountains outside of White Sulphur Springs, West Virginia—for nearly two decades. Several business entities associated with The Greenbrier, including the hotel, the associated golf and tennis club, and the on-site medical facility, are also named as Defendants. (*See id.* ¶¶ 5–10.)

Plaintiff WSSH is a Texas limited liability company formed on March 12, 2026.[3] On or about March 25, 2026, WSSH purported to purchase the Loans from Carter Bank. (*Id.* ¶¶ 1, 22.) WSSH's sole member is OHO Corporation. (*Id.* ¶ 1.) OHO Corporation is in turn wholly owned by TRT, the parent holding company that also owns Omni Hotels & Resorts. (*See* Disclosure of Corp. Affiliations (ECF No. 2).) TRT is owned and operated by Texas billionaire Robert

---

[2] The relevant facts are set forth herein and in the accompanying exhibits, in Plaintiff's Amended Complaint and accompanying exhibits, and in the Declarations of James C. Justice II ("Justice II Decl.") (Ex. 2) and James C. Justice III ("Justice III Decl.") (Ex. 3).

[3] *See* Texas Comptroller of Public Accounts, *Franchise Tax Account Status*, https://comptroller.texas.gov/taxes/franchise/account-status/search/32104872745 (last visited May 22, 2026).

Rowling.[4]  Omni operates more than 50 hotel and resort properties worldwide,[5] including a luxury golf and convention-scale resort called the Omni Homestead Resort & Spa, which is less than an hour's drive from The Greenbrier in Hot Springs, Virginia.[6]

### B.      The Carter Bank Loans

Carter Bank first extended the Loans to the Justices in early 2010.  (*See* Am. Compl. ¶¶ 13–14; Ex. B (ECF No. 38-2) through Ex. L (ECF No. 38-12).)  Over the past two years, Carter Bank and the Justices entered into various agreements regarding the Justices' repayment of the Loans, including forbearance agreements and confessions of judgment.  (*See* Am. Compl. ¶¶ 15–17.)  In early 2025, Carter Bank told the Justices that they could pay off the Loans for approximately $300 million.  (Justice III Decl. ¶ 15.)  With the assistance of a prominent investment bank, the Justices lined up several potential lenders to obtain refinancing and fully repay Carter Bank.  (*Id.* ¶ 16.)  But Carter Bank suddenly reneged on its offer and upped its repayment demand to $360 million.  (*Id.* ¶ 17.)  When one potential lender remained willing to proceed, Carter Bank killed the deal by setting arbitrary and unachievable deadlines that led the remaining lender to withdraw.  (*Id.* ¶¶ 18–19.)

---

[4]      *See* SMU Dedman Sch. Of L., Robert B. Rowling '79:  Featured Speaker at the Trailblazer Speaker Series (Dec. 12, 2024), https://www.smu.edu/law/news-events/2024/robert-rowling-trailblazer (last visited May 22, 2026) (R. Rowling is "owner and chairman of TRT Holdings").

The Court can take judicial notice of company websites and other facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *see also United States ex rel. Miller* v. *Reckitt Benckiser Grp. PLC*, 698 F. Supp. 3d 889, 906 n.11 (W.D. Va. 2023) (taking judicial notice of a company's website).

[5]      *See* Omni Hotels & Resorts, *All Hotels & Resorts*, https://www.omnihotels.com/destinations (last visited May 22, 2026).

[6]      *See* Omni Hotels & Resorts, *Omni Homestead*, https://www.omnihotels.com/hotels/homestead-virginia/property-details (last visited May 22, 2026).

The most recent Forbearance Agreement is dated February 28, 2026 (the "Forbearance Agreement"). Absent a default, it remained in effect through April 15, 2026, and prevented Carter Bank from seeking any remedies, including foreclosing on The Greenbrier and related collateral. (Am. Compl., Ex. A (ECF No. 38-1) at 11.) Throughout this process, Carter Bank knew of the ongoing refinancing efforts and assured the Justices that it had no intention of selling the Loans. (Justice III Decl. ¶¶ 21–22.) That was false. As the Justices now know, Carter Bank was conspiring with TRT to sell the Loans to TRT so that TRT could use them to try to take possession of The Greenbrier.

### C. The Scheme to Transfer the Loans

In September 2024, representatives of TRT (including TRT executives Blake Rowling and Michael Smith) visited The Greenbrier as purported consultants for a private equity firm exploring potential transactions with the Justices. (*Id.* ¶ 26.) During that visit, TRT received confidential information under false pretenses—including proprietary pricing, marketing, reservation, and financial information, as well as access to non-public areas of the resort—for the purpose of its consulting role. (*See id.* ¶¶ 28–29.) Defendants provided that information because, as the private equity firm's consultant, TRT was bound by a confidentiality agreement prohibiting TRT from using confidential information it received for any purpose other than the contemplated financing transaction. (*See* Ex. 4 § 1(a) (Confidentiality Agreement).) The agreement also prohibited TRT from "acquir[ing] or propos[ing] or agree[ing] to acquire in any manner beneficial ownership . . . or constructive economic ownership[] through . . . any indebtedness of [The Greenbrier]." (*Id.* § 6.)

That same month, TRT bought second-lien debt that further restricted TRT's ability to acquire The Greenbrier's debt. As Blake Rowling later revealed to the Dallas Morning News, in

or around September 2024,[7] TRT secretly acquired $12–15 million in second-lien debt of The Greenbrier. (*See* Ex. 5 (Dallas Morning News Article).) The second-lien note independently barred TRT—directly or indirectly—from communicating or negotiating with Defendants' lenders about Defendants' indebtedness or from purchasing, negotiating to purchase, or attempting to purchase the Justice family's debt. (*See* Ex. 6 § 13k(i)–(ii).)

In January 2026, in violation of the confidentiality agreement and the second-lien note, TRT met with Carter Bank to negotiate TRT's purchase of the Loans. (Justice III Decl. ¶ 44.) Meanwhile, Carter Bank continued falsely to tell the Justices that it had no realistic buyers for the Loans. (*See id.* ¶ 22.) On March 25, 2026, without notice to the Justices, Carter Bank purported to sell the Loans to TRT's shell company WSSH. (*See id.* ¶ 31; Ex. 7 (Carter 8-K).) WSSH paid $289.5 million—more than $70 million less than Carter Bank previously demanded from another lender. (Ex. 7; *see* Justice III Decl. ¶ 17.)

**D.      Defendants' Post-Sale Negotiations With TRT**

After the sale became public, Senator Justice, then-unaware of TRT's scheme, spoke with Robert Rowling. (*See* Justice II Decl. ¶ 8.) During the call, Robert Rowling expressed a desire to work cooperatively with the Justice family at The Greenbrier. (*Id.* ¶ 9.) At an April 6, 2026 meeting, the Rowlings and Michael Smith acknowledged that the Loans could be repaid for $341 million. (*Id.* ¶ 10.) As an alternative, Robert Rowling offered a deal whereby TRT would forgive $200 million of the Loans in exchange for a 50% interest in The Greenbrier and various other consideration. (*Id.* ¶ 11.) Confronted with the threat that TRT posed to the value of The Greenbrier and the welfare of its employees, Senator Justice considered and ultimately accepted the offer,

---

[7]      Blake Rowling mistakenly stated that TRT acquired the second lien note in or around September 2024. (*See* Ex. 5.) The note is in fact dated October 15, 2024. (*See* Ex. 6.)

asking TRT to put the terms in writing. (*Id.*) But TRT reneged the next day. (*See* Ex. 8 (Ruby / TRT email).) Defendants then notified TRT that they intended to pay off the Loans at $341 million, the amount that TRT was demanding (and $51.5 million more than it had paid for the Loans just thirteen days earlier), and quickly arranged a new lender. (*See* Justice III Decl. ¶¶ 35–36; Ex. 7.) On April 8, 2026, Defendants sought confirmation of the exact repayment amount from TRT. (*See* Ex. 8.) Instead, on April 9, 2026, WSSH sent a "Notice of Default and Termination of Forbearance," suddenly claiming that Defendants had defaulted on the Loans and that TRT could exercise all rights available under the loan documents. (*See* Ex. 9 at 1–4).)

### E. WSSH's Attempt to Force the Greenbrier into Receivership and Defendants' Discovery of the Unlawful Scheme

On the same day that it sent the default letter, WSSH filed its initial, one-count complaint in this action that sought the "immediate" appointment of a receiver to assume control of The Greenbrier and numerous associated properties that Defendants own. (*See* ECF No. 1 at 16–18.)

As this was unfolding, Defendants were uncovering the unlawful scheme that TRT employed to purchase the Loans. Specifically, Defendants discovered that WSSH, TRT, Carter Bank, and others had—in violation of two separate contracts and various West Virginia laws— conspired for TRT to purchase the Loans so that TRT could attempt to force a takeover of The Greenbrier. Defendants immediately filed a lawsuit in Greenbrier County Circuit Court on April 12, 2026, that detailed the unlawful scheme, asserted claims for fraud, breach of contract, and tortious interference with business relationships, and sought (among other things) rescission of the sale of the Loans to WSSH under West Virginia law. (*See* Compl., *Greenbrier Hotel Corp. v. TRT Holdings, Inc.*, Case No. CC-13-2026-C-51, Dkt. No. 1 (Cir. Ct. Greenbrier Cnty.).) Defendants have since amended that complaint, including to add antitrust claims, as the full scope

of TRT's scheme has come to light, and are seeking preliminary injunctive relief. (*See* Ex. 1 (Amended State Court Complaint).) Briefing on that motion is ongoing.

On April 13, 2026, the day after Defendants filed their lawsuit in Greenbrier County outlining WSSH's and TRT's fraudulent scheme and seeking rescission of the sale of the Loans, WSSH filed a motion seeking the "emergency" appointment of a receiver and a preliminary injunction. (*See* ECF Nos. 6, 6-1.) WSSH's motion claimed "the immediate right to collect the entire amount of indebtedness owed to it" and to exercise "all rights available to it" under the governing loan documents. (ECF No. 6-1 at 2, 6.) The motion asked this Court to appoint a receiver with sweeping authority to seize Defendants' real and personal property and to enjoin Defendants from controlling or collecting from any of the property subject to receivership. (*See* ECF No. 6 at 4–5; ECF No. 6-2 at 19.)

Recognizing that WSSH's motion was intended to undercut the state court's consideration of whether WSSH validly purchased the Loans, Defendants quickly moved to stay this action. (*See* ECF No. 9.) On April 17, 2026, this Court set a briefing schedule for the parties' pending motions and scheduled an evidentiary hearing for May 11, 2026. (*See* ECF No. 18.) But nearly a week after the Court entered its scheduling order (and 10 days after WSSH filed its "emergency" request), WSSH's counsel informed Defendants' counsel of its intent to file an amended complaint and an amended motion. (*See* Ex. 10 at 1 (Hayes email to Ruby).) The parties then requested a joint extension of the schedule, which the Court granted. (*See* ECF Nos. 33, 34, 35.)

On May 1, 2026, WSSH filed its amended complaint, which seeks the same broad injunctive relief and immediate appointment of a receiver to "take full control" of The Greenbrier and related properties, operate them, and potentially sell them. (*See* Am. Compl. at 27–30.) Apparently realizing that receivership is a remedy rather than a standalone claim, WSSH added a

contrived breach of contract claim on the basis that Defendants violated various provisions of the Forbearance Agreement (that WSSH unlawfully acquired from Carter Bank), as well as a claim for attorneys' fees and costs. (*Id.* at ¶¶ 54–64, 87–89.) WSSH also filed an amended motion seeking appointment of a receiver (ECF No. 39) and a new motion seeking a preliminary injunction (ECF No. 41). These motions reiterate WSSH's extraordinary demands to restrict Defendants' use of their funds and property and for a receiver that would "assume full operation, management, and control of" The Greenbrier and related assets, while also being empowered to "market and lease or sell all or any part" of the property. (ECF No. 39-37 at 2, 9; *see* ECF No. 42 ("Prelim. Inj. Mem.") at 16–17.)

### F. The Greenbrier and Other Collateral

WSSH seeks this expansive relief despite the fact that The Greenbrier and other collateral that secure the Loans are valued far in excess of the total amount due on the Loans. In April 2023, several appraisals from global valuation firms valued The Greenbrier and its related assets that collateralize the Loans at approximately $1.107 billion. (Justice III Decl. ¶ 13.) Specifically, the appraisals valued the Greenbrier Resort at $597 million, the Greenbrier Sporting Club at $110.4 million, the Oakhurst real estate development at $52.5 million, a group of timber and farming properties at $59 million, and a mining complex at $289 million. (*Id.*)

But WSSH's and TRT's hostile campaign—including its attempts to force The Greenbrier into receivership—threatens to diminish that value. Following WSSH's well-publicized default accusation, bookings at The Greenbrier have fallen. (*Id.* ¶ 48.) The Greenbrier has also struggled to attract corporate clients or secure large-scale events, a critical component of The Greenbrier's revenue. (*Id.*) Indeed, clients have already expressed hesitation about future bookings in light of the uncertainty that WSSH's conduct has generated. (*Id.*) And, if WSSH proceeds, The Greenbrier

is at risk of losing several large upcoming contracts.  (*Id.*)  WSSH's actions have also jeopardized

The Greenbrier's relationships with its vendors and business partners.  (*Id.* ¶ 49.)  Put simply,

WSSH and TRT—not the Justices—are threatening ongoing damage to The Greenbrier's value.

**ARGUMENT**

**I.  WSSH FAILS TO SATISFY ITS HIGH BURDEN TO SHOW THAT IT IS ENTITLED TO EMERGENCY APPOINTMENT OF A RECEIVER.**

**A.  Governing Federal Law Sets a High Bar for Appointment of a Receiver.**

"The appointment of a receiver in a diversity case is a procedural matter governed by

federal law and federal equitable principles."  *ACA Fin. Guar. Corp.* v. *City of Buena Vista*, 298

F. Supp. 3d 834, 846 (W.D. Va. 2018).  On this point, courts, commentators, and the Federal Rules

of Civil Procedure agree.  *See Nat'l P'ship Inv. Corp.* v. *Nat'l Hous. Dev. Corp.*, 153 F.3d 1289,

1291, 1293 (11th Cir. 1998); 12 Wright & Miller's Federal Practice & Procedure § 2983 (3d ed.

2026); Fed. R. Civ. P. 66 ("These rules govern an action in which the appointment of a receiver is

sought . . . .").[8]

Federal courts have long recognized that appointment of a receiver is "a drastic remedy"

that "calls for the exercise of the greatest care and judgment."  *Home Mortg. Co.* v. *Ramsey*, 49

F.2d 738, 742 (4th Cir. 1931).  Because the remedy is so severe, appointment of a receiver is "to

be avoided in all but the most acute cases of harm or loss to a demonstrated interest."  *Goldberg*

---

[8]      WSSH acknowledges that "federal law governs whether a receiver will be appointed" but still argues West Virginia statutes authorize appointment of a receiver.  (ECF No. 40 at 17 (citation omitted).)  No West Virginia statute permits a *federal* court to appoint a receiver.  For example, W. Va. Code Section 55-21-6 refers to the powers of a *West Virginia circuit court*—not a federal district court.  *See* W. Va. Code § 55-21-2 ("'Court' means a circuit court.").  Similarly, W. Va. Code Section 53-6-1 provides bases for the appointment of a receiver in a "court of equity," which the code subsequently clarifies refers to a West Virginia circuit court.  *See* W. Va. Code § 53-6-2 (providing appellate right to Supreme Court of Appeals of West Virginia from decision of "circuit court" pursuant to § 53-6-1).  Put simply, appointment of a receiver in federal court is an equitable remedy governed by a federal common law standard.

v. *Kaczmarek*, 2025 WL 3227346, at *2 (D. Md. Nov. 19, 2025); *see* 12 Wright & Miller's Federal Practice & Procedure § 2983 ("The appointment of a receiver is considered to be an extraordinary remedy that should be employed with the utmost caution and granted only in cases of clear necessity to protect plaintiff's interests in the property."). WSSH falls woefully short of meeting this standard.

**B. WSSH Does Not Have a Contractual Right to a Receiver.**

WSSH claims that its request for a receiver should be freely granted because the contractual language "encompasses" its right to a receiver. (ECF No. 40 ("Am. Recv'r Mem.") at 19.) WSSH cannot rely on contracts in which it has no rights, and even if it could, no contractual language here authorizes appointment of a receiver.

As an initial matter, as Defendants have alleged in the Greenbrier County Circuit Court, WSSH does not validly own the Loans. Whether the sale of the Loans should be rescinded and whether WSSH can enforce claimed rights under the Loans is currently being considered by the Circuit Court. Because a "legally recognized right" in Defendants' property is a prerequisite to obtaining a receivership, WSSH would have no basis for that remedy (or any other) here if the Circuit Court finds for Defendants on those claims. *See, e.g.*, *Manuel* v. *Gembala*, 2010 WL 3860407, at *6 (E.D.N.C. Sep. 30, 2010); *cf. Pusey & Jones Co.* v. *Hanssen*, 261 U.S. 491, 497 (1923) (noting importance of "substantive right, legal or equitable, in or to the property of [the] debtor"). Defendants have thus asked this Court to stay this action until the state court resolves that key threshold question. (*See* ECF Nos. 44, 45.)

But even if WSSH validly owned the Loans, they do not provide for appointment of a receiver. WSSH acknowledges this point: "there is no contractual provision in the [Forbearance

Agreement] that expressly references the appointment of a receiver." (Am. Recv'r Mem. at 19.)[9] WSSH cites only a general provision permitting a lender to pursue rights available "at law, in equity or otherwise available," (ECF No. 38-1 at 21), and argues that this "broad grant of remedial authority encompasses WSSH's . . . right to the appointment of a receiver." (Am. Recv'r Mem. at 19.) But WSSH points to no case where a court determined that such a general grant of authority to pursue rights already available under law created the specific right to appointment of a receiver as WSSH now claims. On the contrary, each case WSSH cites involved a contractual provision expressly providing for a receivership. *See Deutsche Bank Tr. Co. Ams.* v. *Mountain W. Hosp., LLC*, 2017 WL 11179626, at *1 (N.D.W. Va. Aug. 3, 2017) (holding bank's contractual "right to have a court-appointed receiver manage the Property" provided "strong support for such an appointment"); *U.S. Bank Nat'l Ass'n* v. *Sayona Hosp., LLC*, 2014 WL 2918549, at *4 (N.D.W. Va. June 25, 2014) ("Defendant has consented to the appointment of a receiver upon an Event of Default."); *FDIC* v. *R&M Invs., LLC*, 2012 WL 12904014, at *3 (D.S.C. Aug. 8, 2012) ("Plaintiff and Defendants specifically contracted regarding the appointment of a receiver in the event that Defendants defaulted."). Put simply, WSSH has no contractual right to the appointment of a receiver, and the Forbearance Agreement and underlying Loan agreements provide no support for its claim here.

### C. The Equitable Factors Weigh Strongly Against Appointment of a Receiver.

Regardless of whether WSSH had a contractual right to a receiver, WSSH still must demonstrate that the equities weigh in favor of receivership. WSSH does not come close to making that showing. Courts in the Fourth Circuit typically look to eight factors to guide their discretion

---

[9]     The underlying loan agreements also do not contain a provision providing for the appointment of a receiver. (*See* ECF No. 38-2 through ECF No. 38-12.)

in determining whether to appoint a receiver:  (1) the adequacy of the collateral to satisfy the debt, (2) the defendant's financial position, (3) any fraudulent conduct by the defendant, (4) the adequacy of legal remedies, (5) any imminent danger of the property being lost or diminishing in value, (6) the balance of hardships between plaintiff and defendant, (7) the plaintiff's likelihood of success on the merits of their underlying claim, and (8) whether the plaintiff's interests would in fact be protected by a receivership.  *See Wilmington Tr., Nat'l Ass'n* v. *Homes4Families, LLC*, 2019 WL 5787985, at *3 (D. Md. Nov. 6, 2019); *First United Bank & Tr.* v. *Square at Falling Run, LLC*, 2011 WL 1563108, at *9 (N.D.W. Va. Mar. 31, 2011); 12 Wright & Miller's Federal Practice & Procedure § 2983.  In applying these factors, courts caution that a "receivership is extreme and to be avoided in all but the most acute cases of harm or loss to a demonstrated interest."  *Goldberg*, 2025 WL 3227346, at *2.  Here, the factors weigh strongly against appointment of a receiver, which would do far more harm than good.

1. **The collateral is more than adequate to satisfy the outstanding debt.**

To obtain appointment of a receiver, WSSH must show that the value of the collateral— here, The Greenbrier and associated assets—is inadequate to satisfy the outstanding debt.  *See MB Fin. Bank, N.A.* v. *World Fresh Mkt., LLC*, 2013 WL 870103, at *3 (D.V.I. Mar. 6, 2013) (denying motion for appointment of receiver when plaintiff offered "no evidentiary support . . . such as an appraisal report, establishing the inadequacy of the security to cover the debt").  The adequacy of the collateral is a key factor for courts considering appointment of a receiver.  *See First United Bank & Tr.*, 2011 WL 1563108, at *9–10 (granting receivership when value of collateral risked being "reduced to zero," thus becoming wholly inadequate to satisfy the debt).

Here, the collateral is more than adequate to satisfy the outstanding debt.  WSSH claims it is owed approximately $370 million.  (*See* ECF No. 9-6 at 1; Justice III Decl. ¶¶ 11, 39.)  Even

assuming that figure is correct, appraisals from April 2023 show that The Greenbrier and other assets are worth \$1.107 billion—almost three times the debt they secure.[10]  (*See* Justice III Decl. ¶¶ 11, 13.)[11]  The Greenbrier is also operating at a profit.  (*See id.* ¶ 4.)  And WSSH has produced no contrary evidence or valuation, which weighs against appointing a receiver.  *See Priv. Fin. Alts., LLC* v. *Walloon Lake Holdings, LLC*, 2025 WL 3290636, at \*6 (W.D. Mich. Nov. 26, 2025) (denying motion for appointment of receiver when plaintiff did "not address" adequacy of collateral and defendant presented evidence that collateral was worth almost three times the debt).

WSSH's only argument to the contrary is that, "in the absence of a receiver, any attempt by WSSH to foreclose on the collateral to satisfy Defendants' debt may have the unintended consequence of rendering the collateral inadequate."  (Am. Recv'r Mem. at 11.)  This speculative and conclusory assertion falls far short of the "clear showing" of insufficient collateral that is required to obtain a receivership.  *Cheng* v. *Liu*, 2026 WL 102443, at \*5 (D.S.C. Jan. 14, 2026). Because the value of the collateral far exceeds the debt—something WSSH has not disputed (and could not dispute) with evidence—this factor weighs strongly against appointment of a receiver.

### 2. WSSH presents no evidence showing that Defendants' financial position endangers the value of The Greenbrier.

To obtain a receivership, WSSH must also show that Defendants' financial position is "so precarious as to endanger its interest in the collateral."  *Wells Fargo Bank, N.A.* v. *Premier Hotels Grp., LLC*, 2015 WL 404549, at \*10 (M.D. Pa. Jan. 29, 2015).  That is, WSSH must explain "how the financial condition of [Defendants] impact[s] . . . the secured property."  *Priv. Fin. Alts., LLC,*

---

[10]     Representatives of the firms that conducted these appraisals are prepared to testify at the June 8 evidentiary hearing to confirm the value of The Greenbrier and related assets.

[11]     This value includes certain coal assets that secure the Loans but that WSSH excluded from its receivership request.  The inclusion of those coal assets increases the value of the collateral that secures the Loans and further undercuts WSSH's contention that the collateral is inadequate.

2025 WL 3290636, at *6. WSSH makes no such showing here, because it fails to link alleged financial troubles to the value of the collateral or show that any alleged financial concerns are large enough to render the overall collateral inadequate.

WSSH asserts—without support—that this factor weighs in favor of a receivership because Defendants are "notoriously in dire financial condition," have a "long public history of failure to pay debts," and that their "mismanagement of their finances and business operations is well documented and widely discussed." (Am. Recv'r Mem. at 6, 11.) But what WSSH labels as a "long public history" is merely a smattering of news articles and irrelevant or conclusory accusations, none of which amount to a clear showing that Defendants' financial position is so dire as to impact the relevant collateral. For example:

- WSSH asserts that Defendants are underinsured and have at times failed to pay vendors, health premiums, 401(k) employer match contributions, and real estate taxes. (*See* Am. Recv'r Mem. at 7; Am. Compl. ¶¶ 41(d), (f)–(h).) But WSSH does not provide any support, nor any explanation, for why those allegations, even if true, pose a risk to the value of the collateral sufficient to warrant a receivership.

- WSSH cites four news articles that speculate about the Justices' worth, repeat *claims* from another lender about a supposed $47 million debt, and discuss a public auction of The Greenbrier that never came to pass because the Justices' *paid their debts*. (*See* Am. Recv'r Mem. at 7–8; Am. Compl. ¶¶ 40, 45(a)–(b).) Public news articles speculating about the Justices' financial position are not admissible evidence. *See, e.g.*, *Greene* v. *Scott*, 637 F. App'x 749, 751–52 (4th Cir. 2016) (concluding that news article offered for truth of the matter asserted was inadmissible hearsay). And even if the Court considers the articles, they

hardly support the contention that the Justices' financial condition imperils the ability of the collateral to satisfy the Loans, which are massively overcollateralized.

- WSSH further discusses, as described in one of those news articles, a complaint filed in a lawsuit brought by a Louisiana-based bank against Defendant Greenbrier Hotel Corporation seeking to collect $47 million on a note. (Am. Recv'r Mem. at 7; Am. Compl. ¶ 45(a).) But that lawsuit is in its early stages; the allegations are contested; and the amount in question is small compared to the value of The Greenbrier. *See First Guar. Bank* v. *Greenbrier Hotel Corp.*, No. 5:25-cv-00687, ECF No. 45 (S.D.W. Va. Feb. 5, 2026).

- WSSH disingenuously claims that "evidence" presented in the Eastern District of Kentucky "alleg[es]" that the Justices are "hiding hundreds of millions of dollars in assets to avoid paying judgments." (Am. Recv'r Mem. at 8; Am. Compl. ¶ 45(d).) WSSH's "evidence" is unsubstantiated assertions in a *brief* concerning a discovery dispute in a case involving entities that are not parties to this lawsuit. *See New Lond. Tobacco Mkt., Inc.* v. *Ky. Fuel Corp.*, No. 6:12-cv-00091-GFVT-HAI, ECF No. 838-1, at 4 (E.D. Ky. Mar. 5, 2026).

- WSSH claims that the Western District of Virginia issued a garnishment summons to Senator Justice. (Am. Recv'r Mem. at 8; Am. Compl. ¶ 45(c).) That is false. As the docket makes clear, the garnishee is *not* Senator Justice but a third-party securities firm from which both the Senator and the creditor sought recovery. *See W. Sur. Co.* v. *Justice*, No. 7:23-cv-00524-MFU, ECF No. 26 (W.D. Va. Jan. 28, 2025).

- WSSH also notes—without citation—that "it was reported" that "all mammography operations" stopped at the Greenbrier Clinic due to an alleged failure to meet "clinical image quality standards." (Am. Recv'r Mem. at 6–7; Am. Compl. ¶ 41(b).) But WSSH does not

even try to explain how these unsupported allegations, if substantiated, show that Defendants' financial position poses a risk to WSSH's interest in the collateral.

- Finally, WSSH alleges that Defendants reached an agreement with the IRS to pay nearly $5.2 million in overdue taxes after the filing of a federal tax lien of more than $8 million and state tax lien of $1.4 million. (Am. Recv'r Mem. at 6; Am. Compl. ¶ 41(a).) But agreements with the IRS to resolve tax liabilities are not out of the ordinary. *Cf. In re Turner*, 182 B.R. 317, 334 (Bankr. N.D. Ala. 1995) ("The IRS commonly, and quite successfully, employs . . . the use of voluntary time payment agreements for the collection of taxes."). WSSH also claims that Defendants are indebted to the State of West Virginia for over $3 million in unpaid sales taxes. (Am. Compl. ¶ 41(e).) But even if these have priority over the Loans, those amounts are a drop in the bucket compared to the $1.107 billion value of the Loans' collateral. (*See* Justice III Decl. ¶ 13.)

For the above reasons, WSSH's so-called evidence of Defendants' precarious financial position is anything but. And even accepting all of this "evidence" as true would not tip this factor in WSSH's favor because it would not demonstrate that Defendants' financial position is "so precarious as to endanger [WSSH's] interest in the collateral or to leave [WSSH] without an adequate remedy at law." *Wells Fargo Bank, N.A.*, 2015 WL 404549, at *10. That alone is fatal.

### 3. Defendants have not engaged in fraudulent conduct.

Simply put, there is no evidence of fraud by Defendants. This is clear from WSSH's conclusory allegation, unsupported by *any evidence*, competent or not, that it "has reason to believe" that Defendants "diverted substantial revenues from the Greenbrier Resort to unrelated businesses outside of the reach of WSSH's security interests." (Am. Recv'r Mem. at 12; *see* Am. Compl. ¶¶ 46, 70.) Even if these allegations were supported, business decisions about how to use

revenues are not fraud.  *Cf. Goldberg*, 2025 WL 3227346, at *4 ("Moving . . . assets around . . . is not sufficient evidence or suggestion of dissipation of assets, conversion, or fraud to warrant the extraordinary relief sought.").  This factor thus weighs against appointment of a receiver.

### 4. WSSH has adequate legal remedies.

"Equity generally does not act where an adequate remedy at law exists." *Cheng*, 2026 WL 102443, at *4 (finding legal remedies adequate when "[p]laintiffs' core alleged injury is monetary").  Therefore, WSSH must show that "Defendants are judgment-proof, assets are unavailable to satisfy an individual judgment, or legal remedies are otherwise inadequate." *Id.* WSSH all but acknowledges that it cannot make such a showing by admitting that this "factor is at least neutral" and that, "[w]ithout a receiver," it "*likely* will have no adequate legal remedy to be made whole." (Am. Recv'r Mem. at 12 (emphasis added).)  That speculation is unfounded because, as discussed above, The Greenbrier and related assets are worth almost three times the debt they secure. (*See supra* Section I.C.1.)  Thus, WSSH has not shown that it will be unable to obtain damages if it prevails on its claims.

The authority on which WSSH relies does not compel a contrary result.  For example, in *Sayona Hospitality, LLC*, the court determined that legal remedies were inadequate and appointed a receiver because the hotel's franchise license was near expiration, which would obliterate the value of the hotel that served as collateral.  2014 WL 2918549, at *5.  Similarly, in *Deutsche Bank*, the court appointed a receiver because that was the only way Hilton would allow the hotel to continue operating "under the Hilton franchise agreements," which the hotel needed to retain its value.  2017 WL 11179626, at *2.  And *First United* involved the appointment of a receiver to protect the creditor's security interest because the debtor was "virtually judgment proof" and thus could not compensate the creditor absent the security interest.  2011 WL 1563108, at *10.

No such circumstances exist here.  WSSH identifies no imminent threat to the continued profitability of The Greenbrier and its related assets that would render them inadequate as collateral.  (*See* Justice III Decl. ¶ 4 ("The Greenbrier is profitable and can meet its obligations.  I expect The Greenbrier to remain profitable and able to meet its obligations for the foreseeable future.").)  Nor does WSSH contend that any Defendants are judgment proof.  WSSH thus fails to demonstrate that it lacks an adequate remedy at law, and this factor thus strongly weighs against appointment of a receiver.

### 5. The Greenbrier and its related assets are in no imminent danger of loss.

Although "imminent danger that property will be concealed, lost, or diminished in value" can support the appointment of a receiver, *Manuel*, 2010 WL 3860407, at *7, "entirely general and mostly speculative" harms are not "specific or concrete enough to meet the tough standard of a motion to appoint [a] receiver," *Goldberg*, 2025 WL 3227346, at *4.  WSSH relies on precisely the latter here.

WSSH's only claims of imminent loss are the inadequate and conclusory assertions set forth above:  unsupported claims that Defendants have not paid vendors and local contractors, have failed to provide health benefits and 401k contributions to Greenbrier employees, have immaterial tax liens, and unfounded assertions of supposed diversions of assets.  (Am. Compl. ¶ 70; *see* Am. Recv'r Mem. at 12–13.)  WSSH also tries to flip the burden by arguing that Defendants "failed to provide . . . records or otherwise confirm that they have not misappropriated" The Greenbrier's funds—which Defendants have no obligation to do absent a shred of evidence to support WSSH's claims.  (Am. Recv'r Mem. at 13; *see* Am. Compl. ¶ 38.)

None of WSSH's assertions demonstrate that The Greenbrier is in imminent danger of being "concealed, lost, or diminished" in a manner that would jeopardize WSSH's ability to collect

on the Loans.  *Manuel*, 2010 WL 3860407, at \*7.  This case is nothing like those where courts have found imminent danger to property.  For example, in *U.S. Bank National Ass'n* v. *Mountain Blue Hotel Group, LLC*, specific evidence showed that the hotel's franchise arrangement risked termination and the hotel would likely cease operating absent immediate intervention.  2017 WL 4700660, at \*2 (N.D.W. Va. Oct. 19, 2017).  And in *First United*, termination of a ground lease threatened to immediately reduce the collateral's value to zero.  2011 WL 1563108, at \*10 & n.4.  Here, WSSH offers only conjecture that, absent receivership, something bad might happen.  That is not enough.  *See Wilmington Tr.*, 2019 WL 5787985, at \*4 (finding that a single piece of ambiguous evidence and vague allegations failed to demonstrate imminent danger); *see also FirstMerit Bank, N.A.* v. *Myrter*, 2015 WL 3916673, at \*7 (W.D. Pa. June 25, 2015) (denying motion for appointment of receiver when there were "absolutely no facts alleged regarding waste, fraud, or imminent danger" and plaintiff had "only wholly conclusory allegations").  The absence of any imminent danger weighs against receivership.

### 6.  The harm to Defendants from appointment of a receiver far outweighs the harm to WSSH if a receiver is not appointed.

The balance of hardships likewise weighs against appointing a receiver.  By appointing a receiver, the Court would seize West Virginia's most iconic property from its rightful owners and place it under the control of a receiver with broad discretion to operate and sell it.  (*See* Am. Compl. at 27.)  The Greenbrier is a successful and profitable resort, the value of which depends on its ability to maintain stable operations, vendor and employee confidence, and customer willingness to continue bookings.  (*See* Justice III Decl. ¶¶ 4, 46–49.)  Imposing a court-supervised federal receivership—authorized to sell the business and displace management—would harm rather than preserve the property's value.  WSSH's assertion that Defendants will "suffer no monetary injury from appointment of a receiver" is fanciful.  (Am. Recv'r Mem. at 14.)  Indeed, just the threat of

a receivership has already worked short-term hardship on The Greenbrier, resulting in, among other things, reduced bookings and the threat of losing key conference reservations. (*See id.* ¶¶ 47–49.) In short, "[t]he deleterious effects of a receivership on the day to day operation" of the Greenbrier "would result in more harm than good." *Meyer Jewelry Co.* v. *Meyer Holdings, Inc.*, 906 F. Supp. 428, 434 (E.D. Mich. 1995).

In contrast, WSSH will face no comparable harm from denial of its motion. As discussed above, WSSH does not (and cannot) show that The Greenbrier and its related assets are being diminished in value such that they will be unable to satisfy the Loans. (*See supra* Section I.C.1.) That is because WSSH is not concerned with protecting the assets as collateral to the Loans; rather, WSSH's goal is a sale of The Greenbrier, with TRT ready to swoop in as a buyer. But a receiver's "role . . . is to safeguard the disputed assets," *SS Richmond LLC* v. *Harrison*, 2023 WL 1499574, at *1 (E.D. Va. Jan. 20, 2023) (citation omitted)—not to make it easier for WSSH to force a sale. Absent the need "to prevent fraud or to save the property from irreparable injury or threatened loss or destruction," receivership "over a solvent company" is not justified. *BMW of N. Am., LLC* v. *CJM Auto. II, LLC*, 2018 WL 3242304, *2 (N.D. Ohio Apr. 26, 2018) (citations omitted). The severe harm to The Greenbrier and Defendants from a receivership, with no comparable harm to WSSH, weighs against appointment.

### 7. WSSH is not likely to succeed on the merits.

WSSH's Amended Complaint alleges four counts—(i) breach of contract, (ii) appointment of a receiver, (iii) preliminary and permanent injunctive relief, and (iv) attorney's fees and costs. (Am. Compl. ¶¶ 54–89.) Only the breach of contract count is a standalone claim—the other three cannot be pursued as separate counts and rise or fall with the breach of contract claim. *See Home Mortg. Co.*, 49 F.2d at 743 ("[T]he proposition is well settled that a federal court has no jurisdiction

to entertain a suit for the appointment of a receiver where the receivership is sought as an end in itself, and not as ancillary to other relief."); *Blankenship* v. *Consolidation Coal Co.*, 850 F.3d 630, 640 (4th Cir. 2017) (explaining that "[i]njunctive relief is a remedy, not a cause of action"); *Carroll Co.* v. *Sherwin-Williams Co.*, 848 F. Supp. 2d 557, 570 (D. Md. 2012) (noting attorney's fees are "a form of relief . . . not a standalone cause of action[]").

As to the breach-of-contract claim, WSSH is highly unlikely to prevail. Defendants are actively arguing in state court that WSSH obtained the Loans and related Forbearance Agreement through fraud and other unlawful means, does not validly own the Loans, and thus has no right to pursue remedies under the Loans. Therefore, as discussed further below, *see infra* Section II.A., WSSH cannot succeed on its breach-of-contract claim. Moreover, even if WSSH could enforce the Forbearance Agreement, Defendants have not breached it, because the April 23, 2026 letter WSSH's points to as evidence of breach was not a refusal to comply but rather a restatement of Defendants' ongoing position that they "do not regard White Sulphur Springs Holdings, LLC, as the holder of any valid rights against [Defendants] and therefore do not regard [WSSH's] demands as having any legal basis." (Am. Compl., Ex. Y (ECF No. 38-25).) Finally, even if Defendants were in breach, that alone is not sufficient to justify a receivership, which requires, among other things, threat of imminent harm, inadequacy of collateral, and lack of alternative remedies. *See Quality Props. Asset Mgmt. Co.* v. *Sehn Harrison, LLC*, 2011 WL 3329889, at \*2–3 (E.D. Mich. Aug. 3, 2011) (denying motion for appointment of receiver when plaintiff had a valid claim but did not show fraudulent conduct, imminent danger to the property, or inadequacy of legal remedies).

### 8. A receivership would not benefit WSSH or the public.

For all the reasons discussed above, a receivership is unwarranted. In fact, a receivership would harm WSSH's purported interests by creating extreme uncertainty that could erode the value of The Greenbrier and its related assets. (*See* Justice III Decl. ¶¶ 47–49, 52–55.) Further, as noted above, receivership is a *remedy*, not a standalone claim. Here, WSSH's underlying claim is based on a handful of alleged breaches of contract, such as failure to maintain insurance until payment under the Loans (*See* Am. Compl. ¶ 57), and WSSH never explains how a receivership remedies any of those purported breaches. Finally, despite WSSH's suggestion that a receivership would serve the community's interests (Am. Recv'r Mem. at 17), the opposite is true. Appointing a receiver threatens the operations of an iconic, well-respected West Virginia institution and risks harm to The Greenbrier's thousands of employees and the property's many patrons and guests. (*See* Justice III Decl. ¶¶ 6, 51–55.) This case perfectly illustrates how a "receivership can do more harm than good to an entity as a going concern." *Goldberg*, 2025 WL 3227346, at \*2. This factor thus weighs against appointment of a receiver.

*     *     *

WSSH's transparent attempt to abuse the receivership process in order to push for a sale of The Greenbrier is precisely why courts have cautioned "that receivership is extreme and to be avoided in all but the most acute cases of harm or loss to a demonstrated interest." *Id.* WSSH's motion falls far short of meeting the high bar needed to obtain appointment of a receiver. The Court should deny WSSH's motion.

## II. WSSH FAILS TO SHOW THAT IT IS ENTITLED TO THE EXTRAORDINARY REMEDY OF A PRELIMINARY INJUNCTION.

As an alternative to the appointment of a receiver, WSSH relies on the same facts detailed above to seek a sweeping preliminary injunction that would effectively place The Greenbrier's

operations under court supervision. Specifically, WSSH asks the Court to bar Defendants from transferring or using resort revenues outside the "ordinary course" without court approval, restrict use of cash reserves, prohibit the sale, encumbrance, or removal of resort property, and control the handling of the Resort's books and records. (Prelim. Inj. Mem. at 16–17.) In substance, the requested injunction mirrors the extraordinary receivership relief WSSH separately seeks: it is receivership by another name. But like a receivership, a preliminary injunction is an "extraordinary remedy" that is "never afforded as of right." *Winter* v. *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). And WSSH fails to show that preliminary injunctive relief should be granted here.

To obtain a preliminary injunction, the moving party must establish four elements: (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. *See id*. All four factors must be established by a "clear showing." *Imagine Medispa, LLC* v. *Transformations, Inc.*, 999 F. Supp. 2d 862, 868 (S.D.W. Va. 2014). Critically, courts in this Circuit routinely deny preliminary injunctive relief where the movant cannot demonstrate a likelihood of irreparable harm, regardless of the other factors. *See Henderson* v. *Bluefield Hosp. Co.*, 902 F.3d 432, 438–39 (4th Cir. 2018) (holding that a preliminary injunction may properly be denied based solely on the movant's failure to show likelihood of irreparable harm). That factor is dispositive here: WSSH cannot make the required clear showing of irreparable harm, which alone defeats its request for extraordinary relief. And WSSH likewise fails to carry its burden on any of the remaining factors. *See Imagine Medispa*, 999 F. Supp. 2d at 868.

**A. WSSH Has Failed to Show That It Is Likely to Succeed on the Merits.**

To justify a preliminary injunction, the moving party must "make a clear showing that [it] will likely succeed on the merits at trial." *Id*. at 871. WSSH has not met that burden on its breach-of-contract claim, which is the only count that matters for purposes of this analysis. (*See supra* Section I.C.7.)

WSSH's theory is that Defendants breached the Forbearance Agreement by allegedly failing to maintain insurance policies, failing to provide certain financial and banking information, allowing liens to arise on collateral, and refusing to "assist and cooperate" with WSSH's efforts to "secure[], protect[], and liquidat[e]" the collateral. (*See* Am. Compl. ¶¶ 57–61.) But WSSH is unlikely to succeed on those claims for multiple reasons.

*First*, as Defendants have made clear in Greenbrier County Circuit Court, WSSH does not validly own the Loans or the rights set forth in the Forbearance Agreement because it obtained them through fraud, violations of West Virginia's antitrust laws, and other unlawful means. *See Greenbrier Hotel Corp.*, No. CC-13-2026-C-51. WSSH thus has no right to enforce the Loans or Forbearance Agreement at all. If the state court agrees, WSSH will have no contractual rights to pursue and this action would end. At a minimum, the existence of that ongoing dispute precludes WSSH from making the "clear showing" of a likelihood of success on the merits that is required for preliminary injunctive relief. *See Di Biase* v. *SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017).

*Second*, even apart from the validity of the loan sale, WSSH's evidence does not establish any breach of contract. WSSH argues that Defendants purportedly admitted to breaching the Forbearance Agreement when Defendants "notified WSSH in writing that they will not assist WSSH in 'securing, protecting and liquidating of [WSSH's] collateral.'" (Prelim. Inj. Mem. at 10 (citing Am. Compl. ¶ 38, Ex. Y (ECF No. 38-25)).) But WSSH mischaracterizes Defendants'

response.  Defendants did not admit breach or refuse to comply with contractual obligations.  Rather, the April 23, 2026 letter that WSSH references merely states the same position that Defendants have taken in these and the related state proceedings—Defendants "do not regard White Sulphur Springs Holdings, LLC, as the holder of any valid rights against [Defendants] and therefore do not regard [WSSH's] demands as having any legal basis."  (Am. Compl., Ex. Y (ECF No. 38-25).)

WSSH again relies on *First United Bank* and *Sayona Hospitality*, citing their findings of a high likelihood of success where the defendant admitted nonpayment of its obligations or where loan documents supported breach claims.  (Prelim. Inj. Mem. at 10.)  But those cases involved lenders enforcing *undisputed* rights under *concededly valid* loan documents against borrowers who either admitted or failed to dispute their payment defaults.  *See First United Bank & Tr.*, 2011 WL 1563108, at *11 ("Falling Run admits it has not paid toward its obligations as a guarantor under the Loan Agreement."); *Sayona Hosp., LLC*, 2014 WL 2918549, at *1–3 (stating that defendant was in default of its obligations and failed to cure defaults).  Neither circumstance is present here.

WSSH then points to the assignment and waiver provisions of the Forbearance Agreement, seemingly to undercut Defendants' challenges to the validity of the loan sale.  (Prelim. Inj. Mem. at 10-12.)  But these contractual provisions do not do the work WSSH claims they do.  For one thing, the waiver provisions on which WSSH relies do not concern the sale of the Loans to WSSH.  As WSSH acknowledges, the cited waiver language addresses only "defenses, rights, claims, counterclaims actions, and causes of action *with respect to . . . indebtedness* under the [Forbearance Agreement]."  (*Id.* at 11.)  Defendants' state claims are different.  Defendants are not asserting routine lender-liability defenses or disputing the underlying indebtedness.  Rather, Defendants allege that WSSH unlawfully procured the Loans through fraud, contractual violations,

and anticompetitive conduct and thus cannot enforce them. *See Greenbrier Hotel Corp.*, No. CC-13-2026-C-51. Claims relating to the legality of the *sale* of the Forbearance Agreement itself are plainly not waived.[12]

And in any event, WSSH cannot invoke those waiver provisions as a shield when WSSH was never lawfully entitled to acquire the Loans in the first place. Put differently, WSSH cannot rely on contractual protections flowing from a transaction whose validity is itself the subject of pending litigation. Simply reciting assignment and waiver language from the Forbearance Agreement falls far short of establishing a "clear showing" that WSSH is likely to prevail on its claim that Defendants breached the Forbearance Agreement. *Di Biase*, 872 F.3d at 230.

WSSH's failure to show a likelihood of success on the merits of its underlying breach-of-contract claim is fatal to its motion for a preliminary injunction.

**B. WSSH's Alleged Harm Is Speculative and Far From Irreparable.**

A plaintiff seeking preliminary relief must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22. A "clear showing" of irreparable harm is a prerequisite to the issuance of a preliminary injunction. *Williams Ohio Valley Midstream, LLC* v. *Kittle*, 2024 WL 3325532, at *3 (4th Cir. July 8, 2024) (citation omitted). The alleged harm must be "neither remote nor speculative, but actual and imminent." *Id.* WSSH comes nowhere close to meeting this standard.

---

[12] Even if the waiver provisions addressed the sale of the Loans, Defendants are not arguing in state court that Carter Bank lacked the general contractual ability to assign the Loans. Defendants' position is narrower: that Carter Bank could not lawfully sell the Loans to WSSH under the circumstances alleged here. Specifically, Defendants allege in the Greenbrier County action that TRT and its affiliates—including WSSH—were prohibited by both the Confidentiality Agreement and the Second-Lien Note from acquiring or even negotiating to acquire the Loans. (*See* Am. Compl., *Greenbrier Hotel Corp.* v. *TRT Holdings, Inc.*, Case No. CC-13-2026-C-51, Dkt. No. 100 ¶¶ 42, 45–48, 119–128 (Cir. Ct. Greenbrier Cnty.).)

From the very start, WSSH bases its request for a preliminary injunction on speculative harm that might occur at some point in the future. WSSH says as much: "The *possibility* of irreparable injury to WSSH's interest in the collateral is significant given that [Defendants] *are likely* diverting revenue generated by the Greenbrier Resort." (Prelim. Inj. Mem. at 12 (emphasis added).) WSSH provides no evidence to support these contentions. To state the obvious, speculating about the "possibility" of harm based on certain events that may or may not be occurring is not the type of actual or imminent harm needed to justify a preliminary injunction. *See Di Biase*, 872 F.3d at 230 (quoting *Winter*, 555 U.S. at 22) ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a 'clear showing' that the plaintiff is entitled to relief."); *see also W&T Offshore, Inc.* v. *Endurance Assurance Corp.*, 2025 WL 2492478, at *4–6 (S.D. Tex. June 25, 2025), *report and recommendation adopted by* 2026 WL 782068 (S.D. Tex. Mar. 17, 2026) (explaining that allegations amounting to mere "speculation" cannot support the extraordinary remedy of injunctive relief).

This is not the only problem with WSSH's claim of irreparable harm. At the end of the day, WSSH is seeking monetary relief in the form of repayment of the Loans. And even if WSSH's familiar (and false) accusations about diversion of revenues, mismanagement of The Greenbrier, tax debts and liens, failure to pay vendors and contractors, failure to pay retirement and health benefits, and loss of property value were accurate (Prelim. Inj. Mem. at 12-13), those are classic examples of injuries that are compensable by money damages—not irreparable injuries for which monetary compensation is an insufficient remedy. *See Al-Abood* v. *El-Shamari*, 71 F. Supp. 2d 511, 516 (E.D. Va. 1999) (denying injunctive relief because plaintiff did not show that transfer of assets outside the jurisdiction and resulting diminution in value of collateral "render[ed]

[d]efendants either insolvent or unable to meet their obligations with regard to the jury's award of damages"). And "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date . . . weighs heavily against a claim of irreparable harm." *Di Biase*, 872 F.3d at 230 (quoting *Sampson* v. *Murray*, 415 U.S. 61, 90 (1974)).

At bottom, even if WSSH were the valid owner of the Loans and prevailed on its breach-of-contract claim in this action, WSSH could be made fully whole by an award of money damages. That is particularly so here given that The Greenbrier and its related assets are valued at nearly three times the amount of the Loans and there is no evidence that Defendants are causing it to lose value. (*See* Justice III Decl. ¶¶ 11, 13.) In such circumstances—where WSSH has claimed only "anticipated financial harm" and has presented no evidence that Defendants are "insolvent, dissipating or transferring assets, preparing to file for bankruptcy, facing bond claims or even soon-to-be filed bond claims"—a preliminary injunction is not appropriate. *W&T Offshore, Inc.*, 2025 WL 2492478, at *5–6; *see Hughes Network Sys., Inc.* v. *InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994) (A "party does not normally suffer irreparable harm simply because it has to win a final judgment on the merits to obtain monetary relief.").

**C. The Balance of the Harm Overwhelmingly Favors Defendants.**

In determining whether to award a preliminary injunction, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. A preliminary injunction is appropriate only if the movant demonstrates that the balance of equities tip in favor of the injunction. *See id.*

Here, the balance plainly favors Defendants. In support of its "balance of the equities" argument, WSSH repeats its unsupported allegations of economic harm: namely that, without a

preliminary injunction, Defendants' alleged operational decisions or use of revenues may diminish the value of The Greenbrier and its associated assets.  (*See* Prelim. Inj. Mem. at 13–14.)  But as discussed above, those purported injuries cannot sustain WSSH's request for a preliminary injunction because they are economic—not imminent or irreparable.  (*See supra* Section II.B.)  Moreover, any claim of irreparable injury from reduction in value of The Greenbrier and its related assets is undercut by the fact that those assets are valued at nearly triple the approximately $370 million allegedly owed to WSSH.  (*See* Justice III Decl. ¶¶ 11, 13.)  Absent an injunction, The Greenbrier will continue operating at a profit, and WSSH's purported interests will be protected.

On the other hand, Defendants will suffer hardship if the Court issues an injunction preventing Defendants from freely using their funds and property.  Indeed, WSSH's efforts to enforce the Loans and publicly declare default have already caused "significant, ongoing harm to The Greenbrier's business interests, reputation, and customer base," including loss of prospective bookings and hesitation from critical vendors.  (*Id.* ¶¶ 47–49.)  In addition, WSSH's freezing of payroll and operations accounts has disrupted The Greenbrier's ability to pay "thousands of employees," vendors, utility costs, maintenance expenses, and marketing fees.  (*Id.* ¶ 51.)  That harm would only compound if the Court were to impose the broad injunctive relief WSSH seeks, which would further disrupt Defendants' operations, undermine customer and vendor confidence, and threaten lasting damage to The Greenbrier's reputation and viability.  In these circumstances, the balance of equities weighs decisively against injunctive relief.

**D.  A Preliminary Injunction Does Not Serve the Public Interest.**

WSSH must also show that granting a preliminary injunction is in the public interest.  *See, e.g.*, *Jensen* v. *Md. Cannabis Admin.*, 719 F. Supp. 3d 466, 478 (D. Md. 2024) (explaining that an injunction must be in the public interest and noting that where "the public interest weigh[s] against

the granting of the injunction," "the analysis could stop here and be complete"). To try to establish this factor, WSSH relies on the same speculative assertions about outstanding tax obligations, alleged diversion of revenues, purported underfunding of operations, and generalized concerns about The Greenbrier's future operations. (Prelim. Inj. Mem. at 14–15.)

But as discussed, WSSH's conduct—not Defendants'—is what threatens harm to The Greenbrier, its employees, and the surrounding community. (Justice III Decl. ¶¶ 47–51.) The Greenbrier is a profitable, ongoing business employing approximately 2,000 people at peak season and serving as a major destination for conferences, tourism, and local commerce. (*Id.* ¶¶ 4–7.) Since WSSH publicly declared default and began pursuing aggressive remedies, however, The Greenbrier has suffered declining bookings, concern from major customers and vendors, and disruptions to payroll and operational accounts used to pay employees, vendors, utilities, maintenance costs, and marketing expenses. (*Id.* ¶¶ 47–51.) The requested injunction would only deepen that disruption by undermining customer and vendor confidence and destabilizing one of West Virginia's most significant employers and tourist destinations. (*Id.* ¶¶ 50–55.)

WSSH invokes the proposition that courts should enforce valid contractual arrangements. (Prelim. Inj. Mem. at 15.) But that principle carries little weight here, where WSSH illegally acquired the Loans and has no enforceable rights under the Forbearance Agreement—as Defendants' state-court litigation will show. *See Greenbrier Hotel Corp.*, No. CC-13-2026-C-51; *see also FBR Cap. Mkts. & Co.* v. *Short*, 2009 WL 3254458, at *6 (E.D. Va. Oct. 9, 2009) (holding that the "appropriate remedy" for a breach of contract resulting in damages is a breach of contract claim, not preliminary injunctive relief). WSSH cannot rely on a policy favoring enforcement of valid contracts when it does not own the rights it seeks to enforce. This factor weighs against issuance of a preliminary injunction.

**E. The Requested Relief Is Effectively a Mandatory Injunction Altering the Status Quo.**

Finally, WSSH claims that its requested preliminary injunction should issue because it would "preserve the status quo." (Prelim. Inj. Mem. at 15.) Not so.

Injunctions that "preserve . . . the status quo" are "prohibitory," while those that seek to "alter . . . the status quo" are "mandatory." *2311 Racing LLC* v. *Nat'l Ass'n for Stock Car Auto Racing, LLC*, 139 F.4th 404, 408 (4th Cir. 2025). The Fourth Circuit has defined "the status quo" for this purpose to be "the last uncontested status between the parties which preceded the controversy." *Di Biase*, 872 F.3d at 228 n.4. WSSH attempts to define the "status quo" as when "Defendants agreed to the provisions of the [Forbearance Agreement] with WSSH's predecessor in interest." (Prelim. Inj. Mem. at 15.) But the "status quo" is not an abstract conceptual framework divorced from the parties' relationships. Here, immediately before the controversy, Defendants operated The Greenbrier free from WSSH's supervision, oversight, and operational control. WSSH had not yet alleged default, demanded operational restrictions, sought access to financial records and accounts, or attempted to subject Defendants' day-to-day operations to judicial oversight. The requested injunction seeking that relief would therefore alter, not preserve, the state of affairs by compelling affirmative compliance with disputed obligations and imposing court-supervised restrictions on Defendants' use of personal and real property.

Because WSSH's requested injunction would affirmatively change how Defendants use and manage their property, it would alter the status quo and thus is a mandatory preliminary injunction. *See Cooke* v. *Lancelotta*, 2022 WL 622229, at *4 (D. Md. Mar. 3, 2022) (holding that requested relief constituted a mandatory injunction because it "remove[d] [the defendant] from control" over the entities, which would "upset 'the last uncontested status between the parties'") (citation omitted). And "[m]andatory preliminary injunctions are warranted only in the most

extraordinary circumstances," *Pierce* v. *N.C. State Bd. of Elections*, 97 F.4th 194, 209 (4th Cir. 2024) (citation and quotation marks omitted), where the movant's right to relief is "indisputably clear," *2311 Racing LLC*, 139 F.4th at 409 (citation omitted). For the reasons discussed above, WSSH falls far short of satisfying that standard—indeed, WSSH cannot make the requisite "clear showing" on any of the four factors required for preliminary injunctive relief. The Court should therefore deny WSSH's request for a preliminary injunction.

## III. EQUITY COUNSELS AGAINST APPOINTMENT OF A RECEIVER AND IMPOSITION OF A PRELIMINARY INJUNCTION.

Setting aside WSSH's failure to satisfy its burdens to justify appointment of a receiver or issuance of a preliminary injunction, WSSH also is not entitled to any equitable relief because it has unclean hands. Under the doctrine of unclean hands, no party asserting an equitable claim or defense may himself be "tainted with inequitableness or bad faith relative to the matter in which he [or she] seeks relief." *Precision Instrument Mfg. Co.* v. *Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). The doctrine requires that "equity['s] . . . suitors . . . shall have acted fairly and without fraud or deceit as to the controversy in issue." *Id.* at 814–15 (internal citation omitted).

But as Defendants articulated in Greenbrier County Circuit Court, WSSH's purported acquisition of the Loans and the Forbearance Agreement was unlawful and void because of the fraud and myriad additional unlawful conduct that WSSH and its co-conspirators employed in "purchasing" the Loans. *See Greenbrier Hotel Corp.*, No. CC-13-2026-C-51. Moreover, WSSH declared the very default that it uses to justify this action only after Defendants attempted to repay the Loans in full, thus manufacturing the default on which it relies for equitable relief. (*See* Justice III Decl. ¶¶ 35-38.) The rights WSSH now asserts in this Court—the right to invoke the Forbearance Agreement, declare a default, and obtain a receiver and preliminary injunctive relief—depend entirely on the validity of WSSH's purported purchase of the Loans and the sham

-34-

default it declared. Because WSSH's misconduct in acquiring the Loans is "directly relevant to [its] claims" under the Loans, that misconduct bars its requested relief. *See Smith* v. *Cessna Aircraft Co.*, 124 F.R.D. 103, 107 (D. Md. 1989). The Court should deny WSSH's brazen attempt to seize The Greenbrier via receivership and preclude Defendants' ability to fully use their personal and real property because WSSH's requests arise from unlawful and dishonest conduct.

## CONCLUSION

For the foregoing reasons, the Court should deny WSSH's amended emergency motion for appointment of a receiver and emergency motion for preliminary injunction.

Dated:  May 22, 2026

Respectfully submitted,

/s/ *Steven R. Ruby*
Steven R. Ruby (WVSB #10752)
Raymond S. Franks II (WVSB #6523)
David R. Pogue (WVSB #10806)
CAREY DOUGLAS KESSLER & RUBY PLLC
901 Chase Tower, 707 Virginia Street, East
P.O. Box 913
Charleston, WV 25323
Telephone:  (304) 345-1234
Facsimile:  (304) 342-1105
sruby@cdkrlaw.com
rfranks@cdkrlaw.com
drpogue@cdkrlaw.com

/s/ *H. Rodgin Cohen*
H. Rodgin Cohen (WVSB #767)
Robert L. Jones IV (*pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Telephone:  (212) 558-4000
cohenhr@sullcrom.com
jonesrob@sullcrom.com

Amanda Flug Davidoff (*pro hac vice*)
Oliver W. Engebretson-Schooley (*pro hac vice*)
1700 New York Avenue, N.W.
Suite 700
Washington, D.C. 20006
Telephone:  (202) 956-7500
davidoffa@sullcrom.com
engebretsono@sullcrom.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2026, the foregoing document was served upon the following counsel by means of the Court's CM/ECF filing system.

Ellen S. Cappellanti, Esq.
Albert F. Sebok, Esq.
Elizabeth B. Elmore, Esq.
JACKSON KELLY PLLC
500 Lee Street East, Suite 1600
P.O. Box 553
Charleston, WV 25301-3202
ecappellanti@jacksonkelly.com
asebok@jacksonkelly.com
ebelmore@jacksonkelly.com

Seth Patrick Hayes, Esq.
Zachary Hanley Warder, Esq.
JACKSON KELLY PLLC
3000 Swiss Pine Way, Suite 200
P.O. Box 619
Morgantown, WV 26501
shayes@jacksonkelly.com
zachary.warder@jacksonkelly.com

R. Clay Hoblit, Esq.
HOBLIT DARLING RALLS HERNANDEZ
& HUDLOW
802 North Carancahua Street
Suite 2100
Corpus Christi, TX 78401
choblit@hdr-law.com

Richard D. Anigian
Charles M. Jones, II
HAYNES AND BOONE, LLP
2801 N. Harwood Street
Suite 2300
Dallas, Texas  75201
rick.anigian@haynesboone.com
charlie.jones@haynesboone.com

/s/ *H. Rodgin Cohen*
H. Rodgin Cohen (WVSB #767)