# EXHIBIT 3

WHITE SULPHUR SPRINGS HOLDINGS, LLC,

    Plaintiff,

v.

JAMES C. JUSTICE, II, *et al.*,

    Defendants.

Civil No. 5:26-cv-00257

Hon. Frank W. Volk

### DECLARATION OF JAMES C. JUSTICE III IN SUPPORT OF DEFENDANTS' AMENDED MOTION TO STAY

I, James C. Justice III, hereby declare under penalty of perjury the following:

1. I have personal knowledge of the facts set forth in this declaration and, if called to testify, could and would competently testify to the truth of the matters stated below.

2. I submit this declaration in support of Defendants' Amended Motion to Stay.

### BACKGROUND

### *The Greenbrier*

3. I am the owner of 30% of Justice Family Group, LLC ("JFG"), and have been a partial owner, along with James C. Justice II and Jillean L. Justice ("the Justices"), of JFG since 2009. I also have direct or indirect ownership interests in many of the other entity Defendants.

4. JFG is the ultimate parent entity of Greenbrier Hotel Corporation, which owns and operates The Greenbrier Hotel & Resort in White Sulphur Springs, West Virginia ("The Greenbrier"). I am an officer of The Greenbrier. I am familiar with The Greenbrier's operations and finances, including its assets and liabilities. I am also familiar with the finances

and operations of several related entities.[1]  The Greenbrier is profitable and can meet its obligations.  I expect The Greenbrier to remain profitable and able to meet its obligations for the foreseeable future.

5.      The Greenbrier is located in White Sulphur Springs, West Virginia, in the Allegheny Mountains.  It is a National Historic Landmark that is listed on the National Register of Historic Places.

6.      The Greenbrier employs approximately 2000 people at peak season.  It has approximately 660 guest rooms and more than 40 meeting rooms.

7.      The Greenbrier is well known for its over 200,000 square feet of conference and event space.  The Greenbrier regularly hosts corporate events, weddings, conferences, and other large-scale events in its convention space.  Hosting conventions and other large-scale events is one of the main sources of The Greenbrier's business.

8.      In addition to its convention and events business, The Greenbrier is home to championship golf courses, including the Old White, the Greenbrier, the Meadows, and the Ashford Short Course.

9.      The Greenbrier regularly competes for business with the Omni Homestead Resort & Spa in Hot Springs, Virginia ("the Omni Homestead"), for both group and leisure business.  The Greenbrier's group sales team consistently deals with prospective groups that are considering both The Greenbrier and the Omni Homestead.  A significant part of the strategy of the The Greenbrier's

---

[1] The entities discussed in this declaration are James C. Justice Companies, Inc.; Twin Fir Estates, LLC; Wilcox Industries, Inc.; Justice Low Seam Mining, Inc.; Players Club, LLC; Justice Family Group, LLC; Greenbrier Medical Institute, LLC; Oakhurst Club, LLC; Greenbrier Golf and Tennis Club Corporation; The Greenbrier Sporting Club Development Co.; TAMS Management, Inc.; Bellwood Corporation; Greenbrier Legacy Cottage Development Company I, Inc.; and Greenbrier Legacy Cottage Development II, Inc.  These entities, together with The Greenbrier, are referred to as the "Borrowing Entities."

group sales team is to distinguish The Greenbrier from the Omni Homestead and persuade prospective groups to choose The Greenbrier over the Omni Homestead.

*Lending Relationship with Carter Bank*

10. Since 2001, the Virginia bank Carter Bank & Trust ("Carter Bank") has extended loans (the "Loans") to the Justices and the Borrowing Entities.

11. The maximum amount needed to repay the entirety of the Loans, according to TRT Holdings Inc. ("TRT"), is currently approximately $370 million.

12. As relevant here, the Loans are secured by various real property and other assets owned by the Borrowing Entities (together, the "Collateral").

13. According to appraisals conducted in April 2023, the value of the Collateral was $1.107 billion. (*See* Exs. 11 – 16.) Specifically, The Greenbrier's market value was $597 million, the market value of The Greenbrier Cottages, estate homes, and additional lots was $110.4 million, The Greenbrier Oakhurst planned development and additional raw land's market value was $52.5 million, The Greenbrier Timber and Farm Acreage's market value was $59 million, and the market value of the collateral mining complex was $289 million.

14. Between 2021 and 2025, the Justices and the Borrowing Entities presented Carter Bank with several proposals, commitments from financial institutions, and readily available funds that would have resulted in full repayment of the Loans. Carter Bank did not accept any of these proposals.

15. In early 2025, Carter Bank conveyed to the Justices and the Borrowing Entities that they could pay off the Loans for approximately $300 million.

16.     With the assistance of a global investment bank, the Justices and the Borrowing Entities identified several lenders who were prepared to refinance the Loans to enable full repayment of Carter Bank.

17.     Carter Bank subsequently reneged on its offer to allow the Justices and the Borrowing Entities to repay the Loans for approximately $300 million.  In place of that offer, Carter Bank demanded $360 million from the Justices and the Borrowing Entities to fully repay the Loans.

18.     One lender remained willing to enter into the refinancing transaction at the $360 million level.

19.     Upon learning that one lender remained willing to execute the refinancing transaction at the $360 million level, Carter Bank stated for the first time that closing needed to take place within approximately four weeks.  But given the size of the transaction and the need for the refinancing lender to complete due diligence, the deal could not be completed in time.

20.     In late November 2025, the Justices and the Borrowing Entities began discussions with another investment bank regarding a partial sale of equity to pay off the Loans and notified Carter Bank of these efforts.  Carter Bank agreed to extend the maturity date of the Loans so long as these negotiations remained ongoing.

21.     The Justices and the Borrowing Entities undertook the above-described refinancing efforts with Carter Bank's knowledge and approval.  In fact, at all relevant times, Carter Bank knew about and encouraged the refinancing efforts.

22.     At all relevant times, Carter Bank represented to the Justices and the Borrowing Entities that Carter Bank was not attempting to sell the Loans. Most recently, on February 19,

2026, Carter Bank conveyed to the Justices that it was not planning to sell the Loans and that the only offers that Carter Bank had received for the Loans were inadequate.

### *TRT's Visit to The Greenbrier*

23. Separate from the Carter Bank transactions described above, in late 2024, the Justices and the Borrowing Entities considered entering into a financing transaction with a private equity firm.

24. In contemplation of that potential transaction, the private equity firm and Greenbrier Hotel Corporation entered into a confidentiality agreement that, among other things, required the private equity firm and its representatives "to keep confidential and to use only for the purpose of evaluating, negotiating, consummating, and/or administering [the transaction] all information that [The Greenbrier] furnishe[d] or otherwise ma[de] available . . . in connection with the" transaction. (*See* Ex. 4 § 1(a).) The confidentiality agreement also prevented the private equity firm and its representatives from "acquir[ing] or propos[ing] or agree[ing] to acquire in any manner … any indebtedness" of the Greenbrier for a period of two years. (*See id.* § 6.)

25. As part of the private equity firm's due diligence process for the transaction, representatives of the firm visited The Greenbrier to evaluate it as potential collateral for the contemplated financing transaction.

26. Specifically, in September 2024, Blake Rowling, Michael Smith, and others visited The Greenbrier. During the visit, Blake Rowling and Michael Smith, who I knew were executives of TRT and involved with Omni Hotels and Resorts, indicated that they were visiting in their capacities as consultants of the private equity firm in connection with the potential transaction.

27. I am aware that TRT owns and operates Omni Hotels & Resorts.

28. During the visit, Blake Rowling and Michael Smith received confidential, proprietary information regarding The Greenbrier. This information included proprietary pricing information, proprietary marketing and reservation information, confidential financial records, and access to areas of The Greenbrier that are not accessible to the public.

29. The Greenbrier understood that the individuals present, including Blake Rowling and Michael Smith, were serving as consultants of the private equity firm and thus were bound by the confidentiality agreement that prevented use of the confidential information received during that visit for anything other than the private equity firm's potential transaction. The Greenbrier also understood that the confidentiality agreement prohibited any of the private equity firm's consultants from acquiring or trying to acquire any assets or liabilities of The Greenbrier for a period of two years.

30. Without the assurances of the confidentiality agreement, The Greenbrier would not have authorized Blake Rowling, Michael Smith, and the other external visitors to receive the confidential, proprietary information that they received or to visit restricted areas of The Greenbrier.

*Sale of the Loans*

31. Around March 26, 2026, I became aware that White Sulphur Springs Holdings, LLC ("WSSH"), a wholly owned subsidiary of TRT, purchased the Loans.

32. On April 6, 2026, Robert Rowling, Blake Rowling, and Michael Smith visited The Greenbrier. I am aware that during that visit, the Rowlings and Michael Smith conveyed that the Justices and the Borrowing Entities could repay the Loans for $341 million.

33. I am further aware that, as an alternative option, Robert Rowling offered that TRT could forgive $200 million of the Loans in exchange for a 50% interest in The Greenbrier. Senator

Justice indicated that he would consider, and then ultimately accepted, this offer and asked TRT to put it in writing.

34. On April 7, 2026, TRT General Counsel Paul Jorge informed Steven Ruby, counsel to the Justices and the Borrowing Entities, that the offer from the day before was no longer on the table.

35. Later that day, the Justices and Steven Ruby informed Paul Jorge from TRT that, in light of the revocation of the offer, the Justices and the Borrowing Entities would pay off the Loans at the $341 million that all parties had agreed was owed.

36. The Justices and the Borrowing Entities secured a new lender to refinance the Loans at the $341 million amount.

37. On April 8, 2026, the Justices and the Borrowing Entities sought final confirmation from TRT of the payoff amount for the Loans. The Justices and the Borrowing Entities did not receive a response from TRT until April 10, 2026.

38. On April 9, 2026, the Justices and the Borrowing Entities received a document stating that the Loans were in default and conveying that WSSH and TRT intended to seek a variety of remedies.

39. On April 10, 2026, the Justices and the Borrowing Entities received a Judgment Payoff Statement indicating that WSSH demanded $370,710,960.05 to fully pay off the Loans.

40. On April 13, 2026, WSSH and TRT froze a number of The Greenbrier's operations and payroll accounts. Among other things, the frozen accounts are used to operate The Greenbrier. Specifically, the accounts are used to pay The Greenbrier's thousands of employees, to make vendor payments, and to cover daily expenses, utility costs, marketing fees, and proper maintenance.

41. On or about April 13, 2026, I had a telephone conversation with an individual (the "Source") who regularly does business with an investment firm located in or around Dallas, Texas (the "Investment Firm").

42. The Source informed me that he had recently received information from a senior official at the Investment Firm regarding the sale of the Loans from Carter Bank to WSSH.

43. The Source stated that the Investment Firm helped broker the sale of the Loans from Carter Bank to WSSH.

44. On or about April 15, 2026, I had a second telephone conversation with the Source. During this conversation, the Source told me that in late January 2026, the principal of the Investment Firm had a meeting with Blake Rowling (president of TRT), a person representing Carter Bank, and others to negotiate the sale of the Loans from Carter Bank to TRT.

45. The Source also relayed during this call that TRT and Blake Rowling intended to use employees from the nearby Omni Homestead to operate The Greenbrier, and likely eliminate the jobs of a substantial number of current employees at The Greenbrier.

### IRREPARABLE HARM

46. The Greenbrier is an iconic resort that has existed for generations. Over that time, it has built a reputation for excellence that guests have come to expect. That reputation is a significant asset and is key to helping The Greenbrier attract guests, corporate clients, and large-scale events.

47. WSSH's efforts to collect on the Loans and the resulting publicity surrounding its efforts is causing significant, ongoing harm to The Greenbrier's business interests, reputation, and customer base.

48. Since WSSH declared that the Justices and the Borrowing Entities were in default and falsely claimed that The Greenbrier is in a state of disrepair, more than 20 business and other groups that either have made or were considering making large reservations have contacted The Greenbrier to express concerns about its stability. As noted above, both corporate clients and large-scale events make up a critical component of The Greenbrier's business and revenue stream. At least two groups have eliminated The Greenbrier from consideration for future stays because of WSSH's actions. The Greenbrier's group sales team has observed a noticeable slowdown in activity related to prospective bookings. The decline in bookings will have a serious negative impact on The Greenbrier's revenues.

49. The most significant vendor on which The Greenbrier depends to provide services to customers has also expressed hesitation about continuing business with The Greenbrier in the wake of WSSH's declaration of default and attempts to collect the Loans.

50. The short-term losses of potential customers and vendors is a serious threat to The Greenbrier. In the hospitality and events industry, short-term losses can compound and turn into long-term patterns that threaten the viability of a business. Resorts like The Greenbrier are particularly susceptible to those trends given the amount to which they rely on reputation and repeat customers, as well as the significant portion of customers that The Greenbrier receives through recurring events like conferences and golf tournaments. Accordingly, the harm that The Greenbrier is currently suffering due to a loss of customers is likely to repeat in future years.

51. WSSH's freezing of The Greenbrier's payroll and operations accounts also caused significant harm by disrupting The Greenbrier's ability to pay its thousands of employees and vendors, as well as its utility costs, maintenance costs, and marketing fees. That harm will only compound if additional accounts of the Justices or the Borrowing Entities are frozen.

52.     I understand that WSSH claims the right to garnish or freeze more accounts, including all accounts of all the Borrowing Entities and James Justice II.  If those accounts were garnished or frozen, The Greenbrier could be unable to pay employees or vendors, which could lead it to shut down.  Any disruption in operations would cause lasting damage to the brand value of The Greenbrier, and customers would lose trust that the resort can continue to provide them with the excellent service that they expect.  That trust will take years to regain, if it can be restored at all.  Beyond direct financial repercussions, this would also cause substantial harm to the Justices' and the Borrowing Entities' business relationships and goodwill, thereby impeding their ability to do business in the future.

53.     I understand that WSSH claims the right to take physical possession of all property at The Greenbrier.  Such seizures would constrain The Greenbrier's ability to operate, and scare away employees, current customers, and potential customers.  This would cause lasting harm to The Greenbrier's reputation and ability to operate in the future.

54.     I understand that WSSH has claimed the right to conduct an extra-judicial sale of The Greenbrier itself.  Such a tumultuous process would scare away additional customers and vendors, thereby harming The Greenbrier's value and impeding its ability to get customers for years to come.

55.     WSSH's actions have caused significant financial and other harm to The Greenbrier and will continue to do so as long as WSSH's efforts continue.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 8th day of May, 2026 in Roanoke, Virginia.

_____
James C. Justice III