# EXHIBIT 6

**FIFTH AMENDED AND RESTATED
SECURED TERM PROMISSORY NOTE**

$42,900,000                                                Dated as of October 15, 2024

For value received, **JAMES C. JUSTICE II** (the "Borrower") promises to pay to **GREENBRIER–WEST VIRGINIA HOLDINGS LLC**, a Delaware limited liability company (the "Bank"), the principal amount of **FORTY TWO MILLION NINE HUNDRED THOUSAND Dollars** ($42,900,000) (the ''Loan") made by the Bank to the Borrower under this Fifth Amended and Restated Secured Term Promissory Note (as amended, restated, supplemented or otherwise modified from time to time in accordance with its terms, the "Note"), together with interest at such rates and payable on such dates as set forth below, and installments of principal payments on the dates and in the amounts set forth in Section 3(d), with a final installment in an amount necessary to repay, in full, the unpaid principal amount of this Note on the Maturity Date as set forth in the most recent Statement of Key Term Loan Terms issued by the Bank in connection with this Note (the "Loan Terms Statement") which is attached to this Note as Exhibit A. All capitalized terms used but not defined in this Note shall be used as defined in the Loan Terms Statement. The Loan Terms Statement is incorporated by reference into this Note.

The Loan is a Variable Loan with the Base Rate identified in the Loan Terms Statement If a Base Rate becomes temporarily or permanently unavailable, it will be replaced in accordance with the provisions of Section 6.

WHEREAS, immediately following the assignment of that certain Fourth Amended and Restated Secured Term Promissory Note dated as of November 30, 2023 (the "Fourth A&R Note"), made by the Borrower to JPMorgan Chase Bank, N.A. (the "Prior Lender"), in the original principal amount of $25,119,527.16, pursuant to that certain Bill of Sale and Assignment of Loan Documents between McCormick 101, LLC, as assignor, and the Bank, as assignee, the Fourth A&R Note shall be replaced in its entirety by this Note and all obligations thereunder shall be deemed to be outstanding under this Note, and immediately following the issuance of this Note, the Bank shall assign this Note to CF Green Investors LP, a Delaware limited partnership ("CF Green"), pursuant to that certain Bill of Sale and Assignment of Loan Documents between the Bank, as assignor, and CF Green, as assignee (the "CF Green Sale and Assignment").

**Section 1.**      **Definitions**. As used in this Note, the following terms have the meaning specified below:

"$", "USD" and "dollars" denote lawful money of the United States of America.

"Applicable Margin" has the meaning set forth in the Loan Terms Statement.

"Bank" is defined in the first paragraph of this Note.

"Banking Day" has the meaning set forth in the Loan Terms Statement.

"Base Rate" has the meaning set forth in the Loan Terms Statement.

"Borrower" has the meaning set forth in the Loan Terms Statement and in the first paragraph of this Note.

"Default Rate" means a floating rate of 5.00% above the otherwise applicable Interest Rate.

"Electronic Note" is defined in Section 16.

"Event of Default" means an event described in Section 8.

"Facility Documents" means (i) this Note, the Loan Terms Statement, the Collateral Agreement, dated as of July 31, 2011, executed by the Borrower in favor of the Prior Lender (as defined below) and any subsequent amendments thereto, and the Seventh Amended and Restated Forbearance Agreement dated as of August 21, 2024, (ii) (A) the Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of November 26, 2014, from Greenbrier Hotel Corporation to David M. Moore, as trustee for the benefit of JPMorgan Chase Bank, N.A. (as assigned to McCormick 101, LLC pursuant to that certain Assignment of Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing and Other Loan Documents, dated as of July 2, 2024) (the "Greenbrier Deed of Trust"), (B) that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated March 25, 2014, and effective March 28, 2014 (as same may have been amended, assigned, and/or assumed) executed by JUSTICE HOLDINGS LLC, a West Virginia limited liability company to CHUD DOLLISON, the Trustee, for the benefit of JPMORGAN CHASE BANK, N.A., the Beneficiary, and recorded April 2, 2014, in Trust Deed Book 5054, Page 8280, in the County Clerk's Office for Raleigh County pertaining to land situated in the State of West Virginia, County of Raleigh;  and as assigned by JPMorgan by that certain Assignment of Deed of Trust, Assignment of Leases and Rents, Security Agreement, Fixture Filing and Other Loan Documents executed July 2, 2024, by JPMORGAN CHASE BANK, N.A., the Assignor, unto MCCORMICK 101, LLC, the Assignee, and recorded July 9, 2024, in Assignment Book 5083, at Page 3920, in the County Clerk's Office for Raleigh County pertaining to land situated in the State of West Virginia, County of Raleigh (collectively, the "Justice Holdings Deed of Trust"), (C) certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated March 11, 2014, and effective March 28, 2014 (as same may have been amended, assigned, and/or assumed) executed by GSR, LLC, a West Virginia limited liability company to CHUD DOLLISON, the Trustee, for the benefit of JPMORGAN CHASE BANK, N.A., the Beneficiary, and recorded April 2, 2014, in Trust Deed Book 5054, Page 8283, in the County Clerk's Office for Raleigh County pertaining to land situated in the State of West Virginia, County of Raleigh;  and as assigned by JPMorgan by that certain Assignment of Deed of Trust, Assignment of Leases and Rents, Security Agreement, Fixture Filing and Other Loan Documents executed July 2, 2024, by JPMORGAN CHASE BANK, N.A., the Assignor, unto MCCORMICK 101, LLC, the Assignee, and recorded July 9, 2024, in Assignment Book 5083, at Page 3919, in the County Clerk's Office for Raleigh County pertaining to land situated in the State of West Virginia, County of Raleigh (collectively, the "GSR Deed of Trust", together with the Justice Holdings Deed of Trust, collectively the "Glade Springs Deed of Trust") and (D) any other mortgage, deed of trust or other agreement which conveys or evidences a security interest or lien in favor of the Bank or the Prior Lender on real or immovable property of the Borrower or any Third Party together with any survey, title insurance policy, flood certificate or any other item required by the Bank, or (iii) any other pledge or security agreement entered into on or after the date hereof by the Borrower, any guarantor of the Loan or

any other Third Party, in favor of the Bank, as any such document may from time to time be amended, modified, restated, supplemented, updated and renewed.

"Fed Funds Effective Rate" means the rate calculated by the NYFRB based on federal funds transactions by depository institutions. The Fed Funds Effective Rate is displayed on the NYFRB's website and is effective for the Banking Day prior to the date of publication. If the Fed Funds Effective Rate as so determined would be less than zero, such rate shall be deemed to be zero for purposes of this Note.

"Governing Law" has the meaning set forth in the Loan Terms Statement.

"Impacted Base Rate" is defined in Section 6(b).

"Interest Payment Date" has the meaning set forth in the Loan Terms Statement.

"Interest Rate" has the meaning set forth in the Loan Terms Statement.

"Interpolated Rate" means at any time the rate per annum determined by the Bank from interpolating on a linear basis between the nearest shortest and nearest longest published rate maturities which are available for the reference rate from which the Base Rate is derived. If the Interpolated Rate is less than zero, then such rate shall be deemed to be zero for purposes of this Note. The Interpolated Rate will be rounded to the same number of decimal places as the Base Rate of the Loan. Any determination of the Interpolated Rate by the Bank shall be conclusive and binding absent manifest error.

"Loan" is defined in the first paragraph of this Note.

"Loan Terms Statement" is defined in the first paragraph of this Note.

"Loan Type" has the meaning set forth in the Loan Terms Statement.

"Maturity Date" shall mean: (a) April 25, 2025; or (b) in the event that the Maturity Date set forth in the Second Amended and Restated Forbearance Agreement, dated as of October 15, 2024, by and among Carter Bank & Trust, James C. Justice, III, James C. Justice II and the other parties thereto (the "Carter Bank Forbearance Agreement") is extended to April 1, 2026 prior to April 2025 and there is no default thereunder at such time, December 31, 2025.

"Minimum MOIC Percentage" means 25%.

"MOIC" shall mean a fraction where (a) the numerator is the aggregate amount of all cash interest payments and any Prepayment Premium payments made by the Borrower to the Bank on or prior to the date of repayment (excluding PIK Interest and default interest paid pursuant to Section 3(b)) and (b) the denominator is $32,191,123.47, provided that if PIK Interest and default interest paid pursuant to Section 3(b) are made pursuant to a prepayment, then such amounts shall be included in the numerator.

"Note" has the meaning set forth in the Loan Terms Statement and the first paragraph hereof.

"NYFRB" means the Federal Reserve Bank of New York (or any successor thereto).

"Paid-in-Kind" means as used with respect to payment of any accrued interest on the Loan, or the payment of any fee or any other amount hereunder that is expressly specified as being required to or permitted to be Paid-in-Kind (or payable in kind, capitalized or similar) (the applicable interest, fee or other amount, the "Reference Obligation"), means that such Reference Obligation shall (automatically, by operation of the terms hereof, without the requirement for any Person to take any action or cause anything to be done in order to effectuate such payment), be deemed paid at 12:01 a.m. on the due date therefor, by deeming the dollar amount of such Reference Obligation to be automatically capitalized as an equivalent principal amount of the Loan due in respect of, and, accordingly, such amount shall be compounded onto, and added to the aggregate principal amount of the Loan outstanding immediately prior to such payment, such that, immediately after giving effect to the payment of the applicable Reference Obligation as described herein, the aggregate outstanding principal amount of the Loan shall include the amount of such Reference Obligation. For the avoidance of doubt, without limiting the foregoing, (i) with respect to any Reference Obligation owing with respect to the Loan, once such Reference Obligation has been Paid-in-Kind in accordance with the foregoing, the amount of such Reference Obligation shall constitute, for all purposes hereunder, a Loan incurred as of such time, which shall thereupon accrue interest in accordance with Section 3 and (ii) the aggregate principal amount of the Loan outstanding as of any time shall be calculated to include (without duplication) (x) the original principal amount thereof remaining unpaid, (y) the aggregate amount of PIK Interest through the time of determination and (z) any other amounts previously Paid-in-Kind hereunder.

"Paper-Based Note" is defined in Section 16.

"PIK Interest" means is defined in Section 3.

"Prepayment Premium" means with respect to the prepayment of the outstanding principal amount of the Loan at any time (including on or after the Maturity Date), whether or not before or after an Event of Default, insolvency, or acceleration of the Loan, an amount which is sufficient to give the Bank a MOIC with respect to the Loan equal to the Minimum MOIC Percentage, as calculated by the Bank; provided that, notwithstanding the foregoing, no Prepayment Premium shall be due with regards to any prepayment of the Loan with the net proceeds of the sale of the Glade Springs Deed of Trust collateral in a prepayment amount not to exceed $15,000,000.00.

"Property Owner Parties" means Greenbrier Hotel Corporation, GSR, LLC, Justice Holdings LLC, Greenbrier Legacy Cottage Development Company I, Inc., Honeysuckle Cottage Homeowners Association, Inc., Hydrangea Cottage Homeowners Association, Inc. and Rhododendron Cottage Homeowners Association, Inc.

"Reference Obligation" is defined in the definition of "Paid-in-Kind".

"Regulation D" means Regulation D of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor thereto or other regulation or official interpretation of said Board of Governors relating to reserve requirements applicable to member banks of the Federal Reserve System.

"Regulatory Change" means the occurrence after the date of this Note of (i) the adoption of any law, rule, regulation, or treaty, (ii) any change in any law, rule, regulation, or treaty, or in the interpretation or application thereof by any governmental or regulatory authority, or (iii) compliance by the Bank with any request, guideline, or directive (whether or not having the force of law and whether domestic or foreign) of any governmental or regulatory authority made or issued after the date of this Note.

"Relevant Governing Body" means the Federal Reserve Board, the NYFRB (or any successor thereto), and/or a committee they officially endorse or convene.

"Replacement Base Rate" means:

(i)    for an Impacted Base Rate, the other Base Rate option for a Variable Loan, if any, identified in the Loan Terms Statement; or

(ii)    if a Replacement Base Rate cannot be determined in accordance with clause (i) because a Variable Loan does not have another Base Rate option identified in the Loan Terms Statement, then the Replacement Base Rate shall be the Base Rate option, regardless of Loan Type, identified in the Loan Terms Statement that is not an Impacted Base Rate (or, as determined by the Bank in its sole discretion, an overnight rate, forward-looking term rate, and/or compounded rate that is based on or derived therefrom); or

(iii)    if all Base Rates identified in the Loan Terms Statement are Impacted Base Rates, then the Replacement Base Rate shall be the sum of: (a) an alternate benchmark rate selected by the Bank, and (b) a spread adjustment (which may be a positive, negative, or zero value, but, for the avoidance of doubt, will not have an impact on the corresponding Applicable Margin) selected by the Bank, in each case, after giving due consideration to (I) any replacement rate and/or spread adjustment, or method for determining such replacement rate or spread adjustment, that is identified as such by a Relevant Governing Body, and/or (II) any evolving or then-prevailing market convention for determining a rate of interest and spread adjustment as a replacement to the Impacted Base Rate(s) for credit facilities, at such time, that are denominated in USD and similar to the credit facility established under the Facility Documents.

If the Replacement Base Rate would be less than zero, the Replacement Base Rate will be deemed to be zero for purposes of this Note.

"Replacement Base Rate Changes" is defined in Section 6(b).

"Replacement Event" is defined in Section 6(b).

"Temporary Impacted Base Rate" is defined in Section 6(a).

"Temporary Replacement Base Rate" means, for any Temporary Impacted Base Rate, the sum of (i) the Fed Funds Effective Rate and (ii) 0.50%; provided, that at any time the Fed Funds Effective Rate is not displayed on a website, screen, or other information service that publishes such rate from time to time, as selected by the Bank, then the Temporary Replacement Base Rate shall be the sum of: (a) a temporary alternate benchmark rate selected by the Bank, and (b) a spread adjustment (which may be a positive, negative, or zero value, but, for the avoidance of doubt, will

not have an impact on the corresponding Applicable Margin) selected by the Bank, in each case, after giving due consideration to (I) any temporary replacement rate and/or spread adjustment, or method for determining such temporary replacement rate or spread adjustment, that is identified as such by a Relevant Governing Body and/or (II) any evolving or then- prevailing market convention for determining a rate of interest and spread adjustment as a temporary replacement to the Temporary Impacted Base Rate for credit facilities, at such time, that are denominated in USD and similar to the credit facility established under the Facility Documents. If the Temporary Replacement Base Rate as determined above would be less than zero, the Temporary Replacement Base Rate will be deemed to be zero for purposes of this Note.

"Third Party" means any party liable with respect to, or otherwise granting support for, this Note, whether by guarantee, subordination, grant of security or otherwise, including, without limitation, any party that is identified as a "Pledgor" or "Guarantor" in the Loan Terms Statement.

"Variable Loan" has the meaning set forth in the Loan Terms Statement.

**Section 2.** <u>**Variable Loan**</u>. The Loan is a Variable Loan with the Base Rate identified in the Loan Terms Statement.

**Section 3.** <u>**Interest; Repayment of the Loan**</u>.

(a)     Interest on the unpaid balance of the principal amount of each of the Loan shall accrue at the Interest Rate set forth in the Loan Terms Statement. Interest shall be due and payable on each Interest Payment Date, on the unpaid balance of the principal amount of the Loan from the date hereof until the Loan, together with accrued interest thereon, is repaid in full; provided that, prior to the Maturity Date, a portion of the Interest equal to the Base Rate plus 1.00% shall be payable in cash and a portion of the interest equal to 9.00% shall be Paid-in-Kind.

(b)     After the occurrence of an Event of Default, the Bank may, at its option, by notice to the Borrower (which notice may be revoked at the option of the Bank), declare that the Loan shall bear interest at the Default Rate from and including the date of such Event of Default until the Loan is paid in full, such interest to be payable on demand and in cash.

(c)     All interest hereunder shall be computed on the basis of a year of 360 days and, in each case, shall be payable for the actual number of days elapsed (including the first day, but excluding the last day).

(d)     All payments (including any prepayments) hereunder shall be made in lawful money of the United States and in immediately available funds. Any extension of time for the payment of the principal of this Note resulting from the due date falling on a non-Banking Day shall be included in the computation of interest. The Bank may (but shall not be obligated to) debit the amount of any payment under this Note that is not made when due from any deposit account of the Borrower with the Bank. Principal amounts repaid on the Loan may not be reborrowed

(e)     The Borrower shall repay the outstanding principal amount of the Loan in installments as follows (unless accelerated sooner pursuant to Section 8): consecutive monthly principal installments each in the amount of One Hundred Thousand Dollars and 00/100

($100,000.00) and payable on the last day of each calendar month (or if such day is not a Banking Date, on the next Banking Day) commencing on October 31, 2024, with a final installment in an amount necessary to repay, in full, the unpaid principal amount of the Note on the Maturity Date. Such installments of principal will be applied by the Bank against the principal balance of the Loan.

**Section 4.**     **Prepayments**.

The Borrower shall have the right at any time and from time to time to prepay the Loan by prepaying the entire remaining principal amount together with all accrued interest, the Prepayment Premium (if any) and other amounts due to the Bank hereunder.

Notwithstanding anything herein to the contrary, upon (w) the payment or prepayment of all or any portion of the Loan for any reason, including in connection with any refinancing, whether before or after (a) the occurrence of an Event of Default or (b) the commencement of any bankruptcy, (x) the acceleration of the Loan pursuant to the terms of this Note for any reason (whether or not such acceleration occurs automatically), including acceleration as a result of any Event of Default, including, without limitation, the commencement of a bankruptcy, (y) the satisfaction, release, payment, restructuring, reorganization, replacement, reinstatement, defeasance or compromise of all or any portion of the Loan in any bankruptcy, foreclosure (whether by power of judicial proceeding or otherwise) or deed in lieu of foreclosure or the making of a distribution of any kind in any bankruptcy to the Bank in full or partial satisfaction of the Loan or (z) the termination of this Note for any reason (the occurrence of any of the events set forth in the foregoing clauses (w) through (z), each a "Premium Event"), then the Bank shall be paid, as an inducement for making the Loan (and not as a penalty) an amount equal to the Prepayment Premium, which Prepayment Premium shall be fully earned, and due and payable, on the date of such payment or prepayment, or on the date such payment or prepayment is required to be made, as applicable, and non-refundable when made. If the Loan is accelerated for any reason under this Note, the Prepayment Premium applicable thereto shall be calculated as if the date of acceleration of the Loan was the date of prepayment of the Loan. The parties hereto further acknowledge and agree that the Prepayment Premium is not intended to act as a penalty or to punish the Borrower for any such repayment or prepayment. The Prepayment Premium, if any, shall also be payable in the event the Loan (and/or this Note) is satisfied or released by foreclosure (whether by power of judicial proceeding), deed in lieu of foreclosure or by any other means. THE BORROWER EXPRESSLY WAIVES THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING PREPAYMENT PREMIUM IN CONNECTION WITH ANY SUCH ACCELERATION. The Borrower expressly agrees that (i) the Prepayment Premium is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel, (ii) the Prepayment Premium shall be payable notwithstanding the then prevailing market rates at the time payment is made, (iii) there has been a course of conduct between the Bank and the Borrower giving specific consideration in this transaction for such agreement to pay the Prepayment Premium, (iv) the agreement to pay the Prepayment Premium is a material inducement to the Bank to make the Loan hereunder, and (v) the Prepayment Premium represents a good faith, reasonable estimate and calculation of the lost profits or damages of the Bank and that it would be impractical and extremely difficult to ascertain the actual amount of damages to the Bank or profits lost by the Bank as a result of such Premium Event.

**Section 5.** **Additional Costs**.

(a)     If as a result of any Regulatory Change which (i) imposes, modifies, or deems applicable any reserve (including pursuant to regulations issued from time to time by the Federal Reserve Board for determining the maximum reserve requirement (including any emergency, special, supplemental or other marginal reserve requirement) with respect to eurocurrency funding (currently referred to as "Eurocurrency liabilities" in Regulation D)), special deposit, deposit insurance or assessments, minimum capital or liquidity, capital ratios or similar requirements relating to any extension of credit or other assets of, or any deposits with or other liabilities of the Bank or its holding company, or (ii) imposes any other condition affecting this Note, the Bank reasonably determines (which determination shall be conclusive absent manifest error) that the cost to it of making or maintaining the Loan is increased or any amount received or receivable by the Bank under this Note is reduced, then the Borrower will pay to the Bank within ten (10) days of its request an additional amount that the Bank reasonably determines will compensate it for the increased cost or reduction in amount.

(b)     Without limiting the effect of the foregoing provisions of this Section 5 (but without duplication), the Borrower shall pay to the Bank from time to time within ten (10) days of its request such amounts as the Bank may reasonably determine to be necessary to compensate the Bank for any costs which it reasonably determines are attributable to the maintenance by it or any of its affiliates of capital in respect of the Loan hereunder pursuant to any law or regulation of any jurisdiction or any interpretation, directive or request (whether or not having the force of law and whether in effect on the date of this Note or thereafter) of any court or governmental or monetary authority. Any such compensation shall include, without limitation, an amount equal to any reduction in return on assets or equity of the Bank to a level below that which it could have achieved but for such law, regulation, interpretation, directive or request.

**Section 6.** **Base Rate Unavailability**.

(a)     **Temporary**. If the Bank determines that:

(i)     adequate and reasonable means do not exist for ascertaining a Base Rate for the Loan, including, without limitation, by means of the Interpolated Rate; provided, that no Replacement Event (defined in clause (b) below) has occurred at such time;

(ii)     a Base Rate will not adequately and fairly reflect the cost to the Bank of making or maintaining the applicable Loan; or

(iii)     it is unlawful for the Bank to maintain the Loan at the Base Rate;

THEN, such Base Rate shall be considered a "Temporary Impacted Base Rate" and the Bank shall give the Borrower prompt notice thereof. Until the Bank notifies the Borrower that the circumstances giving rise to such notice no longer exist, (A) the Temporary Impacted Base Rate is deemed not to be available and will be replaced with the Temporary Replacement Base Rate, and (B) all references to "Base Rate" in respect of the Temporary Impacted Base Rate only, shall be deemed to be references to the "Temporary Replacement Base Rate."

(b)     **Permanent**. Notwithstanding anything to the contrary herein or in any other Facility Document, a Base Rate is deemed no longer to be available and will be replaced if any of the following events (each, a "Replacement Event") occur:

(i)     a public statement is made or there is publication of information by or on behalf of the administrator of a Base Rate, the regulatory supervisor for the administrator of a Base Rate, the U.S. Federal Reserve System, an insolvency official or resolution authority with jurisdiction over the administrator of a Base Rate, or a court or an entity with similar insolvency or resolution authority over the administrator of a Base Rate, in each case, which states that such administrator has ceased or will cease to provide such Base Rate, permanently or indefinitely; provided that, at that time, there is no successor administrator that will continue to provide such Base Rate; or

(ii)     a public statement is made or there is publication of information by the regulatory supervisor for the administrator of a Base Rate announcing that such Base Rate is no longer representative.

If a Replacement Event occurs in respect of a Base Rate, then such Base Rate shall be considered an "Impacted Base Rate" and the Bank shall give the Borrower prompt notice thereof. After a Replacement Event occurs, (A) an Impacted Base Rate is deemed not to be available as a Base Rate option and will be replaced with the applicable Replacement Base Rate, (B) all references to "Base Rate" in respect of the Impacted Base Rate only, shall be deemed to be references to the "Replacement Base Rate" and (C) if the applicable Replacement Base Rate is determined based on clauses (i) or (ii) of the definition of Replacement Base Rate, then the Applicable Margin for such Replacement Base Rate shall be the Applicable Margin that corresponds to the Base Rate option upon which such Replacement Base Rate is based. Refer to Section I of this Note for the definition of Replacement Base Rate.

The Bank will have the right, from time to time, by notice to the Borrower, to make any technical, administrative, or operational changes (including, without limitation, (I) changes to the definitions of Banking Day and Interest Payment Date, (II) timing and frequency of determining rates and making payments of interest, (III) inclusion of compounding methodologies and conventions if applicable, and (IV) other administrative matters (collectively, "Replacement Base Rate Changes")) that the Bank decides in its reasonable discretion may be appropriate to reflect the adoption and implementation of the Replacement Base Rate. The Replacement Base Rate, together with all such Replacement Base Rate Changes as specified in any notice, shall become effective on the date specified by the Bank in the notice, without any further action or consent of the Borrower. The Base Rate options set forth in the Loan Terms Statement could be replaced more than once during the term of this Note based on the events described in this clause (b).  Until a Replacement Base Rate shall be determined and only to the extent the Impacted Base Rate is not available or published or permitted to be utilized at such time on a current basis, the last paragraph of clause (a) above shall apply.

(c)     **Determinations**. Any determination, decision, or election that may be made by the Bank pursuant to clauses (a) or (b) of this Section 6, including any conclusion that it is not possible to determine the Interpolated Rate, any determination with respect to a rate or adjustment or the occurrence or non-occurrence of an event, circumstance or date, and any decision to take or refrain

from taking any action, will be conclusive and binding absent manifest error and may be made in its sole discretion and without consent from the Borrower.

**Section 7.** <u>**Representations and Warranties**</u>. The Borrower represents and warrants that:

(a) the Facility Documents constitute the legal, valid, enforceable and binding obligations of the Borrower and the Third Parties party thereto, enforceable against the Borrower and such Third Parties in accordance with their terms, except as the enforcement hereof and thereof may be limited by bankruptcy, insolvency, or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity;

(b) the execution, delivery and performance by the Borrower and the Third Parties party thereto of the Facility Documents and all other documents contemplated hereby or thereby, and the use of the proceeds of the Loan, or any portion thereof, do not and will not (i) conflict with or constitute a breach of, or default under, any agreement by which it is bound or result in the creation of any lien, charge or encumbrance upon the property or assets of the Borrower thereunder (other than pursuant to any Facility Documents), (ii) violate any provision of any law, rule, regulation (including, without limitation, Regulation U of the Federal Reserve Board), order, writ, judgment or injunction presently in effect having applicability to the Borrower, or (iii) require the consent, authorization, approval, registration, declaration or filing with, any governmental authority or any individual, business or other entity;

(c) except as otherwise disclosed in writing to the Bank by the Borrower, no litigation, claim, investigation, administrative proceeding or similar action is pending or, to the best of the Borrower's knowledge, threatened (i) involving or affecting any material part of any Property Owner Party's assets, any of the Collateral, or the transactions contemplated in the Facility Documents or (ii) against any Property Owner Party that, if adversely determined, is likely to have a material adverse effect on the condition of such Property Owner Party. There are currently no material judgments entered against any Property Owner Party and each Property Owner Party is not in default with respect to any judgment, writ, injunction or order of any court or other judicial authority, which default is likely to have or has had a material adverse effect on the condition of such Property Owner Party;

(d) the state listed as "Governing Law" in the Loan Terms Statement: (i) is the state of the Borrower's legal residence; or (ii) notwithstanding the Borrower's state of legal residence, has been requested by the Borrower, after consultation with the Borrower's legal and financial advisors to the extent the Borrower deemed it appropriate and in the Borrower's own independent judgment, because the natural persons comprising the Borrower have legal residences in different states or the state whose law governs the trust agreement of a trust co- Borrower is different from the state of a natural person co-Borrower's legal residence;

(e) all UCC financing statements and documents required to be filed in order to create in favor of the Bank a first priority perfected security interest in the Collateral and any other assets securing the liabilities and obligations hereunder (to the extent that such a security interest may be perfected by a filing under the UCC or applicable law) have been properly filed in each office in each jurisdiction required;

(f)        as of the date hereof, Greenbrier Hotel Corporation does not have any management agreements or any agreement in place with any affiliate of the Greenbrier Hotel Corporation, Borrower or any Third Party;

(g)        Borrower has the corporate and limited liability company power and authority, as applicable, to cause each of its subsidiaries and affiliates to dismiss with prejudice each of the Legal Actions pursuant to Section 22(a);

(h)        Borrower has, or has caused each of the Property Owner Parties, as applicable, to have paid all federal, state and local taxes levied or imposed upon any of the Collateral, and there is no tax deficiency or assessment against any of the Property Owner Parties or any of the Collateral;

(i)        all taxes required to be paid by the Carter Bank Forbearance Agreement as of the date hereof have been paid. The Collateral is not subject to any delinquent real estate taxes, any unpaid current real estate taxes or any pending or levied assessments on the Collateral, including, but not limited to, those for sidewalks, streets, street, curbs, gutters, sewers and water lines. That all charges for water or sewer services provided to the Collateral that are currently due have been paid. All license fees, state franchise taxes and city and state taxes that are currently due and payable by any Property Owner Party in the State of West Virginia have been paid in full. There are no outstanding federal or state tax liens on the Collateral other than those identified on Schedule 1 hereto;

(j)        there are no leases, land leases, or other occupancy agreements affecting the Collateral other than those identified on Schedule 1 hereto. No other tenants or any other parties have any leasehold or tenancy rights to occupy any portion of the Collateral or any right of first refusal, right of first offer, or other purchase options to purchase all or any portion of the Collateral;

(k)        no portion of the Collateral is subject to a mechanics lien. At no time within the past 100 days has any Property Owner Party contracted for or caused any work, services or labor to be performed in connection with the Collateral, nor has Property Owner Party contracted for or caused any fixtures, apparatus or material to be furnished in connection with or to the Collateral, except such work, services, labor, fixtures, apparatus or materials as have been fully and completely paid for;

(l)        no unrecorded mortgages, deeds of trust, improvement loans, chattel mortgages, contracts of sale, retention agreements, security agreements, agreements not to sell or encumber, financing statements, personal property leases, or material easement agreements are in existence that affect any Property Owner Party's rights to or title to the Collateral or that affect any fixtures, appliances or equipment now installed in or on the Collateral by any Property Owner Party;

(m)        Property Owner Party's possession of the Collateral has been peaceable and undisturbed, and title to the Collateral has never been disputed or questioned. No litigation or dispute regarding the lines and corners of the Collateral or any encroachment or other matter which would be shown by a current and accurate survey is now pending;

(n)        there are no mortgage, judgment or tax liens affecting the Collateral other than those identified on Schedule 1 attached hereto; and

(o)      that certain Club Lease Agreement between Glade Springs Resort Limited Liability Company, as landlord and Glade Springs Village Property Owners Association, as tenant, dated May 4, 2001, as evidenced by a Memorandum of Lease recorded in Microfilm Roll 5004, Page 5050 was terminated on April 2, 2020, and there are no outstanding obligations or liabilities with respect thereto.

**Section 8.      Events of Default**. If any one or more of the following events shall occur (each an "Event of Default"):

(a)      the Borrower fails to pay the principal of, or interest on, this Note, or any other amount payable under this Note, as and when due and payable;

(b)      any Borrower or Third Party (i) fails to observe or perform any other term or agreement of any of the Facility Documents (including, for the avoidance of doubt, the Loan Terms Statement); (ii) makes any materially incorrect or misleading representation to the Bank; (iii) fails to pay when due (whether by scheduled maturity, acceleration, demand or otherwise, and after giving effect to any applicable notice and/or cure periods) any of its indebtedness (including, but not limited to, indebtedness for borrowed money), other than trade payables, owing to parties other than the Bank or its affiliates or any interest or premium thereon when due that materially impacts any of the Collateral; or (iv) fails to comply with, or perform under any agreement (other than the Facility Documents), now or hereafter in effect, with the Bank or any affiliate of the Bank;

(c)      any Borrower or Third Party: (i) [reserved], (ii) makes an assignment for the benefit of creditors, (iii) commences any proceeding under any bankruptcy, reorganization, liquidation, insolvency or similar laws, (iv) has had any such petition filed, or any such proceeding has been commenced against it, in which an adjudication is made or order for relief is entered or which remains undismissed for a period of sixty (60) days, (v) has had a receiver, custodian or trustee appointed for all or a substantial part of its property, or (vi) takes any action effectuating, approving or consenting to any of the events described in clauses (i) through (v);

(d)      any Borrower or Third Party who is a natural person dies, or is determined or adjudged incompetent or otherwise incapacitated by a court of competent jurisdiction; provided that, notwithstanding the foregoing, this Section 8(d) shall not constitute an Event of Default if a substitute borrower that is reasonably satisfactory to the Bank is joined hereunder in such capacity within thirty (30) days of the death or adjudication of incompetency of the Borrower;

(e)      any entity Third Party fully distributes, decants, divides its assets, liabilities and/or obligations (whether pursuant to a "plan of division" or similar arrangement), dissolves or for any reason ceases to be in existence or merges or consolidates, or if there is a change in the direct or indirect beneficial ownership of any entity Third Party;

(f)      any Borrower or Third Party is involved in a proceeding respecting any Collateral given by any Borrower or any Third Party to the Bank or which is likely to result in a forfeiture of all or a substantial part of its assets or a material judgment is entered against any Borrower or Third Party respecting any Collateral;

(g)      (i) there is, in the reasonable opinion of the Bank, a material adverse change in the business or financial condition of any Borrower or Third Party that has a material adverse effect on the value of any of the Collateral or (ii) one or more final judgments in an aggregate amount in excess of $1,000,000 is entered against, or one or more criminal or civil fines or penalties in an aggregate amount in excess of $1,000,000 are entered against, any Property Owner Party;

(h)      any Facility Document granting a security interest at any time and for any reason ceases to create a valid and perfected security interest in and to the property purported to be subject to the Facility Document or ceases to be in full force and effect or is declared null and void, or the validity or enforceability of any Facility Document is contested by any party to the Facility Document, or such signatory to the Facility Document denies it has any further liability or obligation under the Facility Document;

(i)      any Borrower fails to furnish any financial information that the Bank may reasonably request from time to time promptly upon the Bank's request;

(j)      any Borrower or Third Party resides, at any time, in a jurisdiction that is located outside the United States, or the organization or trust documents of any Borrower or Third Party are, at any time, governed by a jurisdiction that is located outside of the United States;

(k)      the Borrower, any Third Party or any related company entity party thereto shall (i) be in default of, or otherwise breach, any of the agreements and loan documents evidencing indebtedness owing to Carter Bank & Trust (including but not limited to that certain Forbearance Agreement, dated as of April 1, 2024, by and among Carter Bank & Trust, James C. Justice, III, James C. Justice II and the other parties thereto) or (ii) fail to pay when due any of its indebtedness (including, but not limited to, indebtedness for borrowed money) or any interest or premium thereon when due (whether by scheduled maturity, acceleration, demand or otherwise taking into account notice, grace and cure periods applicable thereto) that is secured, in whole or in part, by the Collateral, with respect to either (i) or (ii) which results in a default under such agreement;

(l)      any Property Owner Party creates, incurs, assumes or suffers to exist, without the prior written consent of the Bank, any lien or other encumbrance upon or with respect to (a) any of its personal property, other than (i) liens under the Facility Documents and other liens in favor of the Bank, (ii) liens listed on the most recent financial statements of such Borrower provided to the Bank prior to the date of this Note, and (iii) non-consensual liens arising by operation of law or (b) any of its real property (other than such liens securing indebtedness owed to Carter Bank & Trust not to exceed $60,000,000.00 together with any accrued and unpaid interest thereon);

(m)      any Property Owner Party incurs or permits to exist, without the prior written consent of the Bank, any material direct or indirect debt, whether absolute or contingent (including, but not limited to, indebtedness for borrowed money, any guarantees, any commitment to make capital contributions to any entity or to make a party whole), other than (i) debt hereunder and other debt owing to the Bank, or (ii) otherwise listed on the most recent financial statements of such Third Parties provided to the Bank dated as of July 31, 2024;

(n)      The Borrower or any of the Third Parties amends, modifies, restates, supplements or otherwise affects any change to any agreement with Carter Bank & Trust to which it is a party

in respect of, related to or ancillary to any financing arrangement or indebtedness in any manner that could reasonably be expected to be adverse in any respect to the Bank, or they permit any subsidiary or affiliated party of the Borrower or any Third Party to do the same.

THEN, the Bank may, by notice to the Borrower, declare the Loan (including, for the avoidance of doubt, any Prepayment Premium) to be due and payable, without presentment, demand, protest, notice of acceleration or intention to accelerate or further notice of any kind, all of which are expressly waived, provided that in the case of an Event of Default described in clause (c) above, this Note (including, for the avoidance of doubt, any Prepayment Premium) shall be immediately due and payable without notice, provided further that, in the case of an Event of Default described in each of clauses (a) – (c) and (e) – (m) above, the Bank shall not exercise foreclosure remedies against the Collateral, and the Borrower may repay the Loan at any time (together with any Prepayment Premium), in each case, prior to the 31st day following notice of acceleration or, in the case of clause (c) above, the date such Event of Default occurred, provided further that in the case of an Event of Default described in clause (d) above due to the death of any Borrower, Third Party (and provided that no other Event of Default has occurred), the Bank shall not accelerate amounts payable under this Note for a period of sixty (60) days.

**Section 9.** **Expenses and Indemnity**. The Borrower will pay to the Bank all reasonable costs and expenses (including reasonable attorneys' fees and legal expenses) incurred by the Bank in connection with the preparation or modification of the Facility Documents and performance thereof and the exercise of any of the Bank's rights, remedies or obligations under the Facility Documents.

The Borrower shall indemnify the Bank and each of its employees, directors, officers, advisors, agents and other representatives (each, an "Indemnitee") from and against, and hold each Indemnitee harmless from, any and all liabilities, and related costs, expenses and disbursements, including the fees, charges and disbursements of any counsel (limited to a single outside counsel to such Indemnitees, taken as a whole, one local counsel in each relevant jurisdiction (which may include a single special counsel acting in multiple jurisdictions) and, solely in the event of an actual or perceived conflict of interest, one additional counsel (and, if necessary, one local counsel in each relevant jurisdiction (which may include a single special counsel acting in multiple jurisdictions)), to each group of similarly situated affected Indemnitees taken as a whole) for any Indemnitee, incurred by or asserted against any Indemnitee or to which any Indemnitee may become subject, arising out of, in connection with, or as a result of (i) the execution or delivery of this Note or any agreement or instrument contemplated hereby, the performance by the parties hereto of their respective obligations hereunder or the consummation of any transactions contemplated hereby, (ii) any Loan or the use of the proceeds therefrom, (iii) any presence or release of, or exposure to, any and all regulated substances, materials, chemicals or pollutants at, on, under or from any property currently or formerly owned, leased or operated by the Borrower or any liability arising in connection therewith related in any way to the Borrower, or (iv) any actual or prospective claim, litigation, investigation, action, suit, arbitration, or administrative, juridical or regulatory action or proceeding in any jurisdiction relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities or related expenses resulted primarily from (x) the gross negligence or willful misconduct of such Indemnitee as determined by a court of competent jurisdiction by final

and nonappealable judgment or (y) a material breach by such Indemnitee of its obligations under this Note or any other Facility Document determined by a court of competent jurisdiction by final and nonappealable judgment.

**Section 10.**     **Governing Law**. This Note shall be governed by and construed in accordance with the laws of the state identified in the "Governing Law" section of the Loan Terms Statement, without regard to conflict of laws principles, and with the laws of the United States of America as applicable.

**Section 11.**     **Jurisdiction**. To the extent not prohibited, the Borrower and each Third Party: (i) agrees that all claims related to this Note may be adjudicated by a state or federal court in the state identified in the "Governing Law" section of the Loan Terms Statement, (ii) agrees that any proceeding brought against the Bank shall be brought only in a state or federal court in the City of New York, and (iii) agrees that the Bank may comply with service of process requirements in any such proceeding by mailing (via prepaid registered or certified U.S. mail) documents to be served in accordance with the notice provisions of Section 13(f). The Borrower agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in any other jurisdiction and waives any defense on the basis of an inconvenient forum. Nothing herein shall affect the right of the Bank to serve legal process in any other manner permitted by law or affect the right of the Bank to bring any action or proceeding against the Borrower or its property in the courts of any other jurisdiction.

**Section 12.**     **WAIVER OF JURY TRIAL**. THE BORROWER AND THE BANK EACH WAIVE ANY RIGHT TO JURY TRIAL.

**Section 13.**     **Miscellaneous**.

(a)     The provisions of this Note are intended to be severable. If any provision of this Note is held invalid or unenforceable in whole or in part in any jurisdiction, such provision shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without affecting the validity or enforceability thereof in any other jurisdiction or the remaining provisions thereof in any jurisdiction.

(b)     Except for (i) any permanent change to a Base Rate and accompanying Applicable Margin or any change to the Loan Terms Statement, in either case, as a result of events described in Section 6 of this Note, (ii) Replacement Base Rate Changes, and (iii) any other change set forth in a new Loan Terms Statement sent by the Bank to the Borrower (x) that incorporates a change requested by the Borrower in a documented communication and agreed to by the Bank or (y) whereby an option is added by the Bank, including, without limitation, an additional Base Rate (together with technical, administrative or operational changes of the type contemplated by the defined term "Replacement Base Rate Changes"), no amendment or modification of any provision of this Note shall be effective unless the same shall be executed by the Borrower and the Bank. A waiver by the Bank of a provision of this Note shall not constitute a waiver of the Bank's right to otherwise demand strict compliance with that provision or any other provision of this Note. Whenever the consent of the Bank is required under this Note, the granting of such consent shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the Bank's sole discretion. The Bank

shall not be deemed to have waived any rights under this Note unless such waiver is in writing and signed by the Bank.

(c)     No delay on the part of the Bank in the exercise of any right or remedy waives that right or remedy. No single or partial exercise by the Bank of any right or remedy precludes any other future exercise of it or the exercise of any other right or remedy. The rights and remedies in this Note are cumulative and not exclusive of any rights and remedies which the Bank may have under law or under other agreements or arrangements with the Borrower. The Borrower waives presentment, notice of dishonor, protest and any other notice or formality with respect to this Note except for any notices expressly required by this Note.

(d)     If the term "Borrower" is defined to include more than one party, then the obligations, representations and warranties of the Borrower hereunder shall be joint and several regardless of any change in business relations, divorce, legal separation or other legal proceedings and regardless of any agreement that may affect liabilities between or among such parties, and the Bank shall be entitled to act on notices and requests from any one of the parties without the consent of the other party(ies).

(e)     The obligations of the Borrower under this Note shall be subject to the limitation that payments of interest shall not be required to the extent that receipt thereof would be contrary to provisions of law applicable to the Bank limiting rates of interest which may be charged or collected by the Bank.

(f)     Except as otherwise permitted in this Note, notices (including, without limitation, interest statements) shall be addressed to the Bank at its address set forth in the Loan Terms Statement and to the Borrower at the mailing address that the Bank has on file for the Borrower as its legal address or any email address that the Borrower has provided to the Bank as the Borrower's email address (or at such other number or address as shall be designated by one party to the other by telephone or in the manner provided for in this Section) and either given electronically or in writing by hand, overnight courier, certified or registered mail, or regular mail. Notices sent by hand, overnight courier, certified or registered mail, or regular mail shall be deemed to have been given when delivered. Notices sent to an email address shall be deemed received when sent, provided, that, if such notice is not sent during normal business hours, such notice shall be deemed to have been sent and received at the opening of business on the next Banking Day. All notices by the Bank properly addressed to the Borrower shall be deemed to have been personally delivered to the Borrower whether actually received or not. If the Bank needs to contact any Borrower by telephone, then the Bank will use the phone number the Bank has on file for such Borrower as its primary phone number.

(g)     Sections 3(c), 5, 9, 10, 11 and 12 hereof shall survive the repayment of the Loan.

(h)     Each reference to the Bank shall be deemed to include its successors, endorsees and assigns, in whose favor the provisions hereof shall inure. Each reference to the Borrower shall be deemed to include the heirs, executors, administrators, legal representatives, successors and assigns of the Borrower, all of whom shall be bound by the provisions hereof. This Note shall be binding on the Borrower and shall inure to the benefit of the Bank, except

that the Borrower may not delegate or assign any of its rights or obligations hereunder without the prior written consent of the Bank.

(i)      This Note, any amendment to this Note, and any agreement, notice or other communication required by this Note to be "written" or "in writing" may be executed in any number of counterparts, including counterparts that are executed on paper and counterparts that are electronic records and are executed using electronic signatures generated through the electronic execution process provided by the Bank or such other electronic execution process acceptable to the Bank in its sole discretion. Bach counterpart of such document, when so executed, shall be deemed an original but all such counterparts shall constitute one and the same document. Delivery of a manually executed counterpart of a signature page of such document by emailed PDF or JPEG from the Borrower's e-mail address on file with the Bank, or any other electronic means acceptable to the Bank in its sole discretion that reproduces an image of such manually executed signature page, shall each be effective as delivery of a manually executed counterpart of such document; provided, that, the Bank, in its sole discretion, can require subsequent delivery of the manually executed counterpart of a signature page.

(j)      The date, amount, Loan Type of, Base Rate of, Applicable Margin of, and the Interest Rate with respect to the Loan evidenced hereby, all payments of principal and/or interest thereof shall, in each case, be evidenced by records maintained by the Bank in the ordinary course of business and such records shall be presumptively correct absent manifest error and any failure to so record or any error in doing so shall not limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Loan made hereunder.

(k)      Without the Borrower's express prior written consent, the Bank shall not, and shall not cause any affiliate, agent, representative or any other party to:

(i)      communicate with, negotiate with, or attempt to contact any of the Borrower's credit providers or lenders, or any credit providers or lenders related to any affiliate, of the Borrower with respect to the Borrower's or any of its affiliates' outstanding indebtedness; or

(ii)      purchase, negotiate for purchase, or attempt to purchase any loans or debt owed by the Borrower or any affiliate, agent, or party related to the Borrower.

(l)      The Bank shall release any and all liens on the Glade Springs Deed of Trust collateral upon payment to the Bank of the greater of $15,000,000.00 or 100% of the net proceeds of the sale or refinance of the Glade Springs Deed of Trust collateral.

**Section 14.**      **Use of Proceeds**.

(a)      The Borrower agrees that has not and will not, directly or indirectly, use the proceeds of the Loan, or any portion thereof, made under this Note or make available any such proceeds to any person or entity: (i) to fund any activities or business of or with any person or entity, or in any country or territory, that, at the time of such funding is the subject of any economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. government, including the U.S. Department of the Treasury's Office of Foreign Assets Control or the U.S. Department of State or (ii) in furtherance of an offer,

payment, promise to pay, or authorization of the payment or giving of money or anything else of value, to any person in violation of any applicable laws, rules, or regulations relating to bribery or corruption.

(b) The Borrower agrees that, with respect to all sale proceeds from the CF Green Sale and Assignment, the Borrower will consult the Bank regarding the use of proceeds in connection with any planned capital expenditures (the "Planned CapEx") and provide the Bank detailed summaries and budgets in respect of such Planned CapEx, in each case, in a form and on the dates reasonably acceptable to the Bank.

**Section 15.** <u>**Reaffirmation**</u>. The Borrower and each Third Party hereby (A) agrees that the Loan shall be guaranteed pursuant to the Facility Documents in accordance with the relevant terms and provisions thereof and shall be secured pursuant to the Facility Documents in accordance with the relevant terms and provisions thereof and (ii) the Borrower and each other Third Party hereby (A) reaffirms its prior grant and the validity of the liens granted by it pursuant to the relevant Facility Documents, (B) agrees that, after giving effect to this Note, the guaranty and the liens created pursuant to the Facility Documents for the benefit of the Bank (or the Prior Lender) continue to be in full force and effect and (C) affirms, acknowledges and confirms its guarantee of obligations and liabilities under the Note and each other Facility Document to which it is a party and the pledge of and/or grant of security interest in its assets as Collateral to secure the obligations hereunder, in each case after giving effect to this Note, all as provided in such Facility Documents, and acknowledges and agrees that such guarantee, pledge and/or grant continue in full force and effect in respect of, and to secure, the obligations under this Note and the other Facility Documents, in each case after giving effect to this Note.

**Section 16.** <u>**Conversion From Electronic Note to Paper-Based Note**</u>. If this Note is executed electronically ("Electronic Note"), the Bank and any person to whom this Electronic Note is later transferred shall have the right to convert this Electronic Note at any time into a paper-based Note ("Paper-Based Note"). In the event this Electronic Note is converted into a Paper-Based Note:

(a) the Paper-Based Note will be an effective, enforceable and valid instrument;

(b) the execution of this Electronic Note will be deemed issuance and delivery of the Paper-Based Note;

(c) the printing of the representation of the electronic signature for the Borrower upon the Paper-Based Note from the system in which the Electronic Note is stored will be deemed the original signature for the Borrower on the Paper-Based Note and will serve to indicate the Borrower's present intention to authenticate the Paper-Based Note;

(d) the Paper-Based Note will be a valid original writing for all legal purposes; and

(e) upon conversion to a Paper-Based Note, the Borrower's obligations in the Electronic Note shall automatically transfer to, and be contained in, the Paper-Based Note, and the Borrower intends to be bound by such obligations.

**Section 17.** **Execution and Use of Electronic Records and Signatures**. If the Borrower has received and reviewed this Note electronically, then the Borrower agrees that this Note may be in the form of an electronic record and may be executed using electronic signatures generated through the electronic execution process provided by the Bank or such other electronic execution process acceptable to the Bank in its sole discretion. Any electronic signature on or associated with this Note and accepted by the Bank shall be valid and binding on the signer to the same extent as a manual signature and upon application thereof, this Note will constitute a legal, valid, and binding obligation enforceable in accordance with its terms to the same extent as if manually executed. Notwithstanding any other provision of this Note, at the Bank's option and in the Bank's sole discretion, any agreement, amendment, notice or other communication required by this Note to be "written" or "in writing" may be in the form of an electronic record and may be executed using electronic signatures generated through the electronic execution process provided by the Bank or such other electronic execution process acceptable to the Bank in its sole discretion.

**Section 18.** **Financial Information**.

(a) If, in connection with the Bank making the Loan, any Borrower or Third Party provides or has provided to the Bank (i) personal financial statements and supporting schedules; (ii) tax returns including, but not limited to schedules, K-ls, and/or proof of tax return extensions; (iii) brokerage or bank statements for significant assets held at institutions other than the Bank; (iv) schedules of contingent liabilities, including unfunded capital commitments to private equity funds; and/or (v) schedules of restricted stock/deferred compensation (each of (i)-(v) individually and collectively, "Financial Information"), then the Borrower hereby acknowledges and agrees that the Bank has relied on, and is relying on, such Financial Information (including the designation made as to the ownership of property) in deciding to make the Loan.

(b) The Borrower represents and warrants that at the time such Financial Information was provided to the Bank that it was true and complete, and that the Bank may consider such Financial Information as continuing to be true and complete until a written notice of a change is given to the Bank by the Borrower.

**Section 19.** **Prior Notes**. This Note is in replacement of and substitution for, but not in repayment of, the Fourth A&R Note, and together with the Third Amended and Restated Secured Term Promissory Note (Variable Libor) dated as of January 1, 2017 made by the Borrower to the Prior Lender, in the original principal amount of $52,019,527.16, the Second Amended and Restated Secured Term Promissory Note (Libor/Prime/Money Market), dated as of June 15, 2016, made by the Borrower to the Prior Lender, in the original principal amount of $52,019,527.16, the Amended and Restated Secured Term Promissory Note (Libor/Prime/Money Market), dated as of March 28, 2014, made by the Borrower to the Prior Lender, in the original principal amount of $142,000,000, and any other notes amended and restated thereby (collectively, the **"Prior Notes")** which are hereby terminated and no longer shall be in effect and all obligations thereunder shall be deemed to be outstanding under this Note. The Borrower and the Bank hereby agree that the indebtedness embodied in and evidenced by this Note is the same indebtedness embodied in and evidenced by the Prior Notes, and that such indebtedness is a continuing obligation of the Borrower to the Bank, and has been and continues to be fully enforceable, absolute and in existence. The Borrower hereby affirms and acknowledges that (i) as of the date hereof, there is presently

outstanding the principal amount of $42,900,000, together with any accrued interest thereon (the "**Outstanding Amount**") and (ii) the Outstanding Amount is a valid obligation of the Borrower to the Bank and is due and owing without defense, claim, setoff or counterclaim of any kind or nature whatsoever. The execution and delivery of this Note shall not constitute a novation.

**Section 20.** <u>**Securities-Based Borrowing Disclosure Statement**</u>. In the event this Note is secured by securities or other assets held in a securities account, the Borrower acknowledges that it has received and reviewed the Bank's "Securities-Based Borrowing Disclosure Statement" and understands the risks of securities-based borrowing as described in said disclosure statement.

**Section 21.** <u>**Grant of Security Interest in the Fixtures**</u>. In its sole discretion, the Bank may file a UCC financing statement or other appropriate filings, recordings or registrations necessary to establish a legal, valid and perfected security interest in favor of the Bank in the fixtures that comprise all or part of the Collateral, including, for the avoidance of doubt, a UCC financing statement that names each of Property Owner Party as "debtor", the Bank as "secured party" and describes the Collateral as "all fixtures of the real property of the debtor, whether now existing or hereafter arising" or words of similar effect.

All terms which are used in this Note which are defined in the Uniform Commercial Code of the State of New York as in effect from time to time (the "**UCC**") shall have the same meanings herein as such terms are defined in the UCC, unless this Note shall otherwise specifically provide.

**Section 22.** <u>**Carter Bank**</u>. Each of the Borrower and the Third Parties hereby agree that it will not agree to a deed in lieu of foreclosure, an assignment for the benefit of creditors, a consensual turnover or any other similar process or agreement in respect of any real property that constitutes Collateral.

**Section 23.** <u>**Post-Closing Obligations**</u>.

(a) Within ten (10) Banking Days of the date hereof, Borrower shall, and shall cause each of its direct or indirect subsidiaries and affiliates to, dismiss with prejudice each of the Legal Actions.

(b) Within sixty (60) days of the date hereof, Borrower shall cause to be delivered to the Bank an ALTA survey for all of the property subject to the Greenbrier Deed of Trust, in a form reasonably satisfactory to and approved by Bank.

**Section 24.** <u>**Release**</u>. Each of the Borrower and the Third Parties hereby acknowledges and agrees that it absolutely, unconditionally, and irrevocably has waived, remised, released, acquitted, satisfied, and forever discharged, and by these presents does, absolutely, unconditionally, and irrevocably waive, remise, release, acquit, satisfy and forever discharge Bank and any of its affiliates, investors, employees, directors, officers, advisors, agents and other representatives from and against any and all manner of debts, liens, accountings, bonds, warranties, representations, covenants, promises, contracts, controversies, agreements, liabilities, obligations, costs, expenses (including, without limitation, attorneys' fees), damages, losses, suits, judgments, executions, actions, inactions, claims, counterclaims, set offs, demands and causes of action of any nature whatsoever, at law or in equity, known or unknown matured or unmatured, fixed or contingent,

liquidated or unliquidated, which Borrower or any Third Party now has or claimed to have had or hereafter can, shall or may have the right to assert by reason of any matter, cause or thing arising out of or relating to, whether directly or indirectly (a) that certain case entitled *The West Virginia Department of Transportation, Division of Highways v. GSR, LLC, JPMorgan Chase Bank, United Bank, West Virginia-American Water Company and the Raleigh County Sheriff* pending in the Circuit Court of Raleigh County, West Virginia, Case No.: 22-C-91, (b) that certain action captioned *Glade Springs Village Property Owners Association, Inc. v. Justice Holdings LL C, JPMorgan Chase Bank, N.A., et al.,* Civil Action No. 22-C-57, filed in the Circuit Court of Raleigh County, West Virginia, (c) that certain case entitled *McCormick 101, LLC v. James C. Justice II, James C. Justice Companies, Inc., Justice Holdings LLC, GSR, LLC, Wintergreen Partners, Inc. and Greenbrier Hotel Corporation*, Index No. 653620/2024 pending in the new York State Supreme Court, New York County (the cases and actions set forth in the preceding clauses (a) – (c), the "**Legal Actions**") and (d) any other claims, causes of action or any other legal rights or remedies relating to any facts, circumstances or allegations arising out of or relating to the Legal Actions, whether known or unknown, or arising before, on or after the date hereof.

[NO FURTHER TEXT; SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, this Note has been duly executed as of the day and year first written above.

_____
James C. Justice II

Receipt of a copy of this Note and acceptance of its terms are hereby acknowledged by:

**GREENBRIER HOTEL CORPORATION**

Name: Jillean L. Justice
Title: President

**WINTERGREEN PARTNERS, INC.**

Name: James C. Justice III
Title: President

**JAMES C. JUSTICE COMPANIES, INC.**

Name: James C. Justice III
Title: Director

**GREENBRIER LEGACY COTTAGE DEVELOPMENT COMPANY I, INC.**

Name: Jillean L. Justice
Title: President

**HONEYSUCKLE COTTAGE HOMEOWNERS ASSOCIATION, INC.**

Name: Jillean L. Justice
Title: President

**HYDRANGEA COTTAGE HOMEOWNERS ASSOCIATION, INC.**

Name: Jillean L. Justice
Title: President

Receipt of a copy of this Note and acceptance of its terms are hereby acknowledged by:

**GREENBRIER HOTEL CORPORATION**

_____

Name: Jillean L. Justice
Title:  President

**WINTERGREEN PARTNERS, INC.**

_____

Name:  James C. Justice III
Title: President

**JAMES C. JUSTICE COMPANIES, INC.**

_____

Name:  James C. Justice III
Title: Director

**GREENBRIER LEGACY COTTAGE DEVELOPMENT COMPANY I, INC.**

_____

Name: Jillean L. Justice
Title:  President

**HONEYSUCKLE COTTAGE HOMEOWNERS ASSOCIATION, INC.**

_____

Name: Jillean L. Justice
Title:  President

**HYDRANGEA COTTAGE HOMEOWNERS ASSOCIATION, INC.**

_____

Name: Jillean L. Justice
Title:  President

Receipt of a copy of this Note and acceptance of its terms are hereby acknowledged by:

GREENBRIER-WEST VIRGINIA
HOLDINGS LLC

By: _____
Name: James C. Justice III
Title: Manager

Receipt of a copy of this Note and acceptance of its terms are hereby acknowledged by:

GSR, LLC

By: _____

Name: James C. Justice III

Title: Manager

JUSTICE HOLDINGS LLC

By: _____

Name: James C. Justice III

Title: Director

# Exhibit A

Loan Terms Statement

# STATEMENT OF KEY TERM LOAN TERMS

| | |
|---|---|
| Note | Fifth Amended and Restated Secured Term Promissory Note, dated as of October 15, 2024, as amended, restated, supplemented or otherwise modified from time to time. |
| Borrower | James C. Justice II |
| Loan Amount: | $42,900,000 |
| Loan Type: | The Loan is a Variable Loan (defined below).<br><br>During the term of the Loan, only one Variable Loan may be outstanding at any time.<br><br>"Variable Loan" means the application of a floating rate of interest to the entire Loan. The floating rate of interest that will be applied will be a Base Rate of Variable SOFR (defined below).<br><br>The Base Rate is defined in the Base Rate section. |
| Interest Rate | For the Loan, the Base Rate + the Applicable Margin of which (1) Base Rate + 1.00% shall be paid in cash and (ii) 9.00% shall be Paid-in-Kind.<br><br>To calculate interest on the Loan, the Base Rate will be rounded upwards to the nearest $1/100^{th}$ of 1%. |
| Applicable Margin | 10.00% |
| Maturity Date | April 1, 2025 |
| Interest Payment Date | Interest on the Loan will be due and payable on (i) the last day of each calendar month commencing October 31, 2024 (or if such day is not a Banking Day, on the next Banking Day) and (ii) the Maturity Date (with all interest paid in cash on the Maturity Date). |
| Guarantor(s) | James C. Justice Companies, Inc., GSR, LLC, Justice Holdings LLC, Wintergreen Partners, Inc., Greenbrier Hotel Corporation, Greenbrier Legacy Cottage Development Company I, Inc., Honeysuckle Cottage Homeowners Association, Inc., Hydrangea Cottage Homeowners Association, Inc. and Rhododendron Cottage Homeowners Association, Inc. |
| Base Rate | The Base Rate for the Loan is Variable SOFR, which is a reference rate that may change daily. The Base Rate for a Variable Loan is determined each day by reference to the effective rate for that day. As a result, the Base Rate may change as and when the underlying reference rate changes. |

| | |
|---|---|
| | "Variable SOFR" refers to the secured overnight financing rate calculated by the NYFRB (defined in the Note) based on certain transactions in the U.S. dollar Treasury repo market with a tenor of one (1) month. Variable SOFR is displayed on the NYFRB's website, currently located at http://www.newyorkfed.org, and is effective for the Banking Day prior to the date of publication. If a Base Rate would be less than zero, then it will be deemed to be zero for purposes of the Note. For each day of a Variable Loan that is not a Banking Day, the Base Rate for such day, will be determined by reference to the applicable Base Rate in effect for the prior Banking Day. If a Base Rate is temporarily not available when selected or temporarily not available then the applicable Base Rate will be the Interpolated Rate (defined in the Note), subject to Section 6 of the Note. Section 6 of the Note contains provisions regarding the temporary and permanent replacement of a Base Rate. <br><br> References to any information service page(s) or website include any replacement page(s) or website which displays the Base Rate and the appropriate page of any replacement information service which displays the Base Rate. References above to any person who administers the Base Rate (for example, the NYFRB in respect of Variable SOFR) include any other person who takes over the administration of that rate. References to when a published Base Rate is effective include any changes in the Base Rate's publication schedule that may be made by the administrator of the Base Rate. |
| Banking Day | Any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed or, with respect to Variable SOFR or the Fed Funds Effective Rate (defined in the Note), any day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading U.S. government securities. |
| Governing Law | New York |
| State of Organization | Not applicable for Natural Person or Trust Borrowers |
| Bank Contact Information | Greenbrier-West Virginia Holdings LLC <br> 302 South Jefferson Street <br> Suite 600 <br> Roanoke, VA 24001 <br> Attn: James C. Justice, III <br> Email: jcj3@bluestone-coal.com <br><br> Or such other Bank Contact Information as may be communicated to the Borrower from time to time in accordance with the provisions of the Note. |

| | |
|---|---|
| Financial Reporting and other Notice Requirements | The Borrower, each Third Party and each related company of the Borrower or any Third Party (as set forth below) shall furnish to the Bank, as applicable: |

(i)      within 30 days of each calendar month end, (A) an internally prepared balance sheet and income statement for the period ended, prepared in accordance with GAAP, (B) an STR, (C) a PACE (or equivalent), (D) a schedule of real property sales in respect of any cottages or other dwellings located on any Facility Document collateral, (E) a report of all capital expenditures, including ongoing projects, planned projects, emergency or contingency projects and (F) copies of each contract that creates or will create an account, and accounts receivable aging and payable reports, inventory valuation reports, and such other and future reports as the Bank shall require in a form satisfactory to the Bank;

(ii)      within 45 days of each calendar quarter end, (A) a quarterly update to the Borrower's personal financial statements and (B) a balance sheet and income statement of any Third Party for the quarter ended, prepared in accordance with GAAP;

(iii)      within 90 days of each calendar year end, (A) an annual personal financial statement of the Borrower, prepared in accordance with sound accounting principles and consistent with the financial statements of the Borrower previously delivered to the Bank, certified to the Bank by the Borrower as true, correct and complete in all material respects and accurately reflecting in all material respects the financial condition of the Borrower as of the date thereof and (B) an audited balance sheet and income statement of any Third Party for the year ended, prepared in accordance with GAAP;

(iv)      within 15 days after such tax return is filed with the Internal Revenue Service or any State taxing authority performing a similar function, State and Federal tax returns for the Borrower and each Third Party (with copies of all exhibits and schedules thereto, including, without limitation, all forms K-1);

(v)      any other financial reporting provided to Carter Bank & Trust by the Borrower or any Third Party;

(vi)      any additional financial information pertaining to the Borrower or any Third Party that the Bank may reasonably request from time to time to confirm compliance with the Facility Documents promptly upon the Bank's request; and

(vii)      the Borrower shall furnish to the Bank prompt written notice of the occurrence of any Event of Default or of an event which, with the passage of time or giving of notice, or both, would constitute an Event of Default.

Important Information:

- The Note includes mechanisms by which the Bank can replace a Base Rate. An example of when the Bank may need to replace a Base Rate is if a Base Rate is permanently discontinued or unavailable. If this happens, the replacement base rate may be an available Base Rate option identified in the Statement of Key Term Loan Terms (or, as determined by the Bank in its sole discretion, a forward-looking term rate or compounded rate that is based on, or derived from, such available Base Rate option) and the Applicable Margin used for Interest Rate calculations involving the replacement base rate may be the Applicable Margin that corresponds to such available Base Rate option. It is possible that a Base Rate may be permanently discontinued or unavailable and forward-looking term rate options may not exist or may not be administratively feasible for the Bank. The Note provides that the Bank is expressly authorized to make technical, administrative, or operational changes to the Note and the Statement of Key Term Loan Terms to reflect and/or implement the use of a replacement base rate following a Base Rate's discontinuance or unavailability. These are defined in the Note as "Replacement Base Rate Changes". Refer to Section 6 of the Note for Base Rate replacement provisions.

- The Bank has no control over the determination, calculation, or publication of any Base Rate and the administrator of any Base Rate may alter the methods of calculation, publication schedule, rate revision practices, or availability of such Base Rate at any time without notice. There can be no assurance that a Base Rate will gain market acceptance or will not be discontinued or fundamentally altered in a manner that is adverse to borrowers with Interest Rates derived from that Base Rate. The Base Rates are floating interest rate options and changes in a Base Rate can lead to a higher or lower cost of borrowing. In the event that a Base Rate is no longer available or in certain other circumstances as set forth in the Note, provisions of the Note provide a mechanism for determining an alternative rate of interest. The Bank will notify the Borrower if any Base Rate is no longer available or no longer deemed an appropriate reference rate upon which to determine the Interest Rate on the Loan. However, the Bank does not warrant or accept any responsibility for, and shall not have any liability with respect to, the continuation, administration, submission, performance or any other matter related to any Base Rate or with respect to any alternative, successor or replacement rate, including without limitation, whether the composition or characteristics of any such alternative reference rate will be similar to or will produce the same value or economic equivalence as that Base Rate or that it will have the same volume or liquidity as that Base Rate did prior to its discontinuance or unavailability. The Bank and its affiliates and/or other related entities may engage in transactions that affect the calculation of a Base Rate, any Replacement Base Rate (defined in the Note) and/or any relevant adjustment(s), in each case, in a manner adverse to the Borrower.

## Schedule 1

1) Liens and/or mortgages in favor of Carter Bank & Trust pursuant to indebtedness referenced in the Carter Bank Forbearance Agreement

2) Liens and/or mortgages in favor of United Bank, a Virginia banking corporation pursuant to: (a) loan number 00004513230-93107 in the current amount of $4,559,296.39; and (b) loan number 00018118838-98007 in the current amount of $147,999.

3) Judgment Liens dated November 2, 2021, in favor of Glade Springs Village Property Owners Association, Inc., against Justice Holdings, LLC in the amount of $6,618,692.18, $627,155.96, $629.022.24, and $660,480.48.

4) Lien dated June 27, 2022, in favor of The Farms Property Owners Association, Inc., against Justice Holdings, LLC in the amount of $6,942.46.

5) Lien dated June 27, 2022, in favor of The Farm Property Owners Association, Inc., against Justice Holdings, LLC in the amount of $2,246.15.

6) Liens dated December 27, 2022, in favor of Glade Springs Village Property Owners Association, Inc., against Justice Holdings, LLC in the amount of $693,506.88, $627,155.97, $629,022.24, and $660,480.48.

7) Lien(s) for taxes owing to the State of West Virginia in the current amount of $1,236,316.04 (reference number 2206-1924 SUT).

8) Lien(s) for taxes owing to the State of West Virginia in the amount of $488,452.12 (reference number 1034-2613 WITH).

9) Binding Term Sheet and Agreement between Greenbrier Hotel Corporation and Affiliates and Carleton Varney Design Company, Dorothy Draper Company, Carleton Varney By The Yard and Affiliates dated as of April, 2020 for retail space lease at the Greenbrier Hotel.

10) Amended and Restated Lease dated April 1, 2018 between Greenbrier Hotel Corporation and Yarid's Incorporated for retail shoe store location at the Greenbrier Hotel.

11) Amended and Restated Lease Agreement dated May 1, 2011, by and between Greenbrier Hotel Corporation, a West Virginia Corporation, f/k/a CSX Hotels, Inc., and CSX IP, LLC, a Delaware limited liability company for server storage space lease for railroad's IP system in bunker at Greenbrier Hotel.