## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## (BECKLEY DIVISION)

| | | |
|---|---|---|
| WHITE SULPHUR SPRINGS HOLDINGS, LLC a Texas Limited Liability Company, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) ) | Case No. 5:26-cv-00257 The Honorable Frank W. Volk |
| JAMES C. JUSTICE, II, Individually; CATHY L. JUSTICE, Individually; JAMES C. JUSTICE, III, Individually; GREENBRIER HOTEL CORPORATION, a West Virginia Corporation; GREENBRIER MEDICAL INSTITUTE, LLC, a West Virginia Limited Liability Company; OAKHURST CLUB, LLC, a West Virginia Limited Liability Company; GREENBRIER GOLF AND TENNIS CLUB CORPORATION, a West Virginia Corporation; GREENBRIER LEGACY COTTAGE DEVELOPMENT COMPANY I, Inc., a West Virginia Corporation; GREENBRIER LEGACY COTTAGE DEVELOPMENT II, Inc., a West Virginia Corporation. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFF'S COMBINED REPLY BRIEF IN SUPPORT OF ITS MOTIONS
<u>FOR APPOINTMENT OF A RECEIVER AND PRELIMINARY INJUNCTION</u>**

## I. INTRODUCTION AND STATEMENT OF KEY FACTS

Defendants' primary basis for opposing WSSH's request for a receivership and preliminary injunction seems to be the claims in their second-filed state-court action. Defendants devote most of the first ten pages of their Consolidated Memorandum in Opposition (dkt. 61, the "Opposition") to recounting those allegations. They then weave them throughout the remainder. Defendants even attach their state-court amended complaint and documents cited therein to the Opposition. (Dkts. 62-1, 62-4, and 62-6). And they reiterate their request to abate this action. (Opp'n at 1).

Defendants' state-court action is a sideshow, and no stay is warranted. (Dkt. 60 *passim*). Defendants could have asserted those claims here. They did not. Perhaps they were concerned about the scrutiny this Court might give, or that the Court would resolve the claims too quickly. Regardless, those claims are not before this Court and provide no basis to deny WSSH any relief.

Defendants also claim WSSH seeks a receiver to do its bidding and "seize control" of the Greenbrier Resort. (Opp'n at 1). But Defendants foretell a doom that cannot pass. Receivers work at the direction and under the authority of the Court. Not the parties. WSSH's proposed order makes that clear. The Court will no doubt do the same.

Defendants also obfuscate on another key point: status quo. They claim their gross non-compliance with the 14th FBA is the status quo and ordering them to comply would be a "mandatory injunction." (Opp'n at 33-34). The real status quo is that WSSH has all rights and privileges under the 14th FBA, including significant financial oversight of the Greenbrier Resort's operation. (E.g., 14th FBA § 7(c) and Sch. 3 (listing the covenants Defendants agreed to honor, including significant "Reporting Requirements" under section 2.08)). Defendants have long disregarded these covenants, but they cannot behave badly and call it the "status quo."

Now, Defendants' filings have made one of WSSH's points clear: Defendants cannot pay their debts ***today***. Their Motion for Continuance (dkt. 58, the "Continuance") removes all doubt.

1

There, they ask (again) for the Court to delay this action so they can pursue a financing transaction they allege "will allow imminent repayment of the amounts WSSH claims it is owed." (Continuance at 4). Yet this request raises more questions than it answers. Why are Defendants laboring on a complex refinancing exercise in the first place? That is, if they really believe the sale of the Judgments to WSSH is invalid, why work to pay WSSH? Wouldn't that expose Defendants to liability from CBT because, in Defendants' view, CBT still owns the Judgments? And if WSSH's receivership and injunction requests are so off base, why the urgent need to pay WSSH?

Those points aside, the Opposition and its exhibits do little to undermine WSSH's request for relief. As explained in WSSH's Amended Memorandum of Law in support of its Receivership Motion (dkt. 40), WSSH satisfies most, if not all, of the factors this Court should consider. For the preliminary injunction, WSSH has demonstrated both a likelihood of success on the merits and the potential for irreparable harm. To show likelihood of success, WSSH need only point to these items outlined in its Amended Complaint (dkt. 37, "FAC"):

- The final and binding Judgments (FAC ¶ 16 and Exs. M-U);

- The 14th FBA, which gave CBT the absolute right to sell the Judgments and other collateral documents to WSSH (FAC, Ex. A);

- CBT's sale of confessed judgments and collateral documents—including the Judgments—to WSSH on March 25th for $289.5 million (FAC, Ex. V);

- The termination of WSSH's forbearance obligations under the 14th FBA (FAC ¶¶ 28-29); and

- Defendants' undeniable breaches of the 14th FBA, including the extensive financial reporting requirements. (E.g., FAC ¶¶ 54-64; 14th FBA § 7(c) and Sch. 3).

On irreparable harm, Defendants' Declaration of Mr. Justice III (dkt. 62-3) carries WSSH's burden. As Mr. Justice III avers, the Greenbrier Resort is unique and historical. These proceedings and the continued financial uncertainty surrounding the Greenbrier Resort are damaging its reputation and goodwill in the marketplace. (Dkt. 62-3 ¶¶ 46-50). This morass is allegedly driving away key business and large corporate clients. (*Id.*). All of which is causing irreparable harm to the Greenbrier Resort. (*Id.*).

It seems, then, the dispute boils down to this: exactly who is causing this harm? Is it (a): the parties who have chronically failed to pay their debts and honor their obligations, resulting in confessed judgments of hundreds of millions of dollars, which they sought to avoid in court and lost, and which they cannot now pay? Or is it (b): the party who lawfully acquired the Judgments and other rights for $289.5 million and elected to pursue its judgment-creditor remedies in Court?[1]

Defendants' other evidence is quite the mixed bag: self-serving affidavits devoid of citation to financial records or hard data of any kind; three-year old appraisals; technical reports prepared for a non-party concerning properties not at issue here; and a remainder of state-court papers, correspondence, a newspaper article, and a CBT Form 8-K. None bear on the central questions before the Court. And as explained below, WSSH's expert Mark S. Dunec opines that the 2023 appraisals Defendants cite for the value of WSSH's collateral are based on faulty projections that did not come close to materializing.

One last point: Defendants' Opposition speaks most clearly by what it does not say. Defendants do not deny there are confessed judgments against them totaling hundreds of millions of dollars. They do not dispute that a Virginia court rejected their attempts to set aside those

---

[1] Of course, no liability of any kind can flow from the privileged statements WSSH has made to this Court in seeking to enforce the Judgments. *Generally, BriovaRx, LLC v. Johnson*, 13-CV-12049, 2014 WL 12744704, at *2-4 (S.D. W. Va. July 2, 2014).

confessed judgments. They do not dispute that WSSH paid CBT $289.5 million in March for all of the confessed judgments and collateral documents described in the 14th FBA, including the Judgments at issue here. They do not dispute WSSH's recitations of the 14th FBA, including the provisions permitting CBT to sell the Judgments without notice to, or consent of, Defendants. They do not dispute that the forbearance period under the 14th FBA has terminated. They do not specifically dispute that they have failed to comply with multiple provisions of the 14th FBA— there is no declaration that Defendants provided *any* of the required financial information—they just don't recognize WSSH as the holder of rights under the contract. They do not dispute that the Judgments are final and collectible. They do not dispute that they have failed to pay real estate taxes and consumer sales and use taxes to the State of West Virginia. They do not dispute that the Greenbrier Resort is suffering irreparable harm. They do not dispute that this Court has the jurisdiction and authority to decide the issues before it.

Defendants do not dispute that they could end this matter immediately by paying the full amount of their debt and honoring all of their obligations under the 14th FBA. And most importantly, Defendants (finally) do not dispute that they cannot pay, *now*, all outstanding amounts they owe.

WSSH is not some V-C corporate raider here to make a quick buck. If Defendants pay their debts promptly in full, so be it. Everything indicates they cannot. If they don't, WSSH is committed to leveraging its access to considerable experience, resources, and hospitality-industry reputation to restore the Greenbrier Resort to the grandeur and prominence from which it has fallen. For the local community. For West Virginia. And, yes, for the stakeholders. Of which WSSH is the largest.

The current condition of the Greenbrier Resort and Defendants' trademark financial opacity are unacceptable. The Court should grant WSSH's requested receivership and preliminary

injunction—tailored as the Court deems appropriate—to preserve the value and operation of the Greenbrier Resort for WSSH and everyone who depends on and benefits from its successful operation.

## II.   WSSH'S EVIDENCE IN RESPONSE TO THE OPPOSITION

WSSH attaches the following evidence in response to the Opposition to this Reply:

- **Exhibit A** – Declaration of Mark S. Dunec, Senior Managing Director of Corporate Finance & Restructuring for FTI Consulting, Inc.

- **Exhibit A-1** – Expert Report of Mark S. Dunec.

- **Exhibit B** – Declaration of Brian C. Ong, Senior Managing Director of Risk & Investigations for FTI Consulting, Inc.

- **Exhibit B-1** – Expert Report of Brian C. Ong.

Messrs. Dunec and Ong will be available to testify at the June 8, 2026 evidentiary hearing.

## III.   LEGAL ARGUMENT

WSSH breaks its Reply argument into three parts. It begins by addressing the deficiencies in Defendants' evidence. WSSH then sets forth its evidence and explains its significance.  WSSH closes by addressing certain of Defendants' legal arguments and reiterates why a receivership and preliminary injunction are necessary.

**A.   Defendants' Unpersuasive Evidence is Insufficient to Defeat WSSH's Request for a Receivership and Preliminary Injunction.**

Defendants' evidentiary array includes (i) two self-serving declarations of Defendants Messrs. Justice II and III, (ii) four "appraisals" from 2023, (iii) two technical reports regarding coal-mining assets, and (iv) various miscellanea: correspondence, state-court pleadings, a CBT Form 8-K, and two alleged non-disclosure agreements. None of it, alone or together, defeats WSSH's requests.

### 1. The Justices' declarations contain conclusory statements unsupported by admissible evidence.

The declaration of the senior Mr. Justice (dkt. 62-2) is little more than hearsay statements that, even if taken as true, have no impact on these proceedings. Whatever discussions may have happened between Mr. Justice II and representatives of TRT Holdings have no bearing on these proceedings, and there is no allegation that those discussions formed any kind of contract.

The declaration of Mr. Justice III (dkt. 62-3, the "Justice III Decl.") attempts to provide evidence supporting Defendants' financial contentions. Tellingly, though, it does not cite a single piece of admissible evidence or aver that Defendants have complied with the 14th FBA. If Defendants' goal is to establish that the Greenbrier Resort is financially sound, one would expect them to bring forth at least some of the Resort's books and records to support the assertions that, for example:

- "the Greenbrier is profitable and can meet its obligations" (Justice III Decl. ¶ 4);

- "I expect The Greenbrier to remain profitable and able to meet its obligations for the foreseeable future" (*id.*); and

- "Hosting conventions and other large-scale events is one of the main sources of The Greenbrier's business" (*id.* ¶ 7).

Defendants' failure to give WSSH access to the Greenbrier Resort's book and records—as the 14th FBA requires—is one of WSSH's fundamental complaints. (E.g., FAC ¶¶ 54-61; 14th FBA § 7(c) and Sch. 3). Yet Defendants refuse, which is impeding WSSH's efforts to collect on the Judgments and evaluate the Greenbrier Resort's true financial condition. This is ***exactly*** why a receiver is necessary: to evaluate and stabilize the Greenbrier Resort's financial condition. That Defendants have not brought forth this financial information now—facing what they claim is a grievously

6

improper request for relief—raises serious questions about what, exactly, those books and records contain.

As discussed below, WSSH's expert Mr. Ong explains in his report that the information that is available to WSSH demonstrates that Defendants are, in fact, denuding the Greenbrier Resort to the benefit of themselves and their affiliated entities. (Exhibit B-1, at 2 ("During 2017–2024, $204,064,762—equal to *96%* of JFG's operating cash flow—was transferred to related parties outside JFG, including coal mining and agricultural entities unrelated to the Greenbrier Resort.")).[2]

In places, the Justice III Declaration statements are so vague that they are not evidence at all. In support of Defendants' "conspiracy" claim, Mr. Justice III swears that he spoke with a "Source" who worked at an "Investment Firm." (Justice III Decl. ¶¶ 41-45). Yet he never identifies the "Source," the "Investment Firm," the "Source's" role at the "Investment Firm," or any other information that would permit the Court to test the veracity of this second-hand hearsay.

Other portions of the Justice III Declaration directly support WSSH's request for a receiver and injunctive relief. Defendants' claim that WSSH's requested relief is improper because WSSH will suffer no irreparable harm. (E.g., Opp'n at 25, 28-31). But the Justice III Declaration explains exactly why WSSH will suffer significant irreparable harm if Defendants are able to continue to damage and diminish the value, reputation, and goodwill of the Greenbrier Resort. (Justice III Decl. ¶¶ 46-55). WSSH agrees with Mr. Justice III that the Greenbrier Resort "is an iconic resort that has existed for generations" that "has built a reputation for excellence that guests have come to expect." (*Id.* ¶ 46). WSSH agrees that the Greenbrier Resort's "reputation is a significant asset

---

[2] As set forth in Mr. Ong's Report and explained below, "JFG" refers to the Justice Family Group, LLC and its subsidiaries—principally Defendant Greenbrier Hotel Corporation. Greenbrier Hotel Corporation's revenue represents 88% of JFG's total revenue during the years 2017–2024. *Infra,* Section III.B.

and is key to helping The Greenbrier attract guests, corporate clients, and largescale events." (*Id.*). WSSH agrees that the ongoing financial uncertainty and Defendants' failure to pay their debts— which necessitated this action—are "causing significant, ongoing harm to The Greenbrier's business interests, reputation, and customer base." (*See id.* ¶ 47). WSSH agrees that such damage is irreparable. This is exactly what WSSH seeks to prevent.

But WSSH and its judgment-collection efforts are not damaging the Greenbrier Resort. The damage comes from the Defendants' chronic failure to pay their debts. But for that conduct, there would be no need for this action. Defendants have repeatedly breached their payment obligations, ignored and repudiated the Judgments, violated multiple provisions of the 14th FBA, and diverted significant assets away from the Greenbrier Resort. Defendants cannot behave so poorly and then complain that WSSH has the gumption to enforce the 14th FBA and collect on the Judgments.

The remainder of the Justice III Declaration rehashes various out-of-court conversations. (Justice III Decl. ¶¶ 23-40). WSSH disputes Defendants' version of events. But, even if taken as true, these events have no impact on the relief WSSH seeks.

### 2. *Defendants' 2023 appraisals are outdated and rely on inaccurate projections.*

Defendants submit four "appraisals" in support of their Response. These are flawed in many ways. First, it is not clear that the persons who actually conducted the analyses will appear at the evidentiary hearing to present and defend the appraisals. Defendants represent only that "representatives of the firms that conducted these appraisals" will appear. (Opp'n at 15 n.10). That is insufficient—WSSH is entitled to cross examine the actual authors of the appraisals.

Second, the appraisals all date to April 2023. But much has changed in three years. As described below, WSSH's expert Mr. Dunec offers a detailed critique of these appraisals and why

the passage of three years renders them unreliable. For example, Defendants' appraisals rely on *projected* financial data. But ***actual*** data is now available. Mr. Dunec's analysis shows that the actual financial data differs significantly from 2023 projections. As a result, assumed value in the 2023 appraisals was greatly overstated by more than $200 million. *Infra* § B.

### 3. *Defendants' coal-mine "technical reports" are irrelevant.*

Defendants submit two 2025 technical reports related to coal-mine assets. (Dkts. 62-15, 62-16). But Defendants never explain why these documents matter or what they show. It is also unclear whether the authors of the technical reports are available for cross examination. (Opp'n at 15 n.10). Moreover, the reports indicate they were prepared for a non-party entity called Justice Low Seam Mining, Inc., which is odd, because WSSH does not seek a receivership or preliminary injunction over that entity or any coal assets.

### 4. *The two "non-disclosure agreements" have no bearing on this dispute.*

To rehash, Defendants' state-court claims rely on allegations that WSSH breached two so-called non-disclosure agreements (dkts. 62-4, 62-6) by purchasing the Judgments and related collateral documents from CBT. (Opp'n at Ex. 1 ¶¶ 42-62, 90-95, 98-105, 108-13, 117-37, 145-54). Of course, Defendants could have brought those claims here. They instead lodged them in their second-filed action. (WSSH's Resp. to Mot. Stay, dkt. 60, at 7-8).

That said, Defendants attached their state-court amended complaint to the Opposition (dkt. 62-1), together with the two "non-disclosure agreements." If the Court does consider the state-court allegations, WSSH respectfully requests that the Court also consider the counterarguments

WSSH (and other parties) made in its 12(b)(6) motion to dismiss that action.[3] That pleading details why Defendants' allegations lack merit.

### 5. *Defendants' remaining miscellanea of evidence are of no importance.*

Defendants also submit: (i) a Dallas Morning News article (dkt. 62-5); (ii) a CBT Form 8-K (dkt. 62-7); and various correspondence (dkts. 62-8, 62-9, 62-10). All are irrelevant.

## B. WSSH Proffers Significant Evidence Further Bolstering Its Requests.

Exhibit A is the Declaration of Mark S. Dunec, Senior Managing Director of Corporate Finance & Restructuring for FTI Consulting, Inc., which attaches his Expert Report as Exhibit A-1. Mr. Dunec—who co-leads FTI's real estate valuation practice—analyzes the four 2023 appraisals Defendants rely on for their critical position that WSSH's collateral value far exceeds the debt at issue. Mr. Dunec uses the 2023 appraisals methodology and actual, available financial data from 2023 through October 2025 to show that the present value of the Greenbrier Resort is roughly $360 million, not the prospective $597 million value Defendants claim, representing a significant diminution in value. Mr. Dunec's report also includes Appraisal Review Reports for the 2023 appraisals and a 2025 appraisal that Defendants did not bring to the Court. He concludes that the prior analyses are unreliable because the projected final results on which they rely were never achieved.

Exhibit B is the Declaration of Brian C. Ong, Senior Managing Director of Risk & Investigations for FTI Consulting, Inc., with his Expert Report attached as Exhibit B-1. Mr. Ong— a CPA and Certified Fraud Examiner with thirty-nine years of experience—analyzes Defendants' financial condition and assesses their ability to service the outstanding debt and properly maintain

---

[3] WSSH will provide a copy of the Memorandum of Law in Support of Rule 12(b)(6) Motion to Dismiss, filed May 20, 2026, in *Greenbrier Hotel Corp., et al., v. Carter Bank & Trust, et al.*, Case No. CC-12-2026-C-51, pending in the Circuit Court of Greenbrier County, West Virginia, to the Court if requested.

the Greenbrier Resort. Mr. Ong concludes that there are a number of risk factors indicating that Defendants cannot meet their obligations to their creditors or properly maintain the Greenbrier Resort.

Mr. Ong developed his opinions, in part, through analysis of available financial information concerning the Justice Family Group ("JFG"). Mr. Ong explains that JFG is a consolidated entity with multiple subsidiaries. JFG's consolidated organizational structure includes Defendant Greenbrier Hotel Corporation, whose revenue represents 88% of JFG's total revenue during the years 2017–2024.

Based on his analysis, Mr. Ong developed many professional expert opinions regarding JFG's financial condition.  For example, Mr. Ong opines that:

- *Justice Family Group's ("JFG") operating cash flow is insufficient to service the interest accruing on the outstanding judgments listed in the 14th FBA, Schedule 2*: The Judgment Debtors (as defined in the 14th FBA) owe $369,774,473 as of March 1, 2026, with interest accruing at $47,506,643 per year. But the JFG generated only $28,346,093 in operating cash flow in 2024—leaving a shortfall of over $19 million annually even if every dollar of cash flow were devoted solely to interest. Operating cash flow is insufficient to service the interest accruing on the outstanding judgments set out in the 14th FBA (Ex. B-1, § V.a);

- *Nearly all operating cash flow has been diverted to related parties*: During 2017–2024, $204,064,762—equal to *96%* of JFG's operating cash flow—was transferred to related parties outside JFG, including coal mining and agricultural entities unrelated to the Greenbrier Resort. Therefore, Defendants' capacity to satisfy creditor obligations has been undermined by the transfer of cash to enterprises unrelated to the Greenbrier Resort. (*id.* § V.b);

- *Historical capital expenditures are significantly lower than represented in the 2025 GHC appraisal report*: JFG's audited financial statements reflect capital expenditures during 2017–2024 that are over 65% less than the amounts represented in a 2025 appraisal report prepared for GHC. Therefore, GHC's capital expenditures have been significantly lower relative to both historically represented levels as well as what was indicated to be an adequate level going forward, calling into question both the accuracy of prior representations and the ongoing maintenance of the Greenbrier Resort. (*id.* § V.c); and

- *Critical operating obligations remain unsatisfied*: Defendants owe $7,795,628 relating to past-due taxes, $2,533,196 in delinquent health fund contributions, $22,824,845 to vendors, and have repeatedly failed to remit 401(k) participant contributions on time. These

delinquencies indicate probable liquidity constraints and deficient financial controls that pose a significant risk to the continued operation and preservation of the Greenbrier Resort. (*id.* § V.d).

The above points are representative of Mr. Ong's opinions, but his full analysis is set forth in his Expert Report.

**C.  A Receivership and Preliminary Injunction are Appropriate to Preserve the Greenbrier Resort for all Stakeholders.**

WSSH stands on the legal arguments and analysis presented in its Memoranda of Law in Support of Receivership (dkt. 40) and Injunctive Relief (dkt. 42). WSSH briefly responds to some of the arguments in the Opposition here.

*1.  WSSH has not mischaracterized the Justices' past legal travails.*

The Justices' past legal adventures are well known—some have taken place in this Court. (Dkt. 60 at 9-10.) Yet Defendants quibble with WSSH's presentation of certain of their past travails. (Opp'n at 17, bullets 2–3). WSSH's description of the *New London Tobacco* case is accurate. There, Justice-party defendants were sanctioned for discovery abuses, including disobeying a court order to produce financial documents and Mr. Justice III's failure to appear for his deposition. *New Lond. Tobacco Mkt., Inc. v. Ky. Fuel Corp.*, No. 12-cv-00091, ECF Nos. 189, 206 (E.D. Ky. Mar. 25, 2014, Sept. 30, 2014). And in *W. Sur. Co. v. Justice, et al.*, Mr. Justice II was the judgment-debtor (to the tune of $3.271 million), and the judgment creditor garnished assets held by a third party in an attempt to satisfy that debt. No. 23-cv-00524, ECF No. 26 (W.D. Va. Jan. 28, 2025).

*2.  West Virginia Law is an alternative basis for appointing a receiver.*

Defendants argue West Virginia law cannot be an independent basis for receivership. (Opp'n at 11 n.8) This footnote argument ignores the necessary *Erie* analysis: state statutes cannot restrict a federal court's authority to exercise jurisdiction. *Wong v. Minn. Dep't of Human Servs.*,

820 F.3d 922, 931 (8th Cir. 2015) (citing *Duchek v. Jacobi*, 646 F.2d 415, 419 (9th Cir.1981)). If the right to a receiver is a matter of state substantive law, then it is available in a diversity action. *See Mintzer v. Arthur L. Wright & Co.*, 263 F.2d 823, 825 (3d Cir. 1959).

Moreover, the Third Circuit explained that one of the cases Defendants cite—*Pusey & Jones Co. v. Hanssen*, 261 U.S. 491 (1923)—has been "vitiated by the implications of Erie" and courts should view "equitable remedial rights" including receivership as "substantive rights." *Id.* at 825. Defendants concede West Virginia statutes support receiverships in state court. (Opp'n at 11 n.8). Thus, there is "no bar to the appointment of a receiver if the law of [West Virginia] would grant the appointment." 263 F.2d at 825.

> **3.** **The value of the Greenbrier is needlessly dwindling, and that harm is irreparable and leaves WSSH without adequate legal remedies.**

WSSH's experts establish that Defendants' appraisals are unreliable, the value of the Greenbrier Resort is diminishing, and the Justices are denuding it of assets. Mr. Justice III's declaration alone carries WSSH's burden of irreparable harm. (Justice III Decl. ¶¶ 46-50.)

> **4.** **Defendants' authorities on the receivership factors are not applicable here.**

Defendants ignore the evidence included in WSSH's opening brief and rely on distinguishable case law. First, Defendants' authorities on the second equitable factor miss the mark. (Opp'n at 15). In *Wells Fargo Bank, N.A. v. Premier Hotels Group, LLC*, No. 3:14-CV-56, 2015 WL 404549, at *10 (M.D. Pa. Jan. 29, 2015), the court specifically noted that the movant offered no evidence of the opposing party's financial status. In *Private Fin. Alternatives, LLC v. Walloon Lake Holdings, LLC*, No. 1:25-CV-165, 2025 WL 3290636, at *6 (W.D. Mich. Nov. 26, 2025), the movant did not "meaningfully address" the equitable factors. By contrast, WSSH has offered significant evidence regarding Defendants' financial issues and explained how these issues impact the Greenbrier Resort. (E.g., dkt. 40 at 2-3).

Second, Defendants' reliance on cited authorities for factors five and six also fails. (Opp'n at 20-22). For example, in *Manuel v. Gembala*, a mere $895.00 of actual damages were alleged in support of receivership. No. 7:10-CV-4-FL, 2010 WL 3860407, at *7 (E.D.N.C. Sept. 30, 2010). These negligible damages stand in stark contrast to the massive sums secured by the Greenbrier Resort. Defendants also rely on *Wilmington Trust* and *FirstMerit Bank*, neither of which involved allegations of mismanagement. *Wilmington Tr., Nat'l Ass'n v. Homes4Families, LLC*, No. 1:19-CV-01896, 2019 WL 5787985, at *4 (D. Md. Nov. 6, 2019) ("There are no allegations that any of the other properties are being mismanaged"); *FirstMerit Bank, N.A. v. Myrter*, No. 2:15-CV-333, 2015 WL 3916673, at *7 (W.D. Pa. June 25, 2015) ("There have been absolutely no facts alleged regarding waste, fraud, or imminent danger of diminished value."). Similarly, in *BMW of N. Am., LLC v. CJM Auto. II, LLC*, No. 1:17CV2688, 2018 WL 3242304, at *2 (N.D. Ohio Apr. 26, 2018), the court specifically noted that there was "no allegation of fraudulent conduct." 2018 WL 3242304, at *2 ("appointment of a receiver over a solvent company is only justified to prevent fraud") (quotations and citations omitted). In contrast, WSSH offers significant evidence of the Defendants' debts and diversion of revenue from the Greenbrier Resort to other unrelated businesses and public records showing Defendants' fraudulent conduct. (E.g., dkt. 40 at 7-8).

5.   ***The appropriate "last uncontested status" is not the weeks preceding this action, but instead the time before Defendants began breaching the 14th FBA and stripping the Greenbrier Resort of its value.***

Defendants try to define the "last uncontested status" in their favor, arguing it is when they (in breach of the 14th FBA) "operated The Greenbrier free from WSSH's supervision, oversight, and operational control." This is not so.

First, the 14th FBA grants WSSH significant financial oversight into the operation of the Greenbrier Resort, among many other rights. (E.g., 14th FBA, § 7(c) and Sch. 3). Defendants'

14

chronic disregard of their financial reporting and oversight obligations does not create a new status quo. If it did, all defendants facing the prospect of injunctive relief would be incentivized to behave as badly as possible to establish a favorable new "status quo" in the period leading up to the injunction hearing. *Varsames v. Palazzolo*, 96 F. Supp. 2d 361, 367 (S.D.N.Y. 2000) ("The Second Circuit has observed that a preliminary injunction that requires the parties to do more than is required by their contract agreement 'arguably alters the status quo.' *Tom Doherty Assocs. Inc. v. Saban Enter., Inc.*, 60 F.3d 27, 35 (2d Cir.1995). However, an order that seeks to restore the parties as best as possible to their positions prior to injury already inflicted by the defendant may be deemed an order directed at preserving the status quo."); *Commure, Inc. v. Canopy Works, Inc.*, 792 F. Supp. 3d 971, 982 (N.D. Cal. 2025) ("Canopy asks the Court to revert to the status quo – prior to the breach of contract – while the ultimate determination of the merits of the parties' respective positions remains pending. Requiring Commure to comply with the terms of a valid, enforceable contract while the action proceeds is not a substantial burden. *See Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016) (finding balance of hardships tips in favor of plaintiff seeking an injunction when it would merely require defendant to comply with provisions of an existing agreement)."); *Steves and Sons, Inc. v. JEN-WEN, Inc.*, 612 F. Supp. 3d 563, 581 (E.D. Va. 2020) (injunction requiring party to comply with existing agreement was prohibitory, notwithstanding that it required the enjoined party to take action).

Second, Defendants ignore the entire crux of the need for the requested relief: to stop Defendants from diverting money out of the Greenbrier Resort while allowing it to incur additional liabilities (such as tax liens) with increasing frequency. Thus, the last uncontested time is the period before Defendants decided to stop paying vendors, 401k contributions, and employee and health plans. Before Defendants began siphoning off the Greenbrier Resort's revenues and allowing the

Greenbrier Resort to fall into disrepair. Before Defendants repeatedly breached their contractual obligations. And, most importantly, before Defendants became systematically incapable of regularly paying their debts.

In short, WSSH's requested preliminary injunction seeks to restore the status quo to what it was before Defendants' contractual breaches, waste, fraud, and abuse of the Greenbrier Resort. To do otherwise would reward Defendants' lawlessness.

**D.     Defendants Ignore the Independent Nature of a Receiver.**

Defendants repeatedly complain that a receiver will undoubtedly turn around and sell the Greenbrier Resort to WSSH. (Opp'n at 21 ("By appointing a receiver, the Court would seize West Virginia's most iconic property from its rightful owners and place it under the control of a receiver with broad discretion to operate and sell it."), 9 ("immediate appointment of a receiver to 'take full control' of The Greenbrier and related properties and . . . potentially sell them"), 35 ("WSSH's brazen attempt to seize The Greenbrier via receivership")). Nonsense. Any receiver will answer to the Court, not WSSH. *First United Bank & Tr. v. Square at Falling Run, LLC*, No. 1:11-CV-31, 2011 WL 1563108, at \*8 (N.D.W. Va. Mar. 31, 2011) ("The receiver's role, and the district court's purpose in the appointment, is to safeguard the disputed assets, administer the property as suitable, and to assist the district court in achieving a final, equitable distribution of the assets if necessary. As an officer of the court, the receiver's powers are coextensive with his order of appointment.") (internal citations omitted).

A receiver here will do exactly what Defendants acknowledge must be done to preserve the value and reputation of the Greenbrier Resort: quickly bring stability and financial transparency to its operations while the parties work to resolve their dispute peaceably in the courts.

16

## IV. CONCLUSION

WSSH respectfully requests that this Court grant its motions for the appointment of a receiver and injunctive relief.

Respectfully submitted,

**WHITE SULPHUR SPRINGS HOLDINGS, LLC**

By counsel,

*/s/ Seth P. Hayes*

Seth P. Hayes, Esq. (WVSB #10381)
Zachary H. Warder, Esq. (WVSB #13566)
JACKSON KELLY PLLC
3000 Swiss Pine Way, Suite 200
P.O. Box 619
Morgantown, WV 26501
shayes@jacksonkelly.com
zachary.warder@jacksonkelly.com

and

Ellen Cappellanti, Esq. (WVSB #627)
Albert F. Sebok, Esq. (WVSB #4722)
Elizabeth B. Elmore (WVSB #6061)
JACKSON KELLY PLLC
500 Lee Street East, Suite 1600
P.O. Box 553
Charleston, WV 25301-3202
ecappellanti@jacksonkelly.com
asebok@jacksonkelly.com

WHITE SULPHUR SPRINGS HOLDINGS, LLC )
a Texas Limited Liability Company, )
                                   )
           Plaintiff, )
                                   )
v. )           Case No. 5:26-cv-00257
                                   )           The Honorable Frank W. Volk
JAMES C. JUSTICE, II, Individually; )
CATHY L. JUSTICE, Individually; )
JAMES C. JUSTICE, III, Individually; )
GREENBRIER HOTEL CORPORATION, )
a West Virginia Corporation; )
GREENBRIER MEDICAL INSTITUTE, LLC, )
a West Virginia Limited Liability Company; )
OAKHURST CLUB, LLC, )
a West Virginia Limited Liability Company; )
GREENBRIER GOLF AND TENNIS )
CLUB CORPORATION, )
a West Virginia Corporation; )
GREENBRIER LEGACY COTTAGE )
DEVELOPMENT COMPANY I, Inc., )
a West Virginia Corporation; )
GREENBRIER LEGACY COTTAGE )
DEVELOPMENT II, Inc., )
a West Virginia Corporation. )
                                   )
           Defendants. )

## CERTIFICATE OF SERVICE

I, Seth P. Hayes, certify that on the 29th day of May, 2026, the foregoing PLAINTIFF'S COMBINED REPLY BRIEF IN SUPPORT OF ITS MOTIONS FOR APPOINTMENT OF A RECEIVER AND PRELIMINARY INJUNCTION was filed using the Court's CM/ECF system. Counsel of record will be served by the Court's CM/ECF system as follows:

Steven R. Ruby, Esquire
Raymond S. Franks II, Esquire
David R. Pogue, Esquire
CAREY DOUGLAS KESSLER & RUBY PLLC
901 Chase Tower, 707 Virginia Street, East
P.O. Box 913
Charleston, WV 25323
sruby@cdkrlaw.com
rfranks@cdkrlaw.com
drpogue@cdkrlaw.com

H. Rodgin Cohen, Esquire
Robert L. Jones IV, Esquire
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
cohenhr@sullcrom.com
jonesrob@sullcrom.com

Amanda Flug Davidoff, Esquire
Oliver W. Engebretson-Schooley, Esquire
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Suite 700
Washington, D.C. 20006
Telephone: (202) 956-7500
davidoffa@sullcrom.com
engebretsono@sullcrom.com

/s/ *Seth P. Hayes*
Seth P. Hayes, Esq. (WVSB # 1031)